# UNITED STATES DISTRICT COURT

## DISTRICT OF KANSAS

| | |
|---|---|
| BRYANT HOLDINGS LLC, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. 11-CV-2072 KHV/JPO |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| vs. | JURY TRIAL DEMANDED |
| YRC WORLDWIDE INC., WILLIAM D. ZOLLARS, SHEILA K. TAYLOR, MICHAEL SMID, TIMOTHY A. WICKS, and STEPHEN L. BRUFFET, | |
| Defendants. | |

## NATURE OF THE ACTION

1.　　This is a federal securities class action on behalf of purchasers of the common stock of YRC Worldwide Inc. ("YRC" or the "Company") between April 24, 2008, and November 2, 2009, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.　　The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

3.　　This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.　　Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b).  YRC maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

5.　　In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.　　Plaintiff Bryant Holdings LLC, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of YRC during the Class Period, as set forth in their certification, which is attached hereto and incorporated herein by reference, and has been damaged thereby.

7.     Defendant YRC provides various transportation services worldwide.  The Company's YRC National Transportation unit offers a range of services for the transportation of industrial, commercial, and retail goods, serving manufacturing, wholesale, retail, and government customers.

8.     Defendant William D. Zollars ("Zollars") served as YRC's Chairman of the Board of Directors, Chief Executive Officer ("CEO") and President of the Company during the Class Period.

9.     Defendant Stephen L. Bruffett ("Bruffett") served as YRC's Chief Financial Officer and Executive Vice President of the Company (from September 2007 until October 2008) during the Class Period.

10.     Defendant Sheila K. Taylor ("Taylor") served as YRC's Chief Financial Officer and Executive Vice President of the Company (beginning October 2009) during the Class Period.

11.     Defendant Timothy A. Wicks ("Wicks") served as YRC's Chief Financial Officer ("CFO") and Executive Vice President of the Company (October 2008-October 2009), President and Chief Operating Officer (beginning October 2009), and was a Senior Vice President of the Company prior to becoming CFO during the Class Period.

12.     Defendant Michael Smid ("Smid") served as YRC's Operations Officer of the Company and President of YRC during the Class Period.  As President of YRC National Transportation, defendant Smid led the integration of Yellow Transportation and Roadway and was responsible for all functions of YRC.  At all relevant times, defendant Smid reported directly to defendant Zollars.

13.     The defendants referenced above in ¶¶8-12 are referred to herein as the "Individual Defendants."

14.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of YRC's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*,

- 2 -

the market.  They were provided with copies of the Company's reports and press releases, alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

15.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of YRC common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (a) deceived the investing public regarding YRC's business, operations, management and the intrinsic value of YRC common stock; (b) enabled defendants to artificially inflate the price of YRC shares; and (c) caused plaintiff and other members of the Class to purchase YRC common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased the common stock of YRC between April 24, 2008, and November 2, 2009, inclusive (the "Class") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, YRC common shares were actively traded on the

NASDAQ National Market ("NASDAQ").  As of April 30, 2009, the Company had over 59.44 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by YRC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of YRC ; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

22.     Defendant YRC provides various transportation services worldwide.  The Company's YRC National Transportation unit offers a range of services for the transportation of industrial, commercial, and retail goods, serving manufacturing, wholesale, retail, and government customers.

23.     The Class Period begins on April 24, 2008.  On that date, YRC issued a press release announcing its financial results for the first quarter of 2008, the period ended March 31, 2008.  For the quarter, the Company reported a loss of ($0.81) per share.  Defendant Zollars commented on the announcement, stating, in pertinent part, as follows:

> The soft economy, severe winter weather and record fuel prices created a very difficult operating environment in the first quarter.  With that said, we have taken a number of actions that address the areas within our control and we are seeing benefits from those efforts.  Despite the macroeconomic challenges that we are facing, we believe that we have turned the corner and expect meaningful earnings improvement starting with the current quarter.
>
> *        *        *
>
> Given our solid action plans and the momentum that is underway, we are excited about the future of YRC and what we can do for our customers, employees and investors.

The press release also represented that YRC expected to earn between $0.30 and $0.40 per share in the second quarter of 2008, stating, in pertinent part, as follows:

> Although the practice of providing earnings guidance was suspended in 2007, due in great part to uncertainty in the economy, which remains difficult to predict, the company determined that investors should be provided with additional near-term clarity regarding the anticipated performance of YRCW.  Based upon the internal actions the company has already implemented, including securing a more competitive labor contract, renewing its credit agreement, and making footprint changes at YRC Regional Transportation, YRCW expects to earn between $.30 and $.40 per share in the second quarter, which ends June 30, 2008.

24.     On April 25, 2008, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, defendants made numerous positive statements about the Company, its business and operations.

25.     On June 18, 2008, YRC and its representatives appeared at the Merrill Lynch Transportation Conference.  During the conference, defendants made numerous positive statements about the Company, its business and operations.

26.     On July 24, 2008, YRC issued a press release announcing its financial results for the second quarter of 2008, the period ended June 30, 2008.  For the quarter, the Company reported diluted earnings per share of $0.62.  Defendant Zollars commented on the announcement, stating, in pertinent part, as follows:

> In spite of a challenging economy, our positive momentum continued in the quarter and we significantly improved our sequential results, delivering earnings consistent with previously issued guidance for the quarter.  Our actions to improve operational efficiency, get our regional companies back on track and reduce overhead costs have been effective.  We are carrying that momentum forward as we implement further operational improvements in the third quarter.
>
> *       *       *
>
> We are encouraged by our progress and are optimistic about continued improvement in our performance.

The press release provided positive forward guidance, stating, in pertinent part, as follows:

> The company expects to earn between $1.05 and $1.15 per share in the third quarter 2008.  These results will include a curtailment gain of approximately $.70 per share and increased union health and pension costs of approximately $.15 per share attributable to contractual increases that take effect on August 1.  The company expects to offset these cost increases with operational efficiencies by year end 2008.  The curtailment gains that were recognized in the second quarter and will be recognized in the third quarter of 2008 are related to the harmonization of retirement plans across the company for non-contractual employees.

27.     On July 25, 2008, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, defendants made numerous positive statements about the Company, its business and operations.

28.     On September 8, 2008, YRC issued a press release announcing that the Company had

"Accelerate[ed its] Integration Strategy and that it had already taken "Actions… to Improve Revenue

Growth and Operating Income." The press release positively described the "strategy" and provided

positive earnings guidance, stating, in pertinent part, as follows:

> With today's announcement, the companies are taking steps to bring together the local sales teams and offer a comprehensive portfolio of services through one operating network. The Yellow Transportation and Roadway brands will remain in the marketplace represented by a combined sales force of over 1,000 account executives. The integration will occur in phases to ensure service continuity to customers and provide a seamless transition to employees. By operating one national network, the company expects to significantly increase its network density resulting in lower fixed costs and enhanced service performance to its customers. The effort is expected to extend through 2009 with a run-rate annual operating income improvement in excess of $200 million.

> *       *       *

> The company expects to report a solid profit in the third quarter 2008 due to the curtailment gain of approximately $.70 per share related to the harmonization of its retirement plans for nonunion employees. However, as a result of the further weakness in the economy and some early investments in the integration of the national networks, the company now expects a slight loss from core operations in the third quarter. The company also expects to incur reorganization costs of about $.06 to $.08 per share primarily related to employee severance.

> YRC Worldwide expects to remain in full compliance with all terms of its credit agreement and to have borrowing capacity in excess of $600 million.

Defendant Zollars commented on the announcement, stating, in pertinent part, as follows:

> Given the positive customer response from our recent combination of the corporate sales teams and the increasingly dynamic operating environment, we believe now is the right time to take such significant action. The economic downturn has created the capacity in our networks needed to effectively integrate our operations, while improving service reliability and speed. By offering a comprehensive service portfolio through one unified network, we can more effectively serve our customers and simplify their experience.

> *       *       *

> The economy has softened further impacting both volume levels and pricing across our operating companies. After a solid second quarter, the third quarter started slowly and has progressively weakened. Our earnings have also been impacted by early investments in combining our national companies. We do not see signs of the

economy improving in the near term, but as we merge Yellow and Roadway, we expect operating results to show meaningful improvement.

29.     On October 7, 2008, YRC issued a press release announcing that the Company had "Reaffirm[ed the] Financial Condition" of the Company.  The press release, stated, in pertinent part, as follows:

> YRC Worldwide Inc. . . . today reaffirmed that it expects to have positive free cash flow in both the third and fourth quarters of 2008 with a significant debt reduction for the year.  In addition, the company expects to remain in full compliance with all terms of its credit agreement, including the leverage ratio.
>
> "With more than $9 billion in annual revenue and comprehensive networks in the national and regional markets, we continue to provide excellent service to our customers each and every day," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide.  "Despite the continuing unrest in the broad financial markets, our current financial position is solid and we remain well positioned to weather this economic environment."

30.     On October 23, 2008, YRC issued a press release announcing its financial results for the third quarter of 2008, the period ended September 30, 2008.  For the quarter, the Company reported diluted earnings per share of $0.63.  Defendant Zollars commented on the results, stating, in pertinent part, as follows:

> Throughout the third quarter, the operating environment progressively weakened resulting in lower than expected volumes and more competitive pricing.  Although the economy slowed more than we expected during the quarter, we still generated solid free cash flow and paid down debt, in addition to removing significant cost from our business.
>
> *       *       *
>
> We are focused on adapting to weaker economic conditions while still providing quality service to our customers.  Although improved efficiencies and enhanced service are the key drivers of the Yellow and Roadway integration, the expected cash flows from additional facility sales and further reducing capital expenditures are incremental benefits that should significantly improve our liquidity. We also remain confident in our ability to deliver a run rate of at least $200 million of operating income improvement by the end of 2009 from the integration.
>
> *       *       *

We plan to generate a healthy amount of cash flow in the fourth quarter and further strengthen our balance sheet by year end.  With our current action plans, we expect to maintain a leverage ratio below 3.5 times.

31.     On October 24, 2008, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, defendants made numerous positive statements about the Company, its business and operations.

32.     Consistent with the Company's efforts to rationalize its costs and expenses in line with its revised revenue and earnings guidance, on October 29, 2008, YRC issued a press release announcing that it had eliminated 3,750 jobs at the Company's various units.  That day, Reuters reported that this was part of the Company's "ongoing efforts to revamp operations." According to the news accounts, the job cuts consisted of dock workers and truck drivers at its Roadway and Yellow Transportation units, representing roughly 6 percent of YRC's total work force of 58,000. Reuters also reported that these personnel reductions followed the Company taking a $782 million goodwill charge, taken earlier in 2008, to reflect the lower fair value of regional unit USF Corp, which YRC bought in 2005, and Roadway, which the largest U.S. truck maker bought in 2003. Finally, Reuters noted that while analysts have questioned whether in a prolonged downturn the Company would be able to pay down its debt and maintain cash flow, the "Company says that it will be able to do both." As further evidence of this, the Reuters report also quoted defendant Zollars as stating, "I think what's happened is that people are trying to create a story where there is no story… In normal times people wouldn't pay attention."

33.     On October 29, 2008, in an effort to reassure the investing community of the financial strength and viability of the Company, defendant Zollars published a letter that stated, in pertinent part, as follows:

YRCW Financial Update from CEO William D. Zollars

You have likely heard or read statements recently about the overall financial health of YRC Worldwide – commentary generated by media, analysts and others.  Given

- 9 -

the noise level and likelihood for speculation and misinterpretation, I would like to set the record straight by addressing the facts head on.

We've put a number of measures in place over the past year to strengthen our balance sheet and take full advantage of our network assets in the marketplace – actions that will enable us to position future service enhancements and position our business for long-term growth.

So here are the facts:

**We are in compliance with our bank debt covenants**

At September 30, 2008, our leverage ratio was 3.18 times our Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) from the last twelve months, *well within the 3.75 covenant level cap*.  This ratio was comprised of $1.19 billion of debt and trailing 12-month EBITDA of $373 million.

At December 31, 2008, and going forward, our leverage ratio cap will be lowered to 3.5 times EBITDA, and we expect our actual ratio to be within that limit.  We are complying with our debt covenants, and we continue to pursue additional measures to further reduce our debt.

**We have ample liquidity; positive cash flow**

In addition to complying with our debt covenants, YRC Worldwide has ample liquidity under its current financial arrangements.  We also generated $52.2 million of cash from operating activities during the third quarter and, when taking into account the $40.4 million of cash inflow from net capital expenditures, third quarter free cash flow was significant at $92.6 million.  We expect to have positive cash flow in the fourth quarter as well.

**We are paying down debt; improving leverage**

Much of the current confusion and speculation about our financial condition stems from a series of recent actions we've taken to pay down debt and strengthen our balance sheet, specifically:

- On October 2, we drew $325 million on our revolving credit facility to pay off two outstanding notes with upcoming maturities.  In doing so, we reduced our interest expense because the notes carried a higher rate than the credit facility.  We believe this was a prudent move given the unrest in the broader credit markets.  This measure also satisfies all of our significant maturities through March 2010.

- On October 9, we issued 1.7 million shares of common stock in exchange for $13.2 million of our outstanding notes.  This action improves our financial leverage by reducing our total debt by $13.2 million and increasing our pre-tax earnings through a one-time gain of $5.3 million

- Finally, on October 23, we drew $250 million on our revolving credit facility and intend to primarily use these funds to opportunistically retire other debt or for general working capital needs.

Reducing debt and improving liquidity is not a new concept for us or many other large U.S. companies. Several large firms have taken similar actions by drawing on their revolving credit facilities as well.

Debt on our books at the end of 2007 was less than it was in 2006 and the trend continues in 2008. Even with our August acquisition of Shanghai Jiayu Logistics, we reduced our balance sheet debt from June 2008 by $11 million, and we expect to significantly reduce debt in the fourth quarter.

**We are prepared should credit ratings further decline**

As you well know, the combination of a weakening economy and the unrest in the credit markets has negatively impacted all financial markets on a historic level. Unfortunately, YRC Worldwide credit ratings and stock performance have been no exception. As I stated previously, the noise created by a lack of understanding of our recent actions to pay down debt have amplified this impact.

That said, we can't control the economy any more than we can control speculation, so we are better positioning ourselves from a balance sheet perspective and continuing to monitor the financial markets for opportunities to further optimize our capital structure. At the same time, we're staying keenly focused on customer satisfaction.

**We are conducting our annual impairment testing**

Before I outline some of the ways we continue to look ahead, I'd like to briefly note the impairment test that we're currently conducting. Due to the recent decline in our stock price, we're required to accelerate our annual impairment review of our intangible assets, reassessing the value of our brand names and goodwill charges associated with our acquisitions. At this time, we do not have the test completed but we expect it to be final before filing our 10-Q in early November.

*The most important item of note is this*: If we do record an impairment charge, remember that it is a non-cash charge that does not impact our financial condition and will be excluded from our bank leverage ratio calculation.

**We're integrating, seizing every opportunity to strengthen**

As we look ahead, we believe our biggest opportunity to enhance service and improve efficiencies is the accelerated integration of Yellow and Roadway, and we're in the process of combining the operational networks and the local sales teams of these two brands.

- 11 -

We're pleased that our valued customers and our employees are supportive.  We're also pleased with the collaboration and support of our Teamsters leadership in these efforts.

In the midst of the Yellow and Roadway network integration, we continue to evaluate additional opportunities to reduce debt, including: additional proceeds from the sales of excess facilities; evaluation of potential sale/leaseback real estate opportunities; and generation of cash from working capital.

In closing, I want to assure you that we are confident about the things we can control and our ability to weather the things we cannot.  Most importantly, we remain focused on providing exceptional service to our customers.

Thank you for your continued support and business.

Regards,
William D. Zollars
Chairman, President and CEO
YRC Worldwide

[Emphasis in original.]

34.     On November 17, 2008, YRC issued a press release which reaffirmed the Company's

financial position, stating, in pertinent part, as follows:

"In this time of unprecedented economic challenges, our industry needs to focus on continually improving our efficiency and effectiveness," Zollars said.  "YRC Worldwide is building on more than 80 years of success. We have an opportunity to improve our performance even in today's economy.  That's why we're taking long-ranging actions which improve our ability to effectively, reliably and quickly serve our customers' supply chain needs today, and in the future."

Zollars said the national integration for Yellow Transportation and Roadway is progressing ahead of schedule.  The network integration is part of the company's aggressive program to improve operations and solidify its financial position.  Other actions include:

Strategic financial and cost moves to solidify profitability

Strategic global growth

*          *          *

"With the support from our customers and the collaboration of the Teamsters, our national integration is going even better than we originally anticipated with more than 60 facilities either consolidated or in the process of consolidation.  Based on this success, we continue to evaluate our initial timeline and expect that it may be further accelerated," said Zollars.

- 12 -

One goal of the integration of the Yellow and Roadway networks is to lay the groundwork for expanded service capabilities. The consolidated facilities provide enhanced local pick-up and delivery services for both Roadway and Yellow customers.

"Integrating our network enables us to provide unparalleled benefits to customers," said Mike Smid, President and CEO of the YRC Worldwide North American Transportation division. "The integrated network builds shipment densities, allowing us to expand service offerings, improve reliability and serve more direct points."

The network and operational integration reflects the company's philosophy of focusing on the future, while meeting the needs of customers today.

35.     On December 24, 2008, YRC issued a press release announcing that the Company was pursuing a "long-term solution" to improve the Company's financial position. The press release, stated, in pertinent part, as follows:

YRC Worldwide Pursues Long-Term Solution to Improve Financial Condition

Cancels Tender Offer and Evaluates Better Opportunities with its Banks

National Integration to be Complete by Early Spring 2009

OVERLAND PARK, Kan., Dec 24, 2008 /PRNewswire-FirstCall via COMTEX News Network/ -- YRC Worldwide Inc. (Nasdaq: YRCW) today announced that it is in discussions with its banking group to modify certain terms of its credit facilities that would enhance the company's financial flexibility including changes to its leverage ratio. The company's credit agreement defines the leverage ratio generally to be total debt to earnings before interest, taxes, depreciation and amortization. The company has targeted late January 2009 to conclude its discussions with its banks on an amendment. As a result of the discussions, YRC expects to remain in compliance with its covenants in its credit facilities (including any minimum leverage ratio requirement) at year end. In addition, the company has terminated its tender offer that expired at midnight on December 23, 2008 since the proposed wage reduction amendment to the National Master Freight Agreement, which was a condition of the tender offer, has not yet been ratified. The company currently expects the union amendment to be ratified around year end 2008.

"Given the economic uncertainty, we believe it is more productive to pursue a revised arrangement with our banks as an alternative to completing the tender offer," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "We continue to have good relationships with our banking group and are confident that we can work out a mutual agreement that provides flexibility in our leverage ratio while improving our liquidity position."

The company currently has over $250 million of cash and expects to generate additional cash from sale and leaseback transactions and proceeds from sales of

excess facilities, while notably reducing its 2009 equipment purchases due to the integration of its national companies.  When combining these actions together with the planned wage reductions for all YRC employees, the company expects to have sufficient liquidity to effectively implement its operating strategy well into the future.

The press release also made numerous representations concerning the integration of Yellow Transportation and Roadway, stating, in pertinent part, as follows:

National Integration Update

As announced previously, the company is in the process of integrating the operations and local sales teams of its two largest brands, Yellow Transportation and Roadway. YRC expects to have around 80 facilities either consolidated or in the process of consolidation by the end of 2008.  Due to the early success of the integration, the company has reevaluated the timeline and now expects the integration to be mostly complete by early spring 2009 with around 450 consolidated operations.

"We have the most experienced and dedicated employees in the industry and they continue to exceed our expectations in integrating two large and comprehensive networks," said Zollars.  "Based on this positive momentum, we are confident in further accelerating our timeline that will allow us to significantly improve density and enhance the value we provide to our customers even sooner."

Finally, the press release contained a purported update of the Company's financial and operational condition, stating, in pertinent part, as follows:

Fourth Quarter 2008 Update

"Consistent with other industry reports, the economic recession continues to put pressure on our volumes and pricing," commented Zollars.  "With that said, the gap between our volume trends and others within the less-than-truckload market appears to be narrowing as we further enhance our networks and improve our financial position."

Key volume statistics for the fourth quarter-to-date as of November 30, 2008 compared to the same period in 2007 include:

--      YRC National Transportation total tonnage per day down 11.8%

--      YRC Regional Transportation total tonnage per day down about 11% when adjusting for the network changes in the first quarter 2008.  Total tonnage per day is down 20.9% without adjusting for the network changes.

36.     On January 29, 2009, YRC issued a press release announcing the Company's financial results for the fourth quarter and full year 2008, the periods ended December 31, 2008. Defendant Zollars commented on the results, stating, in pertinent part, as follows:

> Our results reflect the significance of the economic recession that has been longer and deeper than anyone anticipated.  Although we were not pleased with this level of performance, it was consistent with our internal expectations and those of our banking group.  The discussions with the banks are progressing well, and we are on track to finalize an amendment by mid- February.

> *       *       *

> Even in this economic environment, we generated a significant amount of cash and we have multiple initiatives in place that can further improve liquidity.   We recognized $128 million of asset proceeds in 2008 and we expect to generate more than $250 million in 2009 from a combination of sale and financing leaseback transactions and sales of excess facilities.

> *       *       *

> Outlook

> Although we cannot control or even predict the economy, we have considerable opportunities to improve our financial position while enhancing service to our customers. . . The network integration at YRC is now on track to deliver a run-rate of $200 million of operating income improvement by early in the fourth quarter of 2009.  Combining this with the employee wage reductions of around $300 million, we expect to improve our results by more than half a billion dollars going into 2010.

37.     On January 30, 2009, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, defendants made numerous positive statements about the Company, its business and operations.

38.     Also on January 30, 2009, YRC issued another press release announcing that the Company was sufficiently well-financed to operate according to plan, following the sale of certain assets to third party, NATMI Truck Terminals, LLC ("NATMI").  The press release, stated, in pertinent part, as follows:

> YRC Worldwide Completes First Phase of Financing Transaction

> -       Receives $101 Million of Cash Proceeds

OVERLAND PARK, Kan., Jan 30, 2009 /PRNewswire-FirstCall via COMTEX/ -- YRC Worldwide Inc. (Nasdaq: YRCW) announced today that it has closed the first part of the sale and financing leaseback transaction from a contract with NATMI Truck Terminals, LLC ("NATMI") entered on December 19, 2008.  The company received approximately $101 million of proceeds today and expects to receive approximately $50 million more in the second closing.  Details of the transaction were provided in a Current Report on Form 8-K filed with the Securities and Exchange Commission ("SEC") on December 24, 2008.

*     *     *

In the company's waivers filed with the SEC on January 22, 2009, it stated that it now has the ability to use the proceeds from this transaction for operating purposes, which is the company's current intention.  The company will account for the proceeds as a financing transaction, therefore, the assets remain on the books and a lease obligation will be recorded as long-term debt.  The company will recognize the lease payments through interest expense with no impact to depreciation expense.

*     *     *

"This is one of many significant steps in the initiatives to improve our liquidity," stated Tim Wicks, Executive Vice President and CFO of YRC Worldwide.  "We are pleased with our strong working relationship with NATMI and how quickly we have been able to complete this first step.  We remain encouraged by our progress on the next phases.  These transactions are a key component of the discussions with our banks, which remain very productive."

39.     On February 20, 2009, YRC issued a press release concerning the Company's

financial position.  The press release, stated, in pertinent part, as follows:

*     S&P Revises CreditWatch to Positive

*     Company Signs Another Sale and Leaseback for $122 Million

OVERLAND PARK, Kan., Feb. 20 /PRNewswire-FirstCall/ -- YRC Worldwide Inc. (Nasdaq: YRCW) announced today that after its recently finalized bank amendment, a positive step was taken by one of the lead credit agencies.  In addition, the company finalized additional sale and financing leaseback agreements with another investor.

Earlier this week, Standard & Poor's (S&P) revised the implications of its CreditWatch review on the company to positive from developing.  Given the company's new bank amendment, S&P stated it could raise the company's ratings after further evaluation.

"We appreciate S&P's initial perspective of our bank amendment and their willingness to evaluate its positive liquidity aspects," stated Tim Wicks, Executive Vice President and CFO of YRC Worldwide.

In addition, the company's operating subsidiaries signed agreements with Estes Express Lines ("Estes") to sell and simultaneously lease back certain facilities. The aggregate sale price is approximately $122 million and the property sales are intended to close from March through June 2009. The initial lease term for each facility is ten years, with two, ten-year renewal options to extend the term of each lease by up to an additional 20 years. The company will have a right of first offer if Estes decides to sell a facility during the first 36 months.

"We are pleased that we finalized another significant component of our liquidity initiatives," stated Wicks. "It is common practice in our industry to lease facilities from other industry providers, and in fact, we presently lease other facilities from Estes and they lease from us. This is a continuation of that relationship. We continue to have additional opportunities in this area with other investors and recent improvements in this particular market have made them even more attractive."

40.     On March 2, 2009, YRC issued a press release announcing that the Company had completed the successful Integration of National Networks. Defendants Zollars and Smid commented on the announcement, stating, in pertinent part, as follows:

"This is a game-changing event for our company and the transportation industry," said Bill Zollars, chairman, president and CEO of YRC Worldwide. "By going to market as YRC, we're making it easier for customers to do business with the industry leader - and harder for the competition to match our network and our capabilities."

Zollars says through the hard work and support of the 37,000 YRC employees, the company implemented a strategic, phased-in approach to the integration. With nearly 450 service centers, YRC offers about 100 more service centers than either Roadway or Yellow did individually. The changes provide 21,000 additional direct service points and position YRC 20 percent closer to customers in major markets. This enables quicker pickups and deliveries, increased flexibility and reduced emissions.

"We've designed our network to help customers succeed. It's that simple," said Mike Smid, president of YRC. "We have the most comprehensive network in North America, the most experienced transportation professionals and the most flexible, efficient solutions to meet any supply chain need.

"The YRC network is built for precision and predictability, so our customers are assured of meeting the needs of their customers," Smid continued. "Our focus is delivering confidence to our customers."

41.     On March 2, 2009, YRC filed its Form 10-K for the fourth quarter and year ended December 31, 2008, with the SEC which was signed by defendants and certified by defendants Zollars and Wicks. In addition to making substantially similar statements concerning the Company

operations, including expenses, costs and ratios, as had been issued previously, the 2008 Form 10-Q also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures.

42.     On April 23, 2009, YRC issued a press release announcing the Company's financial results for the first quarter of 2009, the period ended March 31, 2009.  Defendant Zollars commented on the announcement, stating, in pertinent part, as follows:

> We made significant investments in our company during the first quarter to enhance our position in the market and improve our future operating performance. Unfortunately, the economy progressively weakened throughout the quarter making it more challenging to get ahead of the volume declines.  With that said, the March 1 integration of our national networks allowed us to remove substantial capacity and reset the volume needs of our network, while significantly enhancing our service offering to the customer.

43.     On April 24, 2009, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, defendants made numerous positive statements about the Company, its business and operations.

44.     On June 18, 2009, YRC issued a press release announcing the Company's amendments to its bank credit agreements.  The press release, stated, in pertinent part, as follows:

> *       Capacity under the revolving credit facility stays at $950 million

> *       Revolver reserve originally established in the February 12 amendment remains

> OVERLAND PARK, Kan., June 18 /PRNewswire-FirstCall/ -- YRC Worldwide Inc. (Nasdaq: YRCW) today clarified that the amendment it finalized on June 17, 2009 to its revolving credit facility with its lenders has the same terms in regards to total liquidity and capacity under the facility that existed prior to yesterday's amendment. The new amendment does give the company immediate access to the escrow funds of $73 million by means of revolver capacity that can be borrowed at any time without approval from the lenders so long as the company's cash is below $150 million.  The $150 million is a new maximum of cash and cash equivalents that was mutually agreed to by the company and the lender group and set well above the company's average daily cash usage.  The company's total liquidity includes its cash balance in addition to the availability under its credit facilities, which in total was $242 million at May 31, 2009.

> "Yesterday's amendment reflects the continued support of our lender group as we further implement our strategic actions both operationally and financially," said Tim Wicks, Executive Vice President and CFO of YRC Worldwide. "We now have immediate access to the escrow funds, which is a month before the original agreement, and there is not an immediate reduction to our capacity."

45.     On July 8, 2009, YRC issued a press release announcing an "update" on the Company's "Comprehensive Plan," and YRC's "additional progress in its comprehensive plan to realize efficiencies from the YRC integration, restore financial strength, and position its operating companies for future success." Defendant Zollars commented on the announcement, stating, in pertinent part, as follows:

> We can't control the economic environment, but we certainly can and are controlling our response to it. Our self-help recovery plan is proactive and has the support of our stakeholders. We are taking the steps needed to manage our plan today, and position our company for success as the economy recovers.

46.     On August 3, 2009, YRC issued a press release announcing its financial results for the second quarter of 2009, the period ended June 30, 2009. Defendant Zollars commented on the announcement, stating, in pertinent part, as follows:

> We are pleased with the sequential improvement in our business volumes and earnings as our pricing discipline, customer mix management and cost initiatives gain significant traction. . . For the quarter, the Regional companies reported positive operating income, and YRC National achieved positive adjusted EBITDA.
>
> *       *       *
>
> With the significant operating momentum we achieved throughout the second quarter and experienced in July, the company is positioned for further growth, and we expect to achieve positive adjusted EBITDA in the third quarter of 2010 in excess of the second quarter.

47.     On October 30, 2009, YRC issued a press release announcing its financial results for the third quarter of 2009, the period ended September 30, 2009. Defendant Zollars commented on the announcement, stating, in pertinent part, as follows:

> We gained significant momentum in the third quarter as we executed on our comprehensive plan to improve operating efficiencies, restore financial strength and position our company for future success. We achieved significant sequential

improvement from the first half of the year.  In fact, YRC Regional Transportation and YRC Logistics were profitable for the quarter, and our operating cash flow trends improved sequentially during the quarter despite the continued economic downturn.

*       *       *

Our third quarter sequential shipment trends have dramatically stabilized as compared to the trends from the first half of the year, while we continue to maintain pricing discipline in an increasingly competitive marketplace.

*       *       *

We continue to receive solid support from our lenders as we implement our recovery plan to manage through this severe economic downturn.  With 100% of the credit facility and ABS lenders approving the amendments, they have once again demonstrated the belief they have in the value of this company and its potential, as the benefits of our strategic plans become more apparent in our results.

48.     On October 30, 2009, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, defendants made numerous positive statements about the Company, its business and operations.

49.     The statements referenced above in paragraphs 23-31 and 33-48 were each materially false and misleading when made, and were known by defendants to be materially false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)     that the integration of its various business lines was not going according to plan and the Company was not deriving the anticipated benefits from that integration;

(b)     that the Company's financial condition was far worse than represented and the Company was in or near the zone of insolvency;

(c)     that the Company's internal controls and systems were unable to provide the Company with timely and accurate financial information, thereby depriving the Company of key information necessary to effectively manage the business of the Company; and

(d)     based on the foregoing, defendants lacked a reasonable basis for their positive statements about the Company, its business, prospects and earnings.

- 20 -

50. On November 2, 2009, YRC shocked investors when it revealed, for the first time, that the Company was performing well below expectations and that it now expected to convert over half a billion dollars of debt into shares of Company stock, thereby effectively giving bondholders as much as 95% of the equity of the Company and resulting in the resignation of seven of its nine directors. The same day, the *Kansas City Business Journal* reported, in part, the following:

> Overland Park-based YRC (Nasdaq: YRCW) said in a Monday release that it hopes to swap about $536.8 million in contingent convertible notes and USF 8.5 percent notes, plus accrued and unpaid interest, for shares of YRC common stock and new class A convertible preferred stock.

> If the preferred stock were converted and combined with the common stock allotment, the noteholders would hold 95 percent of the company's common stock. A Monday filing with the Securities and Exchange Commission detailed a plan to convert preferred stock to common stock, contingent on shareholder approval.

> As of the offering's effective date, expected in mid-December, seven of YRC's nine directors would resign. They would be replaced with three chosen by the new owners and three mutually agreed upon by the company and its new owners, along with one appointed by the International Brotherhood of Teamsters union, YRC spokeswoman Suzanne Dawson said. She said it was not yet known which two directors would remain. YRC CEO Bill Zollars chairs the company's current board.

> YRC has about 60.2 million shares of common stock outstanding; noteholders would get at least 42 million shares of common stock and 5 million shares of preferred stock with an aggregate face amount of $250 million, the filing said.

> Provisions would remain for options for YRC's union employees, who in concessions negotiations were promised options for a 35 percent stake in the company. Non-union employees, promised options for a 7 percent stake of YRC common stock, could still get those, Dawson said.

51. Shares of YRC stock plummeted on this news—falling 64% on a single trading day, over $2.30 per share on huge volume of 54.8 million shares traded, over five times the stock's average daily volume over the past three months, to close trading that day at only $1.32 per share. Further explaining the massive decline in the price of the Company's shares, the *Kansas City Business Journal* further reported comments by research analyst Lee Llaskow, of Longbow Research, who stated, in part, the following:

The bond exchange offering is "much more dilutive than we originally thought," [Longbow Research analyst Lee] Klaskow said.

"Our conclusion is that management needed to entice its bondholders at the expense of its current shareholders to get the exchange offering done," he wrote.

He said the second block of options given the Teamsters, for 20 percent of common stock in conjunction with a second round of concessions, would be dilutive after the exchange.  If the preferred stock is converted and the union and non-union employees exercise their options, YRC would have about 1.6 billion shares outstanding.

### CAUSATION AND ECONOMIC LOSS

52.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated the price of YRC stock and operated as a fraud or deceit on Class Period purchasers of YRC stock by misrepresenting the Company's financial results.  Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of YRC declined precipitously - - evidence that the prior artificial inflation in the price of YRC stock was eradicated. As a result of their purchases of YRC stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

53.     Defendants' false and materially misleading statements had the intended effect of causing YRC shares to trade at artificially inflated levels throughout the Class Period--reaching a Class Period high of over $20.00 per share during August 2008.

54.     On November 2, 2009, however, as investors learned the truth about the Company and the true condition of its business, the price of YRC stock collapsed.  Defendants' belated disclosures had an immediate, adverse impact on the price of YRC common stock.

55.     The decline in the price of YRC stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market. The timing and magnitude of the decline in the price of YRC stock negates any inference that the

losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.  During the same period in which the price of YRC stock fell over 60% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

56.     The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of YRC stock and the subsequent significant decline in the value of YRC stock when defendants' prior misstatements and other fraudulent conduct was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

57.     As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein, defendants, by virtue of their receipt of information reflecting the true facts regarding YRC, their control over, and/or receipt and/or modification of YRC's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning YRC, participated in the fraudulent scheme alleged herein.

## Applicability Of Presumption Of Reliance:
## Fraud-On-The-Market Doctrine

58.     At all relevant times, the market for YRC common stock was an efficient market for the following reasons, among others:

(a)      YRC stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)      As a regulated issuer, YRC filed periodic public reports with the SEC and the NASDAQ;

(c)      YRC regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      YRC was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

59.      As a result of the foregoing, the market for YRC securities promptly digested current information regarding YRC from all publicly available sources and reflected such information in YRC stock price.  Under these circumstances, all purchasers of YRC common stock during the Class Period suffered similar injury through their purchase of YRC common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

60.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of YRC Worldwide who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

61.     Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by YRC, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding YRC's business, operations, management and the intrinsic value of YRC common stock; (b) enable defendants to artificially inflate the price of YRC shares; and (c) cause plaintiff and other members of the Class to purchase YRC common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

64.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for YRC common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

65.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of YRC as specified herein.

66.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of YRC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about YRC and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of YRC common stock during the Class Period.

67.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his/her responsibilities and activities

as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

68.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.  Such defendants' material misrepresentations and/or omissions were done knowingly or with recklessly for the purpose and effect of concealing YRC's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

69.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of YRC common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of YRC's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or

recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired YRC common stock during the Class Period at artificially high prices and were damaged thereby.

70.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that YRC was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their YRC common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

71.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

72.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

### COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

73.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     The Individual Defendants acted as controlling persons of YRC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence

and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

76.     As set forth above, YRC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

DATED:  February 7, 2011                        SHAMBERG, JOHNSON & BERGMAN,
                                                                                CHTD.


                                                                        s/ Lynn R. Johnson
                                                                        LYNN R. JOHNSON

                                                                        2600 Grand Blvd.-Ste. 550
                                                                        Kansas City, MO 64108
                                                                        Telephone:  816/474-0004
                                                                        816/474-0003 (fax)
                                                                        ljohnson@sjblaw.com

                                                                        ROBBINS GELLER RUDMAN
                                                                             & DOWD LLP
                                                                        SAMUEL H. RUDMAN
                                                                        58 South Service Road, Suite 200
                                                                        Melville, NY  11747
                                                                        Telephone:  631/367-7100
                                                                        631/367-1173 (fax)
                                                                        srudman@rgrdlaw.com

                                                                        KAHN SWICK & FOTI, LLC
                                                                        KIM MILLER
                                                                        500 Fifth Avenue, Ste. 1810
                                                                        New York, NY 10110
                                                                        Telephone: 212/696-3730
                                                                        504/455-1498 (fax)
                                                                        kim.miller@ksfcounsel.com

KAHN SWICK & FOTI, LLC
LEWIS KAHN
206 Covington Street
Madisonville, Louisiana 70447
Telephone: 504/455-1400
504/455-1498 (fax)
lewis.kahn@ksfcounsel.com

Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL AND DESIGNATION OF PLACE OF TRIAL**

Plaintiff hereby demands a trial by jury of the above-captioned matter and designates the

place of trial as Kansas City, Kansas.

DATED:  February 7, 2011                    SHAMBERG, JOHNSON & BERGMAN,
                                                                              CHTD.


                                                          s/ Lynn R. Johnson
                                                          LYNN R. JOHNSON

                                                          2600 Grand Blvd.-Ste. 550
                                                          Kansas City, MO 64108
                                                          Telephone:  816/474-0004
                                                          816/474-0003 (fax)
                                                          ljohnson@sjblaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

KAHN SWICK & FOTI, LLC
KIM MILLER
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: 212/696-3730
504/455-1498 (fax)
kim.miller@ksfcounsel.com

KAHN SWICK & FOTI, LLC
LEWIS KAHN
206 Covington Street
Madisonville, Louisiana 70447
Telephone: 504/455-1400
504/455-1498 (fax)
lewis.kahn@ksfcounsel.com

Attorneys for Plaintiff