UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| STAN BETTER and YRC INVESTORS GROUP, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>YRC WORLDWIDE INC., WILLIAM D. ZOLLARS, MICHAEL SMID, TIMOTHY A. WICKS, F. JOSEPH WHITSEL III, and STEPHEN L. BRUFFETT,<br><br>Defendants. | Case No.: 11-2072-KHV<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

{175091.DOC }

1.      This is a federal securities class action on behalf of purchasers of the common stock of YRC Worldwide Inc. ("YRC" or the "Company") between April 24, 2008, and November 2, 2009, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Plaintiffs allege the following based upon the investigation of Plaintiffs' counsel, which included a review of SEC filings by YRC, regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and interviews with witnesses with knowledge of the allegations herein. Plaintiffs believe that substantial additional evidentiary support will exist for these allegations after a reasonable opportunity for discovery. Those witnesses with knowledge of the allegations are referred to herein as Confidential Witnesses ("CWs") as follows:

   a. CW1 was a YRC employee who worked in the E-Business Internet Quality Assurance Department from 2005 until October 2009.

   b. CW2 was employed in the Revenue Management Department of YRC. CW2 worked at the Company for nearly 25 years from the mid 1980's to January 2010.

   c. CW3 worked at YRC as an Account Executive from June 2008 until February 2009.

   d. CW4 worked at YRC as a Roadway Dispatcher from the mid 1980's until October 2010.

   e. CW5 was the Director of Liability Claims at YRC from 2004 until September 2008.

f.  CW6 was a Vice Presidential Executive Assistant at the Company from February 2008 through May 2009.

g.  CW7 worked with YRC as an IT Supervisor focusing on management software from August 2006 until October 2009.

h.  CW8 worked at YRC in several positions from 2005 until April 2010. Between 2005 and 2006, s/he was a Marketing Project Manager. From 2006 until November 2009, CW 8 was an Account Manager/ E-Business Field Manager at the Company.

i.  CW9 worked at YRC as a Vice President of Enterprise Services and Revenue Management between 2007 and 2011. CW9 reported directly to Defendant F. Joseph Whitsel III. CW9 also reported to Chief Information Officer Mike Naatz and Senior Vice President and Chief Financial Officer Phil Gaines.

j.  CW10 worked as a Team Driver at YRC from August 2006 until January 2011.

k.  CW11 was a Manager of Central Rating at YRC and worked in various other departments at YRC for nearly 30 years until 2010. S/he reported directly to Defendant F. Joseph Whitsel III.

l.  CW12 was a Senior Project Manager at YRC. Prior to his/her departure in 2010, s/he worked in a variety of positions, including IT and sales, starting in 1999.

m.  CW13 was a Programmer Analyst at YRC from 2007 until March 2009.

n.  CW14 was a Credit Analyst at YRC between August 2007 and October 2010.

o.  CW15 was a Systems Engineer in YRC's IT Department from 1998 until December 2010.

{175091.DOC }

p.  CW16 was a YRC Senior Project Manager from 2006 until February 2010.

q.  CW17 was the YRC Director of Business Strategy. S/he was employed at YRC from 2003 until September 2011. S/he reported to YRC's Chief Marketing Officer, Greg Reid, and the Senior Vice President of Sales, Natalie Putnam.

**OVERVIEW**

3.       Throughout the Class Period, Defendants made materially false and misleading statements and omissions about the Company. Specifically, the positive statements and omissions concerned the purported success of the technical integration of Yellow Corp. ("Yellow") and Roadway Corp. ("Roadway")[1]; the financial condition of the Company, including its cash flows, liquidity, revenues, compliance with credit agreements, and payment of debt; the success of its customer relationships; and the adequacy of the Company's internal controls. Defendants' statements were materially false and misleading when made because they omitted to disclose the following known, adverse true facts about the Company:

- The Company's purported "successful" technical integration of Yellow and Roadway was deeply flawed and incomplete. Because the planned transition to the Yellow platform was so time-consuming and behind schedule, Defendants abruptly and covertly switched in July 2008 from converting all data to the Yellow system to converting all data to the outdated and antiquated Roadway system for the sole purpose of saving time;

- The Roadway integration platform "was suspect at best…because the technology was old and limited, and the people who knew it were aging and were shrinking in

[1] In 2003, Yellow acquired Roadway for a purchase price of approximately $966 million in a half cash, half stock transaction. Yellow assumed $140 million in net Roadway indebtedness, which brought the enterprise value of the acquisition to approximately $1.1 billion. The resulting entity, YRC, operated as two separate and distinct entities with separate customer bases, shipping software, and revenue streams. In February 2008, Defendants decided to attempt to effectuate the technical integration of the Yellow and Roadway technology platforms five years after the acquisition of Roadway. Many analysts wondered why YRC waited five years to begin the technical integration between Yellow and Roadway.

{175091.DOC }

numbers";

- The heavily-touted March 1, 2009, date for completion of the integration was not the result of the integration process running smoothly and/or ahead of schedule but rather a forced deadline mandated by the Company's lenders – Defendants knew that meeting the deadline was a literal impossibility, and YRC was forced to offer a massive 60% discount to all customers;

- The Company's IT department determined in or around February 2008 that the integration could not be completed before December of 2009;

- During the attempted integration, YRC lost massive quantities of customer information and user profiles, which resulted in huge inadvertent price increases for certain customers;

- Frustrated, unsatisfied and angry customers began abandoning their YRC contracts and commitments;

- YRC was forced to offer a whopping 60% across-the-board discount to all remaining customers in a panicked effort to placate irate customers;

- The Company's lending groups were exerting enormous pressure on and control over YRC's operations directly contributing to failure of the technical integration;

- Many YRC "trailers were only 10% full and a lot of lanes were not running full";

- YRC was in danger of violating its bank covenants because the YRC's technical integration could not be completed before December 2009, in violation of the lender-mandated March 2009 deadline. Ultimately, YRC did violate these covenants;

- YRC was in danger of missing revenue targets that would trigger the lenders to pull the bank covenants and YRC ultimately failed to comply with its credit agreement;

- The Company suffered from internal control problems so severe that employees literally could not keep track of the vast majority of customer data and profiles, resulting in inadvertent overcharges, customer anger, frustration, and departures, and deep discounting; and

- The Company was performing so far below expectations and suffering from so many fundamental problems that a year prior to the end of the Class Period the Company commenced working on a desperate, last-ditch deal to convert hundreds of millions of dollars of debt into shares of stock. One analyst was so surprised when the deal was revealed on November 2, 2009 that he responded: "***I didn't see the train wreck hitting the school bus full of kids and nuns.***" (Emphasis added).

{175091.DOC }

4.     Defendants' knowledge and/or reckless disregard of the true, adverse facts concealed from investors throughout the Class Period is supported by, *inter alia*, Defendants' own admissions; statements of numerous well-placed former employees of YRC, including several former high-level former employees and others who reported directly to one or more Individual Defendants; Defendants' receipt of reports detailing the specifics of concealed problems; Defendants' positions at the Company; and Defendants' motives, including bonus awards based on stock performance.

5.     On November 2, 2009, when Defendants' prior misrepresentations and omissions came to be fully revealed to investors, shares of YRC declined precipitously - - evidence that the prior artificial inflation in the price of YRC stock was eradicated. Shares of YRC stock plummeted on this news—falling 64% on a single trading day, over $2.30 per share on huge volume of 54.8 million shares traded, over five times the stock's average daily volume over the past three months, to close trading that day at only $1.32 per share. As a result of their purchases of YRC stock during the Class Period, Plaintiffs and other members of the Class suffered economic losses after the truth was revealed and absorbed by the market.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act [15 U.S.C. §78aa].

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b).  YRC maintains its principal place of business in this District and many of the

5

acts and practices complained of herein occurred in substantial part in this District.

9.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

10.      Plaintiffs **Stan Better** and **YRC Investors Group** (comprised of Frank Yonan, George Alexiou, Suzanne Alexiou, Robert Dodd, and Bryant Holdings, LLC) purchased the common stock of YRC during the Class Period and were damaged when the truth was revealed and the artificial inflation was removed from the price of the stock, as set forth in their certifications previously submitted to the Court in their motions for appointment as Lead Plaintiff [Doc. ## 17 & 18] filed on April 8, 2011, and incorporated herein by reference.

### Company Defendant

11.      Defendant **YRC** is a Delaware corporation organized in 1983, maintaining its principal place of business at 10990 Roe Avenue, Overland Park, Kansas, 66211. The Company's YRC National Transportation unit offers a range of services for the transportation of industrial, commercial, and retail goods, serving manufacturing, wholesale, retail, and government customers.

### Individual Defendants

12.      Defendant **William D. Zollars** ("Zollars") served as YRC's Chairman of the Board of Directors, Chief Executive Officer ("CEO") and President throughout the Class Period. During the Class Period, Defendant Zollars made materially false and misleading statements and

6

omissions and signed and certified the Company's SEC filings, including YRC's annual reports on Form 10-K and/or quarterly reports on Form 10-Q.

13.     Defendant **Stephen L. Bruffett** ("Bruffett") served as YRC's Chief Financial Officer and Executive Vice President from September 2007 until October 2008. During the Class Period, Defendant Bruffett signed and certified the Company's SEC filings, including YRC's annual reports on Form 10-K and/or quarterly reports on Form 10-Q.

14.     Defendant **Timothy A. Wicks** ("Wicks") served as YRC's Chief Financial Officer ("CFO") and Executive Vice President from October 2008 to October 2009 and President and Chief Operating Officer from October 2009 to April 2010. During the Class Period, Defendant Wicks made materially false and misleading statements and omissions and signed and certified the Company's SEC filings, including YRC's annual reports on Form 10-K and/or quarterly reports on Form 10-Q.

15.     Defendant **Michael Smid** ("Smid") served as YRC's Operations Officer of the Company and President of YRC throughout the Class Period. As President of YRC National Transportation, defendant Smid led the integration of Yellow Transportation and Roadway and was responsible for all functions of YRC. At all relevant times, Defendant Smid reported directly to defendant Zollars. During the Class Period, Defendant Smid made materially false and misleading statements and omissions.

16.     Defendant **F. Joseph Whitsel III** ("Whitsel") served as YRC's Vice President of Revenue Management throughout the Class Period.  As Vice President of Revenue Management, Whitsel directed all major revenue decisions at YRC during the Class Period, including decisions regarding across the board rate discounts and collection write offs. At all relevant times, defendant Whitsel reported directly to Defendant Zollars. During the Class Period, Defendant

Whitsel made materially false and misleading statements and omissions.

17.    The Defendants referenced above in ¶¶12-16 are referred to herein as the "Individual Defendants." All Defendants are referred to collectively as "Defendants."

18.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of YRC common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding YRC's business, operations, management and the intrinsic value of YRC common stock; (b) enabled Defendants to artificially inflate the price of YRC shares; (c) caused plaintiffs and other members of the Class to purchase YRC common stock at artificially inflated prices; and (d) harmed investors when the previously undisclosed truth was revealed at the end of the Class Period.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE BY DEFENDANTS DURING THE CLASS PERIOD

19.    On April 24, 2008, the inception of the Class Period, Defendants published a release announcing purported results for the first quarter of 2008, the period ended March 31, 2008. This release stated, in part, the following:

> "The soft economy, severe winter weather and record fuel prices created a very difficult operating environment in the first quarter," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. **"With that said, we have taken a number of actions that address the areas within our control and we are seeing benefits from those efforts. Despite the macroeconomic challenges that we are facing, we believe that we have turned the corner and expect meaningful earnings improvement starting with the current quarter,"** Zollars continued.
>
> \* \* \*
>
> **"Given our solid action plans and the momentum that is underway, we are excited about the future of YRC and what we can do for our customers, employees and investors,"** stated Zollars.
>
> Although the practice of providing earnings guidance was suspended in 2007, due in great part to uncertainty in the economy, which remains difficult to predict, the

8

company determined that investors should be provided with additional near-term clarity regarding the anticipated performance of YRCW. Based upon the internal actions the company has already implemented, including securing a more competitive labor contract, **renewing its credit agreement, and making footprint changes at YRC Regional Transportation**, YRCW expects to earn between $.30 and $.40 per share in the second quarter, which ends June 30, 2008.

(Emphasis added).

20.    The next day, April 25, 2008, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations. The following exchange took place between analyst Thomas Albrecht and Defendant Zollars:

**Thomas Albrecht - Stephens Inc.**

And then in terms of guidance and that, did the banks have a hand in perhaps prompting you to offer guidance or was that your own decision?

**William D. Zollars**

I have to take full responsibility for that. That was our idea. And, you know, just to clarify that a little bit, **we really did feel like the investors deserved to know that we've turned the corner**. We didn't want to go through another quarter of uncertainty in the minds of the investors, and so we thought it was important to provide more clarity around that and try and quantify it so that we could give them a sense for the kind of change that's taking place here.

(Emphasis added).

21.    The foregoing statements by Defendants that YRC had "turned the corner" were materially false and misleading when made. In truth, YRC's financial troubles began prior to the start of the technical integration of Yellow and Roadway. In fact, CW9 revealed that many of YRC's "trailers were only 10% full and a lot of lanes were not running full." Thus, YRC had not "turned the corner" and still faced tumultuous times ahead, which was confirmed by a string of poor financial results continuing long after April 25, 2008. These statements were also materially false and misleading when made, because they failed to disclose that the "solid action plans" that were "underway," including YRC's "renewing its credit agreement, and

9

making footprint changes at YRC Regional Transportation," involved effectuating a difficult technical integration between the Yellow's and Roadway systems. In particular, according to CW8, these statements failed to disclose that YRC's renewed credit agreement contained an express provision mandating that the technical integration be completed by March 2009, and that the Company faced a real threat of violating this agreement because it had been made aware as early as February 2008 that the technical integration could not be successfully completed until at least December 2009. Additionally, the statements regarding the "effective[ness]" of the Company's internal controls and procedures were materially false and misleading when made because CW9 stated that "trailers were only 10% full and a lot of lanes were not running full," and CW11 stated that after the technical integration was declared "complete" on March 1, 2009, serious problems plagued customer accounts. S/he said, "we could not get the right pricing on the systems." No historical data remained for many customers, meaning that no pricing data existed either. "The information had simply been lost." In order to make up for the problems, Defendant Whitsel sent an email to CW 11 and others directing them to give ALL customers an across the board 60% discount of the base rate.

22.     During the Class Period, Defendants filed with the SEC the Company's 1Q:08 Form 10-Q, 2Q:08 Form 10-Q, 3Q:08 Form 10-Q, 2008 Form 10-K, 1Q:09 Form 10-Q, and 2Q:09 Form 10-Q signed and certified by Defendants Zollars, Bruffett, and/or Wicks. The 1Q:08 Form 10-Q, 2Q:08 Form 10-Q, 3Q:08 Form 10-Q, 2008 Form 10-K, 1Q:09 Form 10-Q, and 2Q:09 Form 10-Q contained representations, which were materially false and misleading for the reasons described in paragraph 24, that attested to the purported effectiveness and sufficiency of the Company's controls and procedures, in part, as follows:

Item 4.  **Controls and Procedures**

10

We maintain a set of disclosure controls and procedures designed to ensure that information required to be disclosed in our filings under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. **Our principal executive and financial officers evaluated our disclosure controls and procedures and concluded that our disclosure controls and procedures were effective as of March 31, 2008.**

(Emphasis added).

23.     **Certifications.** In addition to the foregoing, throughout the Class Period, the Company's 1Q:08 Form 10-Q, 2Q:08 Form 10-Q, 3Q:08 Form 10-Q, 2008 Form 10-K, 1Q:09 Form 10-Q, and 2Q:09 Form 10-Q contained certifications by Defendants Zollars, Bruffett, and/or Wicks, which were materially false and misleading for the reasons described below, that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

(1)       I have reviewed this report on Form 10-Q of YRC Worldwide Inc.;

(2)       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report

24.     Defendants' statements throughout the Class Period regarding the effectiveness of their "disclosure controls and procedures" were materially false and misleading when made because CW9 revealed that many of YRC's "trailers were only 10% full and a lot of lanes were not running full," and serious problems plagued customer accounts as result of the materially flawed technical integration—*e.g.*, such as YRC lost customer information and user profiles during the transition, which resulted in huge inadvertent price increases for certain customers, and unsatisfied customers began abandoning their YRC contracts and commitments, and YRC was forced to offer a massive 60% discount to all customers. Additionally, Defendants Zollars,

{175091.DOC }

Bruffett, and/or Wicks' certifications made throughout the Class Period contained materially false and misleading statements and omissions concerning the following: positive statements and omissions concerned the purported success of the technical integration of Yellow and Roadway; the financial condition of the Company, including its cash flows, liquidity, revenues, compliance with credit agreements, and payment of debt; the success of its customer relationships; and the adequacy of the Company's internal controls.

25.     On July 24, 2008, Defendants published a release announcing purported results for the second quarter of 2008, the period ended June 30, 2008. This release also stated, in part, the following:

> "In spite of a challenging economy, our positive momentum continued in the quarter and we significantly improved our sequential results, delivering earnings consistent with previously issued guidance for the quarter," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. **"Our actions to improve operational efficiency, get our regional companies back on track and reduce overhead costs have been effective. We are carrying that momentum forward as we implement further operational improvements in the third quarter**," Zollars continued.
>
> * * *
>
> "**We are encouraged by our progress** and are optimistic about continued improvement in our performance," stated Zollars.
>
> The company expects to earn between $1.05 and $1.15 per share in the third quarter 2008. These results will include a curtailment gain of approximately $.70 per share and increased union health and pension costs of approximately $.15 per share attributable to contractual increases that take effect on August 1. **The company expects to offset these cost increases with operational efficiencies by year end 2008.** The curtailment gains that were recognized in the second quarter and will be recognized in the third quarter of 2008 are related to the harmonization of retirement plans across the company for non- contractual employees.
>
> (Emphasis added).

26.     The next day, July 25, 2008, YRC held a conference call during which Defendant

Zollars stated that a key objective during the second quarter involved the national companies. According to Defendant Zollars: "The goal was to complete all the planning necessary for successful execution of the changes of operations at Yellow and Roadway… **So far, customer response to these changes has been overwhelmingly positive."** (Emphasis added).

27.    The foregoing statements were materially false and misleading when made because Defendants failed to disclose that the Company's "operational efficiencies" [the technical integration] "expect[ed] to offset these cost increases" would not be completed "by year end 2008."  In particular, these statements failed to disclose that the credit agreements required complete integration by March 2009; and the integration of Yellow and Roadway likely would not be completed until year end 2009. These statements were also materially false and misleading when made because Defendants failed to disclose, that "customer response" to the integration of Yellow and Roadway had not been "overwhelmingly positive." In fact, CW9 explained that "well before" the purported completion of the integration on March 1, 2009, customers began abandoning their YRC contracts and commitments because they "didn't want to be part of the nonsense" of the integration.

28.    On September 8, 2008, YRC Worldwide published an unscheduled release to announce that the Company had "Accelerate[ed its] Integration Strategy and that it had already taken "Actions… to Improve Revenue Growth and Operating Income." This release stated, in part, the following:

> OVERLAND PARK, Kan., Sept. 8 /PRNewswire-FirstCall/ -- YRC Worldwide Inc. (Nasdaq: YRCW) **announced today that it is accelerating its integration strategy, focusing on the corporation's two largest operating subsidiaries, Yellow Transportation and Roadway. Since acquiring Roadway, the company has reduced duplicate back-office functions, shared technology applications, formed common management teams and, most recently, combined corporate sales.**

13

**With today's announcement, the companies are taking steps to bring together the local sales teams and offer a comprehensive portfolio of services through one operating network.** The Yellow Transportation and Roadway brands will remain in the marketplace represented by a combined sales force of over 1,000 account executives. **The integration will occur in phases to ensure service continuity to customers and provide a seamless transition to employees.** By operating one national network, the company expects to significantly increase its network density resulting in lower fixed costs and enhanced service performance to its customers. The effort is expected to extend through 2009 with a run-rate annual operating income improvement in excess of $200 million.

**YRC Worldwide expects to remain in full compliance with all terms of its credit agreement** and to have borrowing capacity in excess of $600 million.

**"Given the positive customer response from our recent combination of the corporate sales teams and the increasingly dynamic operating environment, we believe now is the right time to take such significant action,"** stated Bill Zollars, Chairman, President and CEO. "The economic downturn has created the capacity in our networks needed to effectively integrate our operations, while improving service reliability and speed. By offering a comprehensive service portfolio through one unified network, we can more effectively serve our customers and simplify their experience."

When asked about the impact on employees, Mike Smid, President and CEO of YRC North American Transportation, said, "Our employees understand the challenges of the marketplace and are excited to improve the way we do business. From our drivers to account executives, every employee will play a key part in continuing to provide our customers exceptional service and enhance our growth."

* * *

"The **economy has softened further impacting both volume levels and pricing** across our operating companies," said Zollars. "After a solid second quarter, the third quarter started slowly and has progressively weakened. Our earnings have also been impacted by early investments in combining our national companies." Zollars continued by saying, "We do not see signs of the economy improving in the near term, **but as we merge Yellow and Roadway, we expect operating results to show meaningful improvement."**

(Emphasis added).

29.     The foregoing statements were materially false and misleading because the terms

of the Company's credit agreements themselves required completion of the technical

14

integration by March 2009, which was not possible. According to CW8, the IT department had informed Defendants the integration could not be completed until December 2009. These statements were materially false and misleading when made for the additional reason that they failed to disclose that the decision to integrate the Yellow and Roadway systems was driven by YRC's lenders and not by "positive customer response" or "the increasingly dynamic operating environment" leading Defendants to believe that "now is the right time to take such significant action." In fact, CW9 explained that customers began abandoning their YRC contracts and commitments well before the integration was purportedly completed on March 1, 2009, because they "didn't want to be part of the nonsense" of the integration.

30.     On October 3, 2008, Defendants published a release announcing the "Redemption of Notes." This release stated, in part, the following:

> As the note redemptions and the draw on the senior revolving credit facility will occur in the same quarterly reporting period, the company does not expect these specific actions to have an affect on its aggregate outstanding indebtedness at the end of the fourth quarter 2008. **The company expects to remain in full compliance with all terms of its credit agreement**. After taking into account the October 2, 2008 draw, the company has nearly $400 million of borrowing capacity remaining under its credit facilities. In addition, these redemptions will satisfy all of the company's significant maturities through March 2010.

(Emphasis added).

31.     The Company's statement that it "expects to remain in full compliance with all terms of its credit agreement," was materially false and misleading when made because by October 2008 Defendant Zollars had *admitted* to CW2 and approximately 150 other revenue managers (but continued to publicly conceal) the "guarded secret" that YRC was in danger of missing revenue targets, at which point the banks would pull their notes. These statements were also materially false and misleading for the reason that the terms of the Company's credit agreements themselves required the technical integration to be complete by March 2009, which

15

was not possible. According to CW8, the IT department had informed Defendants in or around February 2008 that the integration could not be completed until December 2009.

32.     Similarly, on October 7, 2008, Defendants published a release which "Reaffirm[ed the] Financial Condition" of the Company and was intended to, and did, condition investors to believe that the Company was operating according to plan, in part, as follows:

> YRC Worldwide Reaffirms Financial Condition
>
> OVERLAND PARK, Kan., Oct. 7 /PRNewswire-FirstCall/ -- YRC Worldwide Inc. (Nasdaq: YRCW) **today reaffirmed that it expects to have positive free cash flow in both the third and fourth quarters of 2008 with a significant debt reduction for the year. In addition, the company expects to remain in full compliance with all terms of its credit agreement, including the leverage ratio.**
>
> "With more than $9 billion in annual revenue and comprehensive networks in the national and regional markets, we continue to provide excellent service to our customers each and every day," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "Despite the continuing unrest in the broad financial markets, our current financial position is solid and we remain well positioned to weather this economic environment."
>
> (Emphasis added).

33.     The Company's statement that it "expects to remain in full compliance with all terms of its credit agreement," was materially false and misleading when made because by October 2008 Defendant Zollars had *admitted* to CW2 and approximately 150 other revenue managers the "guarded secret" that YRC was in danger of missing revenue targets, at which point the banks would pull their notes. These statements were also materially false and misleading because the terms of the Company's credit agreements themselves required the technical integration to be complete by March 2009, which was not possible. According to CW8, the IT department informed Defendants in or around February 2008 that the integration

could not be completed until December 2009.

34.     On October 23, 2008, Defendants published a release announcing purported results for the third quarter of 2008, the period ended September 30, 2008. This release quoted defendant Zollars, in part, as follows:

> "Throughout the third quarter, the operating environment progressively weakened resulting in lower than expected volumes and more competitive pricing," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "Although the economy slowed more than we expected during the quarter, **we still generated solid free cash flow and paid down debt, in addition to removing significant cost from our business,"** Zollars added.
>
> * * *
>
> Outlook
>
> "We are focused on adapting to weaker economic conditions while still providing quality service to our customers. **Although improved efficiencies and enhanced service are the key drivers of the Yellow and Roadway integration, the expected cash flows from additional facility sales and further reducing capital expenditures are incremental benefits that should significantly improve our liquidity,"** Zollars stated. **"We also remain confident in our ability to deliver a run rate of at least $200 million of operating income improvement by the end of 2009 from the integration."**
>
> * * *
>
> "We plan to generate a healthy amount of cash flow in the fourth quarter and further strengthen our balance sheet by year end. With our current action plans, we expect to maintain a leverage ratio below 3.5 times," Zollars concluded.
>
> (Emphasis added).

35.     On October 24, 2008, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made numerous positive statements about the Company, its business, and its operations. Defendant Zollars, in pertinent part, stated:

{175091.DOC }

**Regarding the third quarter, it did not turn out the way we expected when we talked in early September.**

Throughout the third quarter the economic environment progressively weakened resulting in lower then expected volumes and more competitive pricing. But we were not expecting a seasonal peak in September, we would have expected at least a normal end of the quarter spike which didn't happen in any of our operating companies.

**When we originally designed our integration plans we allowed the flexibility to accelerate or slow down the process depending on a number of factors including our level of confidence and the volumes moving through the system**.

**Based on the support from customers and our labor partners in addition to our experience so far we've gained a level of confidence necessary to accelerate the process further**.

(Emphasis added).

36.    Defendant Zollars' statement that "[r]egarding the third quarter, it did not turn out the way we expected when we talked in early September" was materially false and misleading when made because Defendants failed to disclose that by October 2008 YRC was in danger of missing revenue targets, as admitted by Defendant Zollars. Further, CW9 stated that "a lot of trailers were only 10% full and a lot of lanes were not running full." Additionally, the foregoing statements were materially false and misleading when made because the decision "to accelerate the [integration] process further" was driven by YRC's lenders and not "[b]ased on the support from customers and our labor partners" or YRC's desire for "improved efficiencies and enhanced service." In fact, CW9 explained that the banks consistently applied pressure to complete the technical integration. Further, CW8 revealed that the IT department originally told senior management the technical integration could not be completed until December 2009; however, "the bank wanted the integration completed by March 2009," which was a "stipulation of the loan." Moreover, Defendants' statement regarding "customer support" was

18

materially false and misleading when made because CW9 explained that customers began abandoning their YRC contracts and commitments "well before" the integration was purportedly completed on March 1, 2009, because they "didn't want to be part of the nonsense" of the integration. "YRC parlayed these customer desertions into financial problems," said CW9.

37.     Consistent with the Company's efforts to rationalize its costs and expenses in line with its revised revenue and earnings guidance, on October 29, 2008, YRC issued a press release announcing that it had eliminated 3,750 jobs at the Company's various units.   That day, Reuters reported that this was part of the Company's "ongoing efforts to revamp operations." According to the news accounts, the job cuts consisted of dock workers and truck drivers at its Roadway and Yellow Transportation units, representing roughly six percent of YRC's total work force of 58,000. Reuters noted that while analysts have questioned whether in a prolonged downturn the Company would be able to pay down its debt and maintain cash flow, the "Company says that it will be able to do both." As further evidence of this, the Reuters report also quoted defendant Zollars as stating, "**I think what's happened is that people are trying to create a story where there is no story**… In normal times people wouldn't pay attention." (Emphasis added).

38.     Following the announcement that the Company planned on reducing headcount, the same day, October 29, 2008, in an effort to reassure the investing community of the financial strength and viability of the Company, Defendant Zollars published a letter that stated, in pertinent part, as follows:

YRCW Financial Update from CEO William D. Zollars

**You have likely heard or read statements recently about the overall financial health of YRC Worldwide – commentary generated by media, analysts and**

19

**others.  Given  the  noise  level  and  likelihood  for  speculation  and misinterpretation,  I  would  like  to  set  the  record  straight  by  addressing  the facts head on.**

We've put a number of measures in place over the past year to strengthen our balance sheet and take full advantage of our network assets in the marketplace – actions that will enable us to position future service enhancements and position our business for long-term growth.

(Emphasis added).

39.    The  foregoing  statements  that  "commentary  generated  by  media,  analysts,  and others"  amounted  to  "noise,"  "speculation  and  misinterpretation,"  misleadingly  implied  that there  was  no  truth  to  analyst  reports  of  YRC's  financial  troubles,  when  at  the  time  this statement  was  made,  the  technical  integration  was  materially  flawed  and  resulting  in  lost customers  and  revenues,  internal  control  problems,  and  deep  across-the-board  customer discounts. Further, CW9 revealed that many of YRC's "trailers were only 10% full and a lot of lanes were not running full." The statements also failed to disclose, according to CW3, Zollars' private admission that YRC was "fighting to survive," and senior management's subsequent decision to slash salaries and health benefits while eliminating the Company's 401(k) program in an effort to keep the Company solvent.

40.    In addition to the foregoing, in the October 29, 2008 letter Defendant Zollars also wrote:

**So here are the facts:**

**We are in compliance with our bank debt covenants**

At September 30, 2008, our leverage ratio was 3.18 times our Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) from the last twelve months, well within the 3.75 covenant level cap. This ratio was comprised of $1.19 billion of debt and trailing 12-month EBITDA of $373 million.

At December 31, 2008, and going forward, our leverage ratio cap will be lowered to 3.5 times EBITDA, and we expect our actual ratio to be within that limit. **We**

**are complying with our debt covenants, and we continue to pursue additional measures to further reduce our debt.**

**We have ample liquidity; positive cash flow**

**In addition to complying with our debt covenants, YRC Worldwide has ample liquidity under its current financial arrangements.** We also generated $52.2 million of cash from operating activities during the third quarter and, when taking into account the $40.4 million of cash inflow from net capital expenditures, third quarter free cash flow was significant at $92.6 million. **We expect to have positive cash flow in the fourth quarter as well**.

**We are paying down debt; improving leverage**

Much of the current confusion and speculation about our financial condition stems from a series of recent actions we've taken **to pay down debt and strengthen our balance sheet,** specifically:

- On October 9, we issued 1.7 million shares of common stock in exchange for $13.2 million of our outstanding notes. **This action improves our financial leverage** by reducing our total debt by $13.2 million and increasing our pre-tax earnings through a one-time gain of $5.3 million

(Emphasis added).

41.    The foregoing statements published by Zollars contained numerous materially false and misleading statements. The statement that "we are in compliance with our bank covenants" was materially false and misleading when made because it failed to disclose, according to CW2, that Zollars privately admitted the "guarded secret" that YRC was in danger of violating its bank covenants because the YRC's technical integration could not be completed until December 2009, in violation of the lender-mandated March 2009 deadline, and YRC was in danger of missing revenue targets that would trigger the lenders to pull the bank covenants.

42.    Additionally, in the October 29, 2008 letter Defendant Zollars also wrote:

**We are prepared should credit ratings further decline**

As you well know, the combination of a **weakening economy and the unrest in the credit markets** has negatively impacted all financial markets on a historic level. **Unfortunately, YRC Worldwide credit ratings and stock performance**

have been no exception.  **As I stated previously, the noise created by a lack of understanding of our recent actions to pay down debt have amplified this impact.**

That said, **we can't control the economy any more than we can control speculation,** so we are better positioning ourselves from a balance sheet perspective  and continuing to monitor the financial markets for opportunities to further optimize our capital structure. At the same time, **we're staying keenly focused on customer satisfaction.**

(Emphasis added).

43.     The statement by Defendant Zollars that "weakening economy and the unrest in the credit markets" were to blame for YRC's financial troubles was materially false and misleading when made because these reasons were not to blame for the financial downfall of YRC. At the time this statement was made, the technical integration was materially flawed, resulting in lost customers and revenues, internal control problems, and deep across-the-board customer discounts. In truth, CW9 explained that customers began abandoning their YRC contracts and commitments "well before" the integration was purportedly "complete" on March 1, 2009, because they "didn't want to be part of the nonsense" of the integration. "YRC parlayed these customer desertions into financial problems," said CW9.

44.     In the October 29, 2008 letter Defendant Zollars also wrote:

**We're integrating, seizing every opportunity to strengthen**

**As we look ahead, we believe our biggest opportunity to enhance service and improve efficiencies is the accelerated integration of Yellow and Roadway**, and we're in the process of combining the operational networks and the local sales teams of these two brands.


**We're pleased that our valued customers and our employees are supportive.**
We're also pleased with the collaboration and support of our Teamsters leadership in these efforts.


In closing, I want to assure you that **we are confident about the things we can control and our ability to weather the things we cannot.  Most importantly, we remain focused on providing exceptional service to our customers.**

22

Thank you for your continued support and business.

Regards,

William D. Zollars
Chairman, President and CEO YRC Worldwide

(Emphasis added).

45.     The foregoing statement that "our biggest opportunity to enhance service and improve efficiencies is the accelerated integration of Yellow and Roadway" was materially false and misleading when made because the Company's acceleration of the technical integration was driven by its lenders, was materially flawed, and was damaging service and creating inefficiencies for the Company and its customers.

46.     On November 17, 2008, the Company published a release that further conditioned investors to believe that YRC Worldwide was operating according to plan, and that again quoted defendant Zollars, in part, as follows:

"In this time of unprecedented economic challenges, our industry needs to focus on continually improving our efficiency and effectiveness," Zollars said. "YRC Worldwide is building on more than 80 years of success. We have an opportunity to improve our performance even in today's economy. **That's why we're taking long-ranging actions which improve our ability to effectively, reliably and quickly serve our customers' supply chain needs today, and in the future."**

**Zollars said the national integration for Yellow Transportation and Roadway is progressing ahead of schedule.** The network integration is part of the company's aggressive program to improve operations and solidify its financial position. Other actions include:

Strategic financial and cost moves to solidify profitability

Strategic global growth

\* \* \*

**"With the support from our customers and the collaboration of the Teamsters, our national integration is going even better than we originally anticipated with more than 60 facilities either consolidated or in the process**

23

**of consolidation.** Based on this success, we continue to evaluate our initial timeline and expect that it may be further accelerated," said Zollars.

One goal of the integration of the Yellow and Roadway networks is to lay the groundwork for expanded service capabilities. The consolidated facilities provide enhanced local pick-up and delivery services for both Roadway and Yellow customers.

**"Integrating our network enables us to provide unparalleled benefits to customers," said Mike Smid**, President and CEO of the YRC Worldwide North American Transportation division. "The integrated network builds shipment densities, allowing us to expand service offerings, improve reliability and serve more direct points."

The network and operational integration reflects the company's philosophy of focusing on the future, while meeting the needs of customers today.

(Emphasis added).

47.     The foregoing statement by Defendants regarding the integration's ability to "provide unparalleled benefits to customers" was materially false and misleading when made because it failed to disclose the increasing numbers of irate customers resulting from the materially flawed integration. The statement was also materially false and misleading when made because by November 2008 "the national integration from Yellow Transportation and Roadway" was not "progressing ahead of schedule."  In fact, by the time this statement was made, Zollars and other senior managers had complained about the slow progress of the technical integration, and were in the process of demanding that the integration be switched from Yellow to Roadway to increase the speed of the integration.  Similarly, the statement that "our national integration is going even better than we originally anticipated" was materially false and misleading when made because the technical integration was materially flawed, was progressing more slowly than anticipated or required by YRC's lenders, and YRC customers were abandoning their contracts even prior to the completion of the integration because they "didn't want to be part of the nonsense" of the integration.

{175091.DOC }

48.     Even in the face of a credit downgrade by the S&P credit ratings agency, on November 20, 2008, Defendant Zollars again defended the financial and operational condition of the Company in an effort to condition investors to believe that YRC Worldwide was continuing to operate according to plan. As evidence of this, the November 20, 2008 release stated, in part, the following:

YRC Worldwide Clarifies Impact of Credit Rating Change

Continues Strategic Plans to Enhance Market Position and Financial Condition

OVERLAND PARK, Kan., Nov 20, 2008 /PRNewswire-FirstCall via COMTEX News Network/ -- YRC Worldwide Inc. (Nasdaq: YRCW) announced today the financial impact of yesterday's credit rating change from S&P. **The credit rating is considered a trigger event under the credit agreement. This trigger event requires the company to collateralize its remaining unencumbered assets, which primarily include its real estate and revenue equipment. The company estimates the market value of these assets to be around $1.5 billion.**

"**It is unfortunate that the economic environment and financial markets are causing these types of reactions**," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "Yet **it is important to understand these disappointing downgrades do not change our strategic plans** to combine the National companies or improve our financial condition."

**Despite the collateralization of these assets, the company's potential to implement multiple strategic actions is not impacted**, more specifically:

--      The company can enter into sale and leaseback transactions, including the collateralized real estate. Under the credit agreement, the first $150 million of proceeds from sale and leasebacks can be reinvested in the business or must be used to pay off its $150 million term loan. After repayment of the term loan, the company can use proceeds as it deems appropriate to manage the business.

--      The company can continue to dispose of excess facilities including the expected 150 properties from the integration of Yellow Transportation and Roadway.

--      The company can also complete debt-for-debt exchanges. To the extent the principal amount of the retired debt is greater than the amount paid, the difference would be recognized as a gain on extinguishment of debt and included in the company's earnings before interest, taxes, depreciation and amortization under the credit agreement.

25

YRC estimates one-time fees for the collateralization to be around $7 to $10 million that would be incurred during the fourth quarter 2008 and first quarter 2009. The company's pricing under its revolving credit facility remains at LIBOR plus 160 basis points, the maximum pricing under the credit facility, which matures in August 2012. The company does not have any significant long-term debt maturities until April 2010.

(Emphasis added).

49.     The foregoing statements by Defendant Zollars that "it is important to understand these disappointing downgrades do not change our strategic plans" and that "the company's potential to implement multiple strategic actions is not impacted" were materially false and misleading when made because in truth the Company's ability to implement its strategic plan was indeed impacted, and adversely so, and the Company was on the brink of financial ruin. In fact, according to CW3, Zollars had privately admitted in an employee town hall meeting in November 2008 that YRC was "fighting to survive," but this remained undisclosed to investors.

50.     On December 24, 2008, Defendants published another release that continued to condition investors to believe that the Company was operating according to plan. This release stated, in part, the following:

YRC Worldwide Pursues Long-Term Solution to Improve Financial Condition

- Cancels Tender Offer and Evaluates Better Opportunities with its Banks
- **National Integration to be Complete by Early Spring 2009**

OVERLAND PARK, Kan., Dec 24, 2008 /PRNewswire-FirstCall via COMTEX News Network/ -- YRC Worldwide Inc. (Nasdaq: YRCW) today announced that it is in discussions with its banking group to modify certain terms of its credit facilities that would enhance the company's financial flexibility including changes to its leverage ratio… As a result of the discussions, YRC expects to remain in compliance with its covenants in its credit facilities (including any minimum leverage ratio requirement) at year end.

"Given the economic uncertainty, we believe it is more productive to pursue a revised arrangement with our banks as an alternative to completing the tender

offer," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "We continue to have good relationships with our banking group and are confident that we can work out a mutual agreement that provides flexibility in our leverage ratio while improving our liquidity position."

The company currently has over $250 million of cash and expects to generate additional cash from sale and leaseback transactions and proceeds from sales of excess facilities, while notably reducing its 2009 equipment purchases due to the integration of its national companies. When combining these actions together with the planned wage reductions for all YRC employees**, the company expects to have sufficient liquidity to effectively implement its operating strategy well into the future.**

National Integration Update

As announced previously, the company is in the process of integrating the operations and local sales teams of its two largest brands, Yellow Transportation and Roadway. YRC expects to have around 80 facilities either consolidated or in the process of consolidation by the end of 2008. **Due to the early success of the integration, the company has reevaluated the timeline and now expects the integration to be mostly complete by early spring 2009** with around 450 consolidated operations.

"We have the most experienced and dedicated employees in the industry and they continue to exceed our expectations in integrating two large and comprehensive networks," said Zollars. **"Based on this positive momentum, we are confident in further accelerating our timeline** that will allow us to significantly improve density and enhance the value we provide to our customers even sooner."

(Emphasis added).

51.     The foregoing statements were materially false and misleading when made because in truth the Company's technical integration was not an "early success."  Around July 2008, Defendants had decided that the technical integration would be dramatically changed from an integration onto Yellow's technical platform to an integration onto Roadway's older system because the integration was taking too long.  Despite this fact, Defendants falsely claimed that it was "the early success of the integration" that led "the company [to] reevaluate the timeline" of YRC's integration. The statement was also materially false and misleading

27

when made because it failed to disclose the abrupt change in the integration plan from the Yellow system onto the Roadway system, which ultimately resulted in numerous problems, including but not limited to customers abandoning their contracts and the loss of significant amounts of customer data.  Moreover, this statement was materially false and misleading when made for the additional reason that it failed to disclose that YRC "expect[ed] the integration to be mostly complete by early spring 2009" not because of "the early success of the integration," but because of the bank-mandated stipulation that the integration be completed by March 2009. Far from anticipating an early spring completion date because of the "early success" of the integration, Defendants scrambled to change course on a materially flawed integration because the Company's lenders required it.

52.   On January 29, 2009, Defendants published a release announcing purported results for the fourth quarter and full year 2008, the period ended December 31, 2008. This release stated, in part, the following:

> YRC Worldwide generated $220 million of cash from operating activities during 2008, and after accounting for net capital expenditures of $35 million, 2008 free cash flow was $185 million. Total debt at December 31, 2008 increased by $127 million compared to the prior year. However, when taking into account cash and cash equivalents of $325 million at December 31, 2008, the company's debt, net of cash, decreased by $140 million compared to 2007.

> "Our results reflect the significance of the economic recession that has been longer and deeper than anyone anticipated," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "Although we were not pleased with this level of performance, it was consistent with our internal expectations and those of our banking group. **The discussions with the banks are progressing well, and we are on track to finalize an amendment by mid-February,"** Zollars added.

> **"Even in this economic environment, we generated a significant amount of cash and we have multiple initiatives in place that can further improve liquidity**," stated Zollars. "We recognized $128 million of asset proceeds in 2008

and we expect to generate more than $250 million in 2009 from a combination of sale and financing leaseback transactions and sales of excess facilities."

* * *

Outlook

"Although we cannot control or even predict the economy, we have considerable opportunities to improve our financial position while enhancing service to our customers," stated Zollars. "**The network integration at YRC is now on track to deliver a run-rate of $200 million of operating income improvement by early in the fourth quarter of 2009. Combining this with the employee wage reductions of around $300 million, we expect to improve our results by more than half a billion dollars going into 2010**."

(Emphasis added).

53.    The foregoing statements by Defendant Zollars that "discussions with the banks are progressing well, and we are on track to finalize an amendment by mid-February" were materially false and misleading when made because in truth the "discussions" with the lending groups during the technical integration process had been very "ugly," as admitted by Defendants Wicks and Whitsel to CW9. Additionally, Defendants' statement that "network integration at YRC is now on track to deliver a run-rate of $200 million of operating income improvement" was materially false and misleading when made because it failed to disclose that the technical "integration" was not going as planned and was materially flawed, such as customers abandoning their contracts and the loss of customer data. The statement was also materially false and misleading when made because despite touting the positive results being experienced by YRC, Defendants concealed the true fact that the Company was already considering a plan to convert hundreds of millions of dollars of debt into shares of stock.

54.    On January 30, 2009, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants

29

made numerous positive statements about the Company, its business and operations. Defendant

Zollars, in pertinent part, stated:

> With respect to the fourth quarter, each month continued to progressively weaken as the economy slowed further and the retail holiday peak never showed up. Lower volumes and declining prices had the most significant impact on our fourth quarter earnings along with some accelerated integration investments and pension settlement costs.
>
> **By accelerating the integration of Yellow and Roadway to early spring, and now March 1 is really the final day of the integration**, we became much more aggressive in these efforts and so our business mix and volumes would be in a better match with the network capacity we will have in the new integrated network.
>
> One last point on volumes and then we'll move on. **We continue to get asked whether we are losing customers due to the integration of Yellow and Roadway. We don't know of one single customer that has left us as a result of that and we remain confident that that will not be happening as we complete the integration.**
>
> **Our customers continue to support the integration** and are excited about the benefits of the network and the foundation it provides to launch new service offerings. In fact, in the locations that we have already consolidated, most customers have already seen enhanced service.
>
> As we said previously, our largest opportunity to enhance service and improve efficiencies is in the integration of Yellow and Roadway and **we are well on our way to a successful implementation.**
>
> As we moved through the integration of the first 80 or so locations we were able to manage the risk of consolidating these locations and **given the early success we had and continued support of both customers and employees, we have accelerated that, as you know, and are now going to be completing the integration on March 1.**
>
> We expect the economic environment to remain difficult, which obviously impacts our near-term profitability **but with the integration complete and our cost actions, we expect significant improvement starting in the second quarter**.
>
> (Emphasis added).

   55.   These foregoing statements were materially false and misleading when made

because Defendants failed to disclose that YRC accelerated the integration to be completed "on March 1" not because of "the early success we had and continued support of both customers and employees," but because of the bank-mandated requirement that the integration be completed by March 2009. Far from anticipating an early spring completion date because of the success of the integration, Defendants scrambled to change course on a materially flawed integration specifically because the Company's lenders required it. Further, Defendants statement that "we are well on our way to a successful implementation" was materially false and misleading because the technical integration was not going as planned and was materially flawed. Moreover, Defendants' statement that "with the integration complete… we expect significant improvement starting in the second quarter" was materially false and misleading because in truth the technical integration was not going as planned, was materially flawed, and customers were abandoning their contracts; thus, there was no reasonable basis to state that there would be significant improvement related to the integration.

56.     Further, Defendants' statements that "[o]ur customers continue to support the integration and are excited about the benefits of the network" and "[w]e don't know of one single customer that has left us as a result of [the integration]" were also materially false and misleading when made because in truth YRC began to feel significant backlash from customers regarding the materially flawed integration, enormous amounts of customer data was lost, and YRC customers began abandoning their contracts even prior to the purported "completion" of the integration on March 1, 2009, because they "didn't want to be part of the nonsense" of the integration. According to CW9, "YRC parlayed these customer desertions into financial problems." Moreover, by the time this statement was made, Zollars and other senior managers had complained about the slow progress of the technical integration, and had demanded that the

31

integration be switched from Yellow to Roadway specifically to increase the speed of the integration.

57.     Also on January 30, 2009, YRC issued another press release announcing that the Company was sufficiently well-financed to operate according to plan, following the sale of certain assets to third party, NATMI Truck Terminals, LLC ("NATMI").  The press release, stated, in pertinent part, as follows:

> "This is one of many significant steps in the initiatives to improve our liquidity," stated Tim Wicks, Executive Vice President and CFO of YRC Worldwide. "We are pleased with our strong working relationship with NATMI and how quickly we have been able to complete this first step.  We remain encouraged by our progress on the next phases.  **These transactions are a key component of the discussions with our banks, which remain very productive**."

> (Emphasis added).

58.     These statements were materially false and misleading because in truth "the discussions with [YRC's] banks" were not "productive." In fact, Defendants Wicks and Whitsel admitted to CW9 that the "discussions" with the lending groups during the technical integration had been "very ugly."   The statement was also materially false and misleading when made because despite touting the "very productive" "discussions with our banks," Defendants concealed the true fact that the Company was already considering a plan to convert hundreds of millions of dollars of debt into shares of stock.

59.     On February 20, 2009, Defendants published a release that purported to advise investors that the Company had "Further Enhance[d its] Financial Position. This release stated, in part, the following:

> *        S&P Revises CreditWatch to Positive
> *        Company Signs Another Sale and Leaseback for $122 Million

32

OVERLAND PARK, Kan., Feb. 20 /PRNewswire-FirstCall/ -- YRC Worldwide Inc. (Nasdaq: YRCW) announced today that after its recently finalized bank amendment, a positive step was taken by one of the lead credit agencies. In addition, the company finalized additional sale and financing leaseback agreements with another investor.

Earlier this week, Standard & Poor's (S&P) revised the implications of its CreditWatch review on the company to positive from developing. Given the company's new bank amendment, S&P stated it could raise the company's ratings after further evaluation.

"We appreciate S&P's initial perspective of our bank amendment and their willingness to evaluate **its positive liquidity aspects**," stated Tim Wicks, Executive Vice President and CFO of YRC Worldwide.

In addition, the company's operating subsidiaries signed agreements with Estes Express Lines ("Estes") to sell and simultaneously lease back certain facilities. The aggregate sale price is approximately $122 million and the property sales are intended to close from March through June 2009. The initial lease term for each facility is ten years, with two, ten-year renewal options to extend the term of each lease by up to an additional 20 years. The company will have a right of first offer if Estes decides to sell a facility during the first 36 months.

**"We are pleased that we finalized another significant component of our liquidity initiatives**," **stated Wicks.** "**It is common practice in our industry to lease facilities from other industry providers, and in fact, we presently lease other facilities from Estes and they lease from us. This is a continuation of that relationship.** We continue to have additional opportunities in this area with other investors and recent improvements in this particular market have made them even more attractive."

(Emphasis added).

60.     The statement by Defendant Wicks that "[i]t is common practice in our industry to lease facilities from other industry providers" was materially false and misleading when made because Defendants failed to disclose to investors, that YRC was not leasing its facilities merely because it was a "common practice" or as a "continuation of that relationship" with Estes. Defendants failed to disclose that they were desperate for liquidity and that, according to

33

CW3, "[t]he lease back agreement was so bad that within six years the rent paid would equal the amount paid for the terminals." The statement was also materially false and misleading when made because despite touting the positive results being experienced by YRC, Defendants concealed the true fact that the Company was already considering a plan to convert hundreds of millions of dollars of debt into shares of stock at the expense of shareholders.

61.    On March 2, 2009, Defendants published a release that advised investors that the Company had purportedly completed the Successful Integration of National Networks. This release stated, in part, the following:

**With historic March 1 integration, Yellow and Roadway strength and experience unite in YRC**

OVERLAND PARK, Kan., March 2 /PRNewswire-FirstCall/ -- **YRC Worldwide Inc. (Nasdaq: YRCW) announced today the successful March 1 integration of the national networks for Yellow Transportation and Roadway. The two industry leaders will now do business as YRC, a brand providing more than 160 combined years of experience moving big shipments.**

"**This is a game-changing event for our company and the transportation industry**," said Bill Zollars, chairman, president and CEO of YRC Worldwide. **"By going to market as YRC, we're making it easier for customers to do business with the industry leader - and harder for the competition to match our network and our capabilities."**

Zollars says through the hard work and support of the 37,000 YRC employees, the company implemented a strategic, phased-in approach to the integration. With nearly 450 service centers, **YRC offers about 100 more service centers than either Roadway or Yellow did individually. The changes provide 21,000 additional direct service points and position YRC 20 percent closer to customers in major markets. This enables quicker pickups and deliveries, increased flexibility and reduced emissions.**

"**We've designed our network to help customers succeed. It's that simple**," **said Mike Smid**, president of YRC. "**We have the most comprehensive network in North America, the most experienced transportation**

**professionals and the most flexible, efficient solutions to meet any supply chain need**."

"**The YRC network is built for precision and predictability, so our customers are assured of meeting the needs of their customers**," Smid continued. "**Our focus is delivering confidence to our customers**."

(Emphasis added).

62.     The foregoing statements were materially false and misleading when made because in truth the technical integration was not "successfully completed" and the purported "successful March 1 integration" was not "a game-changing event for our company." In fact, the forced technical integration was incomplete and materially flawed by March 1, 2009. CW11 stated that after the technical integration was declared "complete" on March 1, 2009, serious problems plagued customer accounts.  It was clear from the IT department's prior guidance to management in early 2008 that the integration could not be completed until December 2009.  CW11 said, "we could not get the right pricing on the systems." No historical data remained for many customers, meaning that no pricing data existed either.   "The information had simply been lost.  In order to make up for the problems, Defendant Whitsel sent an email to CW 11 and others directing them to give ALL customers an across the board 60% discount of the base rate." Likewise, CW 12 stated that after the technical integration was declared "complete" on March 1, 2009, most of his/her customers were severely affected and frustrated—many simply walked away from their obligations. Further, CW15 noted that when s/he left YRC in December of 2010, the networks were still not fully integrated, except for "parts of the national immigration program (billing and shipping system)." Further, Defendant Smid's statement that "[w]e've designed our network to help customers succeed" was materially false and misleading when made because in truth, as result of the flawed technical

35

integration, YRC lost an enormous amount of customer data, infuriating customers and resulting in arbitrary and unexplained rises in prices that customers were unwilling to pay, and that YRC's new technical platform was integrated onto an inferior system that was so archaic and outdated that few people who knew the software were even still working in the industry. Additionally, CW9 explained that customers began abandoning their YRC contracts and commitments "well before" the integration was purportedly "completed" on March 1, 2009, because they "didn't want to be part of the nonsense" of the integration. "YRC parlayed these customer desertions into financial problems," said CW9.

63.     On April 23, 2009, Defendants published a release announcing purported "results for the first quarter of 2009, the period ended March 31, 2009. This release also stated, in part, the following:

YRC Worldwide Reports First Quarter 2009 Results

*       **Successfully Completed Integration of National Networks**
*       Makes Significant Investments to Enhance Its Market Position

OVERLAND PARK, Kan., April 23 /PRNewswire-FirstCall/ -- YRC Worldwide Inc. (Nasdaq: YRCW) today announced a loss per share for the first quarter 2009 of $2.63, excluding significant charges as listed below, and a loss per share of $4.34 when including the charges. The company's loss per share in the first quarter of 2008 was $.82.

* * *

YRC Worldwide reported cash, cash equivalents and restricted cash of $266 million at March 31, 2009. The company raised $176 million of cash through sale and financing leaseback transactions and sales of excess properties during the first quarter. On April 22, 2009, the company entered into additional sale and financing leaseback agreements with Estes Express Lines ("Estes") for $32 million. When combined with the company's previously announced transactions with Estes, it results in an expected total of approximately $150 million during 2009.

"We made significant investments in our company during the first quarter to enhance our position in the market and improve our future operating performance," stated Bill Zollars, Chairman, President and CEO of YRC

36

Worldwide. "Unfortunately, the economy progressively weakened throughout the quarter making it more challenging to get ahead of the volume declines. **With that said, the March 1 integration of our national networks allowed us to remove substantial capacity and reset the volume needs of our network, while significantly enhancing our service offering to the customer**."

\* \* \*

"**We remain pleased with the number of investors who are interested in our very attractive real estate and the long-term lease commitments that we are able to negotiate**," stated Tim Wicks, Executive Vice President and CFO of YRC Worldwide. "We will continue to evaluate these opportunities and enter agreements as they make sense from a financial and operational perspective."

\* \* \*

"**Our volumes were impacted by multiple factors, most notably the economy and business diversion due to customer anxiety surrounding the integration of Yellow and Roadway**," said Zollars. "Some customers have already returned business, which was temporarily diverted, but it is difficult to predict at what levels or how quickly the rest will come back."

(Emphasis added).

64.     The foregoing statements were materially false and misleading when made because in truth the technical integration was not "successfully completed" and did not "enhance[e] our service offering to the customer." In fact, the forced technical integration was materially flawed and was not successfully completed by March 1, 2009. CW 11 stated that after the technical integration was declared "complete" on March 1, 2009, serious problems plagued customer accounts.  S/he said, "we could not get the right pricing on the systems." No historical data remained for many customers, meaning that no pricing data existed either.  "The information had simply been lost.  In order to make up for the problems, Defendant Whitsel sent an email to CW 11 and others directing them to give ALL customers an across the board 60% discount of the base rate." Likewise, CW 12 stated that after the technical integration was declared "complete" on March 1, 2009, most of his/her customers were severely affected and frustrated—many simply walked away from their obligations. Further, CW15 noted that when

37

s/he left YRC in December of 2010, the networks were still not fully integrated, except for "parts of the national immigration program (billing and shipping system)." These statements were also materially false and misleading when made because in truth the "business diversion" was not merely "due to customer anxiety surrounding the integration of Yellow and Roadway," but was a result of the incomplete, materially flawed integration by YRC that resulted in immediate, painful problems for direct customers—*e.g.*, lost data, decreased functionality of the archaic system, and sudden unexplained price increases. In fact, according to CW9, "YRC parlayed these customer desertions into financial problems." Further, CW12 noted that YRC documented the reason that every customer left. Finally, CW17 explained that "[e]veryone knew that customers were leaving and why they were leaving and what could be done to save them." The statement was also materially false and misleading when made because despite touting the "significant investments in our company during the first quarter to enhance our position in the market and improve our future operating performance," Defendants concealed the true fact that the Company was already considering a plan to convert hundreds of millions of dollars of debt into shares of stock.

65.     On April 24, 2009, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made numerous positive statements about the Company, its business and operations. Defendant Zollars, in pertinent part, stated:

> As we commented recently, the economy progressively weakened throughout the first quarter. **This went to more volume decline than we initially expected at all of our operating companies.**
>
> **In addition to the economy, we believe we are still experiencing some customer diversion due to concerns surrounding the integration. It's difficult to quantify this volume, but we believe it's about a third of our year-over-year decline at national or about 10%. We believe much of that volume will**

**return, and in fact some of it already has, but we can't predict how quickly or at what levels the rest will come back.**

(Emphasis added).

66.     The foregoing statements were materially false and misleading when made because contrary to Defendant Zollars' statement that "we believe we are still experiencing some customer diversion," in reality YRC was actually experiencing customer diversion due to problems surrounding the integration. For example, CW 12 stated that after the technical integration was declared "complete" on March 1, 2009, most of his/her customers were severely, negatively affected and frustrated—many simply walked away from their obligations. After the Company announced the technical integration was complete, CW12 recalled being "required to make a special report on winning back customers" and that these reports came out of the "War Room." CW12 further stated that s/he was appointed to be one of the project managers tasked with winning back lost customers. CW12 further explained s/he attended weekly "enterprise solutions group" meetings beginning a few months before October 2009 with Defendant Wicks and other senior executives, including Group VP Craig Tallman, VP of Enterprise Strategy Bruce Kennedy, and CW17, wherein they addressed a multitude of problems plaguing the Company. During these weekly meeting, they discussed, *inter alia*, gains, lost customers, trouble spots, initiatives to win back lost business, sales opportunities, and results of these campaigns. CW17 confirmed his attendance and the foregoing discussions taking place at the "enterprise solutions group" meetings. In fact, CW17 stated, "Losing customers was always a topic of conversation." Additionally, CW12 stated that after the technical integration was declared "complete" on March 1, 2009, most of his/her customers were severely affected and frustrated—many simply walked away from their obligations. In fact, CW12 noted that YRC documented the reason that every customer left and there were

39

daily discussions in the "war room" about each of some 40 customers. Finally, CW17 explained that "[e]veryone knew that customers were leaving and why they were leaving and what could be done to save them."

67.   The April 23-24, 2009, statements that YRC was experiencing "business diversion due to customer anxiety surrounding the integration" and that "we are still experiencing some customer diversion due to concerns surrounding the integration" constituted a partial disclosure.  This led to a decline in YRC's stock price but continued to materially mislead the market because it continued to conceal that it was not merely customer anxiety but also lost data, decreased functionality of the archaic system, and sudden unexplained price increases, among other material problems facing the Company. The true, adverse facts were not fully disclosed until November 2, 2009.

68.   On May 15, 2009, when Defendants announced that they had finalized an amendment with the Company's lenders of its credit facilities that eliminated the second quarter earnings before interest, taxes, depreciation and amortization ("EBITDA") covenant. Defendants again used this release to condition investors to believe that the Company was still operating within the range of revised expectations and quoted Defendant Zollars again, in part, as follows:

> "It is still too early in the second quarter to precisely project our earnings results," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. **"Although volumes that were temporarily diverted have begun to return, it has not been at the level and speed that we initially expected, and as a result, we proactively worked through an amendment with our banks to remove any EBITDA targets in the second quarter." Zollars continued by saying, "Our operational trends continue to improve and the loyalty of our customers remains strong, which gives us confidence in our earnings trends as we progress through the year."**

(Emphasis added).

69.    The foregoing statements by Defendant Zollars that "[o]ur operational trends continue to improve and the loyalty of our customers remains strong" were materially false and misleading, but undisclosed to investors, when made for two important reasons: (1) CW9 said that during the financial meetings with YRC's lending groups, which Defendants Whitsel, and Wicks all attended, the lending groups were shown financial forecasting models that revealed YRC's financials were going to be "ugly;" and (2) angry customers were walking away from their contracts due to the serious problems associated with the integration. The statement was also materially false and misleading when made because despite touting the "operational trends continu[ing] to improve and the loyalty of our customers remain[ing] strong," Defendants concealed the true fact that the Company was already considering a plan to convert over hundreds of millions of dollars of debt into shares of stock.

70.    On June 18, 2009, Defendants again published a release that purported to "clarify" the Company's amendments to its bank credit agreements. This release stated, in part, the following:

> "**Yesterday's amendment reflects the continued support of our lender group as we further implement our strategic actions both operationally and financially**," said Tim Wicks, Executive Vice President and CFO of YRC Worldwide. "We now have immediate access to the escrow funds, which is a month before the original agreement, and there is not an immediate reduction to our capacity."

(Emphasis added).

71.    Defendant Wicks' foregoing statement that "[y]esterday's amendment reflects the continued support of our lender group" was materially false and misleading when made because it failed to disclose that YRC's discussions with its lending groups were "very ugly." Additionally, CW9 stated YRC narrowly focused only on the topic of securing covenant

41

waivers from its lending groups. There were no broader financial discussions regarding the Company and the lending groups were shown financial forecasting models that revealed YRC's financials were going to be "ugly." The statement was also materially false and misleading when made because despite touting YRC's "strategic actions both operationally and financially," Defendants concealed the true fact that the Company was already considering a strategic plan to convert hundreds of millions of dollars of debt into shares of stock.

72.     On July 8, 2009, Defendants published a release that purported to provide an "update" on the Company's "Comprehensive Plan," and its "additional progress in its comprehensive plan to realize efficiencies from the YRC integration, restore financial strength, and position its operating companies for future success." In addition, this release again quoted Defendant Zollars, in part, as follows:

> "We can't control the economic environment, but we certainly can and are controlling our response to it," said Bill Zollars, Chairman, President and CEO of YRC Worldwide. "**Our self-help recovery plan is proactive and has the support of our stakeholders. We are taking the steps needed to manage our plan today, and position our company for success as the economy recovers**."

(Emphasis added).

> *         Network re-engineering **- In March 2009, the company took a trailblazing step forward by integrating the Yellow Transportation and Roadway networks into YRC. The move created the most comprehensive LTL network in North America, allowing the company to reduce facilities and costs, while enhancing services.**

> *         Continued support from lender group - Last month the company announced an amendment to its bank agreement to provide for the immediate release of escrow funds generated from the company's prior asset sales to pay down the revolving credit facility without reducing the company's borrowing availability under the facility.

(Emphasis added).

73.     The foregoing statement by Defendants that YRC took a "trailblazing step

{175091.DOC }

forward by integrating the Yellow Transportation and Roadway networks" was materially false and misleading when made because in truth the forced technical integration was materially flawed and was neither successful nor complete. In fact, CW 11 stated that after the technical integration was purportedly "complete" on March 1, 2009, serious problems plagued customer accounts.  S/he said, "[W]e could not get the right pricing on the systems." No historical data remained for many customers, meaning that no pricing data existed either.  "The information had simply been lost.  In order to make up for the problems, Defendant Whitsel sent an email to CW 11 and others directing them to give ALL customers an across the board 60% discount of the base rate." Likewise, CW 12 stated that after the technical integration was "complete" on March 1, 2009, most of his/her customers were severely affected and frustrated—many simply walked away from their obligations. Further, CW15 noted that when s/he left YRC in December of 2010, the integration was still not complete, except for "parts of the national immigration program (billing and shipping system)" and the networks were still not fully integrated. The statement was also materially false and misleading when made because despite touting YRC's "self-help recovery plan [as] proactive and [having] the support of our stakeholders" and that YRC was "positioning our company for success as the economy recovers," Defendants concealed the true fact that the Company was already considering a plan to convert hundreds of millions of dollars of debt into shares of stock.

74.    On July 14, 2009, Defendants issued a follow-up release that continued to report that the Company was making "significant progress on its comprehensive plan," and that again quoted defendant Zollars, in part, as follows:

> OVERLAND PARK, Kan., July 14, 2009 /PRNewswire-FirstCall via COMTEX News Network/ -- YRC Worldwide Inc. (Nasdaq: YRCW) announced today **significant progress on its previously announced comprehensive plan to realize efficiencies from the YRC integration**, **restore financial strength, and**

**position its operating companies for future success.** The company's progress report includes updates on two key areas of its plan.

\* \* \*

Lender group support and discussions continue

Today the company announced that it finalized an amendment to its revolving credit facility with its lenders to extend the revolver reserve through July 31, 2009. During this extension, YRC Worldwide and its lenders will work collaboratively to reach agreement on options for longer-term modifications to its existing credit facilities. The revolver reserve was initially established in February 2009 to serve as a temporary reserve against the revolver capacity as the company sold real estate collateralized to the lenders.

(Emphasis added).

75.     The statement by Defendants that YRC made "significant progress on its previously announced comprehensive plan to realize efficiencies from the YRC integration, restore financial strength, and position its operating companies for future success" was materially false and misleading when made because in reality "anyone could run the numbers and see Zollars' [comprehensive] plan was not doable," according to CW9.

76.     CW9 also disclosed that during the financial meetings with YRC's lending groups in May or June 2009, which Defendants Whitsel, and Wicks all attended, the lending groups were shown financial forecasting models that revealed YRC's financials were going to be "ugly." The statement was also materially false and misleading when made because despite touting YRC's "significant progress on its previously announced comprehensive plan to realize efficiencies from the YRC integration, restore financial strength, and position its operating companies for future success," Defendants concealed the true fact that the Company was already considering a plan to convert hundreds of millions of dollars of debt into shares of stock.

77.     On July 30, 2009, YRC held a conference call with analysts and investors to

44

discuss the Company's earnings and operations. During the conference call, Defendants made numerous positive statements about the Company, its business and operations. Defendant Zollars:

> First, please keep in mind that when we started the second quarter we were only a month past the integration of our Yellow and Roadway networks which was a once in a lifetime event, and while that process wasn't perfect, and **we hit quite a few bumps in the road two weeks following the integration**. We feel very good about what we have accomplished in a short time and are now beginning to reap the benefits of increased efficiencies from the integration and better service product.
>
> **First we've successfully completed the integration** as I mentioned earlier and have taken significant costs out of the business while achieving record service levels although we had a couple of weeks there that were pretty rough.

(Emphasis added).

78.     The statement by Defendant Zollars that "we've successfully completed the integration" was materially false and misleading when made because in truth the forced technical integration was materially flawed and was not successfully completed. In fact, CW 11 stated that after the technical integration was declared "complete" on March 1, 2009, serious problems plagued customer accounts.  S/he said, "[W]e could not get the right pricing on the systems." No historical data remained for many customers, meaning that no pricing data existed either.  "The information had simply been lost.  In order to make up for the problems, Defendant Whitsel sent an email to CW 11 and others directing them to give ALL customers an across the board 60% discount of the base rate." Likewise, CW 12 stated that after the technical integration was "completed," most of his/her customers were severely affected and frustrated— many simply walked away from their obligations. Further, CW15 noted that when s/he left YRC in December of 2010, the integration was still not fully completed, except for "parts of the national immigration program (billing and shipping system)" and the networks were still

not fully integrated.

79.     On August 10, 2009, Defendants filed the 2Q:09 Form 10-Q with SEC. The Form

10-Q stated, in part, the following:

> **In addition, we believe that some of our customers have reduced their shipments with us to mitigate the risks of integration of our Yellow Transportation and Roadway networks**. We experienced these reduced shipment levels to a greater extent in March 2009 and for a longer period extending into the second quarter than we anticipated when planning the integration of our networks. **As a result, our financial results for the second quarter have fallen short of our previous expectations.**
>
> *YRC Integration*
>
> **In March 2009, we completed the integration of our Yellow Transportation and Roadway networks into one service network**, now branded "YRC".

80.     These statements were also materially false and misleading when made because in

truth customers were not reducing "their shipments with [YRC] to mitigate the risks of

integration of our Yellow Transportation and Roadway networks," but as a result of the

incomplete, materially flawed integration by YRC. In fact, according to CW9, "YRC parlayed

these customer desertions into financial problems."   In fact, the forced technical integration

was materially flawed and was not successfully completed by March 1, 2009. CW 11 stated

that after the technical integration was declared "complete" on March 1, 2009, serious

problems plagued customer accounts.   S/he said, "we could not get the right pricing on the

systems." No historical data remained for many customers, meaning that no pricing data

existed either.   "The information had simply been lost.  In order to make up for the problems,

Defendant Whitsel sent an email to CW 11 and others directing them to give ALL customers an

across the board 60% discount of the base rate." Likewise, CW 12 stated that after the technical

integration was declared "complete" on March 1, 2009, most of his/her customers were

severely affected and frustrated—many simply walked away from their obligations. Further,

CW15 noted that when s/he left YRC in December of 2010, the networks were still not fully integrated, except for "parts of the national immigration program (billing and shipping system)."

81.     On October 30, 2009, Defendants published a release announcing results for the third quarter of 2009, the period ended September 30, 2009. This release also stated, in part, the following:

YRC Worldwide Reports Significant Sequential Improvement in Its Third Quarter 2009 Results

OVERLAND PARK, Kan., Oct 30, 2009 /PRNewswire-FirstCall

--     YRC Regional and YRC Logistics Profitable
--     ABS Facility Renewed Early; Extended through October 2010
--     New Long-Term Bank Amendment Provides for Deferral of Interest and Fees
--     Update on Proposed Exchange Offer

YRC Worldwide Inc. (Nasdaq: YRCW) today reported its results for the third quarter and provided an update on its comprehensive plan. For the quarter, the company announced a loss per share of $2.67 that included a net gain on property disposals of $.18 per share, severance charges of $.08 per share **due to further headcount reductions** and lease termination charges of $.11 per share related to further optimizing the networks. By comparison, the company reported a loss per share in the third quarter of 2008 of $12.58 that included impairment charges on goodwill and intangible assets of $13.20 per share, a curtailment gain of $.84 per share, and a net gain on property disposals of $.21 per share.

* * *

YRC Worldwide also reported aggregated cash and available unused capacity under the credit facilities of $171 million at September 30, 2009, including $163 million of cash and cash equivalents. In addition, the revolver reserve under the company's credit agreement was $102 million at September 30, 2009. The company expects to commence an exchange offer for its outstanding USF 8-1/2% notes and its contingent convertible notes. **The successful completion of this exchange would allow the company to access this revolver reserve under its recently amended credit agreement, therefore providing a significant source of new liquidity**. More information regarding the exchange offer and credit

agreement is provided below. The company also completed $21 million of sale and financing leaseback transactions and sold $68 million of excess property during the third quarter, including $10 million in pension deferral debt pay downs from these proceeds.

"**We gained significant momentum in the third quarter as we executed on our comprehensive plan to improve operating efficiencies, restore financial strength and position our company for future success**," stated Bill Zollars, Chairman and CEO of YRC Worldwide. "We achieved significant sequential improvement from the first half of the year. In fact, YRC Regional Transportation and YRC Logistics were profitable for the quarter, and our operating cash flow trends improved sequentially during the quarter despite the continued economic downturn."

\* \* \*

"**Our third quarter sequential shipment trends have dramatically stabilized as compared to the trends from the first half of the year, while we continue to maintain pricing discipline in an increasingly competitive marketplace**," said Tim Wicks, President and Chief Operating Officer of YRC Worldwide.

\* \* \*

"**We continue to receive solid support from our lenders as we implement our recovery plan to manage through this severe economic downturn**," stated Sheila Taylor, Executive Vice President and CFO of YRC Worldwide. "**With 100% of the credit facility and ABS lenders approving the amendments, they have once again demonstrated the belief they have in the value of this company and its potential, as the benefits of our strategic plans become more apparent in our results**."

"We have been in active dialogue with our noteholders and feel good about the progress being made. **The exchange will be a key milestone in our comprehensive plan which is expected to improve our capital structure, reduce our debt and increase our cash flow,**" stated Zollars.

(Emphasis added).

82.    The foregoing statements made by Defendants and contained in the Company's August 3, 2009 and October 30, 2009 releases were materially false and misleading when made, because in truth, when YRC lost customer data, Defendants decided to give an across the

board 60% discount of the base rate and simply wrote off the lost revenues, and YRC saw a dramatic increase in the number of delinquent accounts as customers walked away from their obligations, and most of these collection cases were written off as losses, both of which ultimately affected YRC's financial results. Additionally, Defendant Zollars' statement that "[w]e gained significant momentum in the third quarter as we executed on our comprehensive plan" was materially false and misleading when made because in truth "anyone could run the numbers and see Zollars' [comprehensive] plan was not doable," according to CW9. These statements were also materially false and misleading when made because Defendants were aware of a proposed exchange offer, which effectively left the Company with no equity value, for at least most of the year prior to the announcement. Defendant Zollars stated, "This is something we've been talking about for most of the year in terms of the final step in our comprehensive **play**." This proposed exchange offer would ultimately be made because the technical integration was incomplete and materially flawed, resulting in lost customers and lost revenues, and the Company was on the precipice of financial ruin, yet this information remained undisclosed to investors. Therefore, the statement was also materially false and misleading when made because despite touting YRC's "significant momentum" on YRC's "comprehensive plan to improve operating efficiencies, restore financial strength and position our company for future success," Defendants concealed the true fact that the Company was performing so far below expectations and that a year prior to the end of the Class Period the Company commenced working on a desperate, last-ditch deal to convert hundreds of millions of dollars of debt into shares of stock.

### THE TRUE FINANCIAL AND OPERATIONAL CONDITION
### OF YRC IS FINALLY FULLY DISCLOSED

83.     Despite the numerous positive statements throughout the Class Period regarding,

*inter alia*, the Company's positive momentum and having financially "turned the corner," on November 2, 2009, YRC shocked investors when it revealed, for the first time, that the Company was performing well below expectations and that it now expected to convert over half a billion dollars of debt into shares of Company stock, thereby effectively giving bondholders as much as 95% of the equity of the Company and resulting in the resignation of seven of its nine directors. This announcement by the Company fully and finally revealed the depths of the Company's pervasive and overwhelming problems -- ranging from the unsuccessful and incomplete integration, to debt and liquidity issues and violations of lending agreements, to the loss of customers, and internal control problems including the loss of massive quantities of crucial customer data that required across-the-board massive discounting to seek to retain those customers who remained -- that made the desperate debt-conversion plan a necessity for the Company's very survival. The release stated, in part, the following:

> OVERLAND PARK, Kan., Nov 02, 2009 /PRNewswire-FirstCall via COMTEX News Network/ -- YRC Worldwide Inc. (Nasdaq: YRCW) today announced that it intends to launch an exchange offer this week based upon terms discussed with representatives of a committee of the holders of its contingent convertible notes and a committee of the holders of its USF 8 1/2% notes (collectively the "Notes").
>
> In the aggregate and with full participation, noteholders would exchange approximately $536.8 million in face value of Notes plus accrued and unpaid interest for shares of common stock and new Class A Convertible Preferred Stock, which together on an as-if converted basis would represent 95% of the company's common stock, with a provision for options to be granted to the company's union employees pursuant to the company's recently ratified Amended and Restated Memorandum of Understanding on the Job Security Plan.

84. The same day, the *Kansas City Business Journal* reported, in part, the following:

> Overland Park-based YRC (Nasdaq: YRCW) said in a Monday release that it hopes to swap about $536.8 million in contingent convertible notes and USF 8.5 percent notes, plus accrued and unpaid interest, for shares of YRC common stock and new class A convertible preferred stock.
>
> If the preferred stock were converted and combined with the common stock

50

allotment, the noteholders would hold 95 percent of the company's common stock. A Monday filing with the Securities and Exchange Commission detailed a plan to convert preferred stock to common stock, contingent on shareholder approval.

As of the offering's effective date, expected in mid-December, seven of YRC's nine directors would resign. They would be replaced with three chosen by the new owners and three mutually agreed upon by the company and its new owners, along with one appointed by the International Brotherhood of Teamsters union, YRC spokeswoman Suzanne Dawson said.  She said it was not yet known which two directors would remain.  YRC CEO Bill Zollars chairs the company's current board.

YRC has about 60.2 million shares of common stock outstanding; noteholders would get at least 42 million shares of common stock and 5 million shares of preferred stock with an aggregate face amount of $250 million, the filing said.

Provisions would remain for options for YRC's union employees, who in concessions negotiations were promised options for a 35 percent stake in the company.  Non-union employees, promised options for a 7 percent stake of YRC common stock, could still get those, Dawson said.

85.     In fact, Defendant Zollars admitted, in commenting on the offer, "***This is something we've been talking about for most of the year in terms of the final step in our comprehensive play.***"  (Emphasis added).

86.     Tellingly, Jason Seidl, a longtime follower of YRC as an analyst for Dahlman Rose & Co., said the next day that the deal's details caught him by surprise. "I had no idea it would be this large," Seidl is quoted by the *Kansas City Sta*r website. "I didn't see the train wreck hitting the school bus full of kids and nuns."

87.     Shares of YRC stock plummeted on this news—falling 64% on a single trading day, over $2.30 per share on huge volume of 54.8 million shares traded, over five times the stock's average daily volume over the past three months, to close trading that day at only $1.32 per share. Further explaining the massive decline in the price of the Company's shares, the *Kansas City Business Journal* further reported comments by research analyst Lee Llaskow, of Longbow Research, who stated, in part, the following:

The bond exchange offering is "much more dilutive than we originally thought," [Longbow Research analyst Lee] Klaskow said.

"Our conclusion is that management needed to entice its bondholders at the expense of its current shareholders to get the exchange offering done," he wrote.

He said the second block of options given the Teamsters, for 20 percent of common stock in conjunction with a second round of concessions, would be dilutive after the exchange. If the preferred stock is converted and the union and non-union employees exercise their options, YRC would have about 1.6 billion shares outstanding.

### **Post-Class Period Developments Further Confirm Defendants' Fraud**

88.     Since that time the news has only gotten worse. According to numerous financial analysts, YRC narrowly avoided bankruptcy in January 2010 when it triggered a complex bond swap agreement with its creditors.  This injection of liquidity only delayed further extraordinary measures that harmed the Class. In early March 2011, YRC reached a new agreement with its creditors to provide them with equity shares and convertible debt provisions that place the Company's creditors in a preferred position in the event of a bankruptcy.  Importantly, this agreement also places regular shareholders – who were fraudulently induced to hold their equity in the Company at artificially inflated prices during the Class Period – at the back of the line in the event of what increasingly appears to be an inevitable bankruptcy.

89.     In its March 16, 2011 Form 10-K, YRC addressed bankruptcy, admitting that it could be the next step for the Company.  YRC admitted that several outcomes were likely in the event of a bankruptcy:

- Our customers would likely cease or substantially reduce their use of our services to avoid the possibility of stranded freight in our network in the event we cease to operate or substantially reduce our operations;

- Our suppliers may attempt to cancel our contracts or restrict ordinary credit terms, require financial assurances of performance or refrain entirely from providing goods or services to us;

- Our employees may become distracted from performance of their duties or more easily attracted to other career opportunities;

- We may have difficulty continuing to obtain and maintain contracts necessary to continue our operations and at affordable rates with competitive terms;

- Transactions outside the ordinary course of business would be subject to the prior approval of the bankruptcy court, which may limit our ability to respond timely to certain events or take advantage of certain opportunities; and,

- We may be unable to retain and motivate key executives and employees through the process of a Chapter 11 reorganization, and we may have difficulty attracting new employees.

90.    In an attempt to stave off bankruptcy, the *Memphis Business Journal* reported on August 19, 2011, that YRC plans to seek shareholder approval to merge YRC with a shell company called YRC Merger Sub, Inc. in order to allow YRC to convert preferred shares it issued to its lenders into numerous common shares.  If approved the upper limit of YRC common shares would increase from 80 million to 10 billion, giving YRC's creditors near complete control of the Company and further diluting the Class's ownership stake in the Company.

91.    YRC announced on September 16, 2011, that the foregoing plan was approved at a Special Meeting of the Stockholders. Morgan Keegan Co. analyst Arthur Hatfield commented: "***When you consider as part of the merger they are issuing… about 4 billion in incremental shares… there really is no equity value in the company***." (emphasis added). Essentially, YRC is attempting to avoid bankruptcy by striking a deal with debt holders to the extreme detriment of shareholders.

92.    As of October 20, 2011, YRC stock traded at $0.05 per share, a 99% decline from the Company's Class Period high.

**THE TRUE, ADVERSE FACTS CONCEALED THROUGHOUT THE CLASS PERIOD**

## The Deeply Flawed and Incomplete Technical "Integration"

93.     According to CW7, a former IT supervisor, at the time of Defendant Zollars'
announcement in February 2008 that YRC would integrate the technology platforms of Yellow
and Roadway, an integration team had been ordered to integrate the Yellow and Roadway
applications onto the Yellow system. CW7 stated that a contracted team began to integrate
these applications onto Yellow's system in February 2008.  The decision to use Yellow's
system was made because Yellow had a much more sophisticated and up-to-date technology
system. CW10, a team driver at YRC, remarked that the industry considered Yellow to have
one of the top-notch tracking systems in the country. CW8, an Account Manager/ E-Business
Field Manager who worked intimately on the integration during the Class Period, confirmed
this initial decision to integrate the Yellow and Roadway systems onto the Yellow system.
CW8 explained that the IT department laid out a plan to carefully integrate all of the IT
systems of Yellow and Roadway into one system on Yellow's platform. Given the sheer size of
the systems and customer bases, CW8 said that IT explained to senior management that it
would take more than a year to successfully complete the integration, providing a target date of
December 2009.

94.     However, CW8 learned that YRC's senior management had agreed to terms with
the banks holding the notes on YRC's merger-related debt that mandated a complete
integration by March 2009, a mere seven months from YRC's announcement of the accelerated
integration. In fact, the CW8 revealed that the March 2009 integration completion date was
included as a "stipulation of the loan" to YRC.

95.     As a result of this pressure, Defendant Zollars and other members of senior
management made the undisclosed decision to completely change the initial integration plan

{175091.DOC }

from integrating onto the Yellow platform to integrating onto the Roadway platform instead. CW11 explained that in July 2008, the Company abandoned the initial integration plan. Now, the plan was no longer to integrate onto the Yellow system, but instead to integrate onto the Roadway system. This change was concealed from the market throughout the Class Period. CW1 confirmed this decision, commenting that s/he had worked for months in 2008 on converting Roadway over to Yellow's system when in late 2008 the plan was entirely changed to the Roadway system. S/he further confirmed the order that the integration had to be completed by March 2009. Essentially, YRC was abandoning IT's careful plan to integrate all of the IT systems onto Yellow's platform and now forcing the IT department to immediately reverse course—without the benefit of a plan—to integrate the Yellow and Roadway systems onto Roadway's platform by March 2009.

96.     The decision to change the integration plan from Yellow to Roadway had disastrous consequences for the technical integration and for the Company as a whole. CW11, a YRC manager in various departments for nearly 30 years who reported directly to Defendant Whitsel, explained that through much of 2008 the "IT group had been converting all of the Roadway records from [their original] VSAM file structure to a [compatible] DB2 [structure] and updating the programs written in COBOL code to accommodate the Yellow system." However, without any warning, senior management halted this conversion and demanded that the IT department reverse its progress and convert everything back to the Roadway program. CW11 states that this "decision was made even though the majority of the records and the programs had already been converted to work on the Yellow system." CW11 emphasized that it made absolutely no sense to change direction at this point.

97.     CW11 explained that, in addition to the timing of the decision, the decision itself

made little sense because the Roadway system was "archaic system that was no longer in mainstream use." CW11 noted that the Roadway system was an IBM mainframe that ran on a MODEL 204 system. In fact, the system was so old that not many people who knew the software were still working in the industry." CW12, a senior project manager at YRC for 11 years beginning in 1999, confirmed that the Roadway system "was suspect at best. This was because the technology was old and limited, and the people who knew it were aging and were shrinking in numbers." Further, CW2 and CW15 confirmed the Roadway system was out of date. CW2 stated that the Roadway system was "antique," while CW15, a Systems Engineer between 1998 and December 2010, said that the "Roadway system was out of date."

98.   An additional problem with the integration involved YRC's refusal to devote sufficient resources to ensure a successful transition. CW5 explained that another reason the integration plan "failed" was because YRC did not make the capital expenditures into IT as they had promised. Senior management acknowledged these problems at employee town hall meetings, and also discussed the lack of resources in monthly employee newsletters. CW8 further noted that there was simply not enough money or resources available to properly integrate the Yellow and Roadway systems.

99.   CW1, who was intimately involved in the technical integration, said that people in the IT department only had a certain number of hours that they could work on fixing problems. As a result of not having sufficient hours, major upgrades were delayed. There were issues with applications on the website and severe bugs that really needed to be fixed. Nevertheless, management only allotted IT a "bucket of hours" to deal with these problems associated with the integration. CW1 said that his/her manager spoke about reports which showed how many hours that IT could work on his/her group's projects. In some months, there were no hours

available to address ongoing problems because the allocated "bucket of hours" had been exhausted.

100.   As a result of forcing through a rushed integration onto the inferior, archaic Roadway system, YRC senior management felt significant backlash from customers.  CW13, a programmer analyst ay YRC, explained that an enormous amount of customer data was lost due to insufficient data mapping.  Data mapping amounted to identifying a customer database field in Yellow's system and figuring out how to map it to a similar database field in the Roadway system.  When senior management pushed for the transfer to be completed by March 2009, CW13 stated that no history of the data mapping transfers was being maintained in the Roadway system. CW13 stated that "the Yellow system had a lot of information that wasn't being maintained in the Roadway system." The result was the loss of massive quantities of crucial customer information – in many instances, all data on a customer was lost.

101.   Commenting on this course change, CW2 said that while everyone acknowledged that the Roadway system was "antique," it was "cheaper" to move to the Roadway system than to the Yellow system, thus satisfying the demands of the banks, but ultimately sacrificing the success of the integration and customer satisfaction.

102.   Tellingly, CW9 explained that customers began "bailing" on their YRC contracts and commitments "well before" the integration was completed because they "didn't want to be part of the nonsense" of the integration. "YRC parlayed these customer desertions into financial problems," said CW9.

103.   Throughout the Class Period, the Individual Defendants and other members of management specifically instructed YRC's employees not to disclose the problems and consequences of the incomplete, materially flawed integration. In addition to Zollars'

announcement to employees in 2008 of the "guarded secret" that if YRC did not hit certain numbers the banks would pull the notes, the Individual Defendants sought to clamp down on public discussions of any kind involving the technical integration by requiring current employees working on the technical integration to sign confidentiality agreements.

104.   CW8 explained that everyone in the IT department, including him/her, was required to sign broad confidentiality agreements prohibiting them from discussing any aspects of the integration or how the integration was effectuated.  CW8 was specifically told that these confidentiality agreements were necessary because senior management did not know how YRC's customers or the shipping industry would react to the incomplete, materially flawed integration.  CW1 and CW2 also confirmed signing broad confidentiality agreements purportedly preventing them from discussing any aspects of the integration, including provisions concerning the manner in which the technical integration was conducted.

105.   CW11 stated that after the integration, serious problems plagued customer accounts.  S/he said, "We could not get the right pricing on the systems."  No historical data, which included pricing data, remained for many customers. The information had simply been lost.  In order to make up for the problems that began to occur after the March 1, 2009 integration "completion" date, Defendant Whitsel sent an email to CW11 and others directing them to give ALL customers an across the board 60% discount of the base rate.  CW11 noted that Whitsel had copied the entire revenue management group on the email.  CW11 personally conducted the programming that gave customers this across the board discount, and further stated that YRC simply wrote off the entire loss incurred by the 60% discount.

106.   Likewise, CW12 stated that after the technical integration was purportedly completed on March 1, 2009, most of his/her customers were severely, adversely affected and

frustrated.  Many simply walked away from their obligations, assuming that YRC would soon file for bankruptcy.  CW12 stated, "Being in sales, it was difficult keeping customers."  After the technical integration, CW12 also observed that senior management knew there were problems because they were given sales reports that showed the problems.  CW14, a credit analyst at YRC from August 2007 to October 2010, reaffirmed that there were a lot of customer complaints concerning the integration.  In fact, CW14 noted that after the integration, s/he "saw an increase in the number of hard core collection cases that YRC had to perform."

107.   Further, after YRC falsely announced the technical integration was "complete" on March 2, 2009, CW11 stated that many customers who owed YRC money stalled payments because they believed that YRC was going bankrupt.  CW11 said that rather than pursue these receivables YRC often just wrote them off.  CW11 emphasized that everyone in revenue management was aware of these increasing write offs because an email distribution list existed for the entire revenue management department that communicated the write offs.  This email list included Senior Director of Revenue Management Kelly Kendall, Senior Revenue Manager Pam Joachim, Defendant Whitsel, and Mike Naatz.  Further, CW11 stated that stockholders were never told how many dollars were simply written off that could have been collected if an effort was made to pursue them by YRC.

108.   CW8 explained that the forced speed of the integration affected everyone in the IT and operations departments. Because of the forced speed of the integration, customers lost functionality, which angered customers, and also lost data. CW8 further revealed that because YRC had now reversed course to integrate the Yellow system onto the Roadway system, the IT department's original integration plan was useless. Accordingly, the IT department was not able to plan for contingencies that arose during the new forced integration plan onto the

Roadway system. Thus, CW8 stated there were a lot of "fire drills" and a lot of "Band-Aids."

109.   With the technical integration incomplete and materially flawed, with customers leaving the Company, and with revenues falling sharply, CW3 stated that Defendant Zollars *admitted* in an employee town hall meeting in February 2009 that YRC had violated its credit agreement with its lenders.

110.   According to CW3, in early 2009, it was obvious that YRC was in trouble after the integration was purportedly "complete" when it sold its shipping terminals and leased them back from Estes, a direct competitor. "The lease back agreement was so bad that within six years the rent paid would equal the amount paid for the terminals." CW1 also observed that YRC put both of its main buildings up for sale after the integration was purportedly "complete" on March 1, 2009.  The Overland Park building was sold and leased back.

111.   CW1 also observed that the loss of customer information and user profiles during the Yellow to Roadway switch resulted in huge inadvertent price increases for certain customers, *i.e.*, there were material billing errors.  S/he explained that some customers who had received the same base rate since 1985 suddenly saw a huge jump in their shipping rates. These material billing errors and material price increases began to manifest themselves shortly after the March 1, 2009 integration completion date. "After the cutover [March 1, 2009], customers were really mad and the changes gave them a lot of heartburn," said CW1. CW8 confirmed that an "enormous" amount of customer data was lost, which resulted in the loss of "company visibility" in the industry because customer information simply could not be retrieved. These problems made some customers irate.

112.   Despite the serious consequences of the incomplete, materially flawed technical integration, CW9 noted that YRC's financial troubles began prior to the integration because

many "trailers were only 10% full and a lot of lanes were not running full."

113.   According to CW8, when it became clear in the middle of 2009 that the integration was not going as planned and the Company was "fighting to survive," senior management made it known that there would be no hard feelings if anyone chose to leave.  In fact, managers were given directions that they were "supposed to be looking for another job." According to CW8, "if [managers] had a better job, they took it."  S/he stated that much of "senior management left because they didn't want to be part of a sinking ship." Similarly, according to CW1, she felt numerous senior managers left YRC in 2009 because they had "seen the writing on the wall" and did not want to continue to be part of a failing company.

114.   While senior managers were given ample warning and instructions to find other work in 2009, lower level employees were simply laid off in droves.  According to CW8, the Company conducted layoffs nearly every Friday for his/her last two to three years at YRC, including a major layoff in April 2009. CW8 observed that the layoffs often did not make business sense because "it was the banks who were pulling the strings."  For example, the size of the e-commerce department shrank in size from seven employees to a single employee, despite having saved the Company $12 million the previous year. CW9 corroborated this statement by noting that the lender groups were calling a lot of the shots.

115.   CW1 also noted that there were massive layoffs, reduced hours, and reduced benefits for all employees during the Class Period. S/he noted especially that, following the incomplete, materially flawed integration, many employees were mandated to take three unpaid furlough days each month. CW16, a senior project manager at the Company between 2006 and 2010, recalled that employees from the IT department were "leaving out the door every week," that management was supportive of people leaving the Company, and that management did not

attempt to dissuade current employees from interviewing for new jobs while on their lunch breaks. CW16 explained that YRC employees simply did not know if the Company was going to survive.

### YRC's Lenders Calling the Shots

116.  CW9, a Company Vice President of Enterprise Services and Revenue Management between 2007 and 2011, stated that the lending groups were "calling a lot of the shots" at YRC during the purported technical integration. CW9 explained that the banks "had a lot of control over YRC" and applied pressure for YRC to complete the technical integration. CW9 reported directly to Defendant F. Joseph Whitsel III. CW9 also reported to Chief Information Officer Mike Naatz and Senior Vice President and Chief Financial Officer Phil Gaines.

117.  Moreover, CW9 explained that he learned "around the first of the year in 2009, the banks had a lot of control over YRC." This was not disclosed during the Class Period. CW9 said that s/he attended meetings in May or June of 2009 with all of the lending groups. *Defendants Whitsel, and Wicks all attended these meetings, and discussed in very frank terms the "ugly discussions" YRC's management had with the banks during the materially flawed technical integration.* CW9 stated YRC narrowly focused on the topic of securing covenant waivers for periods of 12-18 months from its lending groups. They were no broader financial discussions regarding the Company. Further, CW9 said that during these meetings with YRC's lending groups, the lending groups were shown financial forecasting models that revealed YRC's financials were going to be "ugly."

118.  CW17, who was employed at YRC between 2003 and 2011 and was the Director of Business Strategy, explained that Defendant Zollars had to keep the "bankers and lenders"

happy. CW17 further noted that financial decisions had to be "run by the banks the lenders" for approval because it was "contractually controlled."

### YRC's Secret Plan to Give Bondholders 95% of the Equity of the Company

119.   For most of 2009, YRC was performing so poorly and so far below expectations that members of senior management were covertly developing a last ditch-plan to convert hundreds of millions of dollars of debt into shares of stock at the expense of shareholders. Defendant Zollars himself ultimately admitted this key fact on November 2, 2009, when he stated, "This is something *we've been talking about for most of the year in terms of the final step in our comprehensive play*."   (Emphasis added).

### ADDITIONAL SCIENTER ALLEGATIONS

120.   Scienter is strongly supported here by myriad sources. Defendants' knowledge and/or reckless disregard of the true, adverse facts concealed from investors throughout the Class Period is supported by, *inter alia*, Defendants' own admissions; statements of numerous, corroborative well-placed former employees of YRC, who were well positioned to know the information they reported – indeed several of them reported directly to one or more of the Individual Defendants; Defendants' receipt of reports detailing the specifics of concealed problems; Defendants' positions at the Company; and Defendants' motives, including bonus awards based on stock performance.

121.   Plaintiffs' witnesses reported, *inter alia*, that the Individual Defendants knew or recklessly disregarded that the Company's technical integration was materially flawed and could not be completed by the March 1, 2009, integration completion deadline imposed by lenders but rather would drag on at least until December 2009; that YRC lost significant quantities of customer information and user profiles during the transition, which resulted in

huge inadvertent price increases for certain customers; that unsatisfied customers began abandoning their YRC contracts and commitments, and YRC was forced to offer a massive 60% discount to all customers; that Company's lending groups were exerting enormous pressure on and control over YRC's operations directly contributing to the incomplete, materially flawed technical integration; that YRC was in danger of violating its bank covenants because the YRC's technical integration was not set to be completed until December 2009, in violation of the lender-mandated March 2009 deadline, YRC was in danger of missing revenue targets that would trigger the lenders to pull the bank covenants, and YRC ultimately failed to comply with its credit agreement. Indeed, the Company was suffering from so many material problems and performing so far below expectations that as Defendant Zollars ultimately admitted on November 2, 2009, for most of that year the Company's management had been working on a desperate, last-ditch deal to salvage the Company by converting hundreds of millions of dollars of debt into shares of stock to the grave detriment of shareholders.

122. The Individual Defendants knew or recklessly disregarded the foregoing information, as describe in more detail below, because they had access to daily shipment and revenue reports, directly communicated with unhappy customers, attended "ugly" meetings with the lending groups, conducted "enterprise solutions group" meetings, and even made admissions privately such as the Company "was fighting to survive" and had been considering the undisclosed last-ditch plan to convert hundreds of millions of dollars of debt into shares of stock "for most of the year in terms of the final step."

123. CW8 explained that the IT department laid out a plan to carefully integrate all of the IT systems of Yellow and Roadway into one system on Yellow's platform. Given the sheer size of the systems and customer bases, CW8 said that IT explained to senior management that

it would take more than a year to successfully complete the integration, providing a target date of December 2009. However, CW8 learned that YRC's senior management had agreed to terms with the banks holding the notes on YRC's merger-related debt that mandated a complete integration by March 2009, a mere seven months from YRC's announcement of the accelerated integration. In fact, the CW8 revealed that the March 2009 integration completion date was included as a "stipulation of the loan" to YRC.

124.   As a result of this pressure, Defendant Zollars and other members of senior management made the undisclosed decision to completely change the initial integration plan from integrating onto the Yellow platform to integrating onto the Roadway platform instead. CW11 explained that in July 2008, the Company abandoned the initial integration plan.

125.   CW11 stated that after the integration, serious problems plagued customer accounts.  S/he said, "We could not get the right pricing on the systems."  No historical data, which included pricing data, remained for many customers. The information had simply been lost.  In order to make up for the problems that began to occur after the March 1, 2009 integration "completion" date, Defendant Whitsel sent an email to CW11 and others directing them to give ALL customers an across the board 60% discount of the base rate.  CW11 noted that Whitsel had copied the entire revenue management group on the email.  CW11 personally conducted the programming that gave customers this across the board discount, and further stated that YRC simply wrote off the entire loss incurred by the 60% discount.

126.   Likewise, CW12 stated that after the technical integration was purportedly completed on March 1, 2009, most of his/her customers were severely, adversely affected and frustrated.  Many simply walked away from their obligations, assuming that YRC would soon file for bankruptcy.  CW12 stated, "Being in sales, it was difficult keeping customers."  After

the technical integration, CW12 also observed that senior management knew there were problems because they were given sales reports that showed the problems.  CW14, a credit analyst at YRC from August 2007 to October 2010, reaffirmed that there were a lot of customer complaints concerning the integration.  In fact, CW14 noted that after the integration, s/he "saw an increase in the number of hard core collection cases that YRC had to perform."

127.   Further, after YRC falsely announced the technical integration was complete on March 2, 2009, CW11 stated that many customers who owed YRC money stalled payments because they believed that YRC was going bankrupt.  CW11 said that rather than pursue these receivables YRC often just wrote them off. CW11 emphasized that everyone in revenue management was aware of these increasing write offs because an email distribution list existed for the entire revenue management department that communicated the write offs.  This email list included Senior Director of Revenue Management Kelly Kendall, Senior Revenue Manager Pam Joachim, Defendant Whitsel, and Mike Naatz.  Further, CW11 stated that stockholders were never told how many dollars were simply written off that could have been collected if an effort was made to pursue them by YRC.

128.   With the technical integration incomplete and deeply flawed, with customers leaving the Company, and with revenues falling sharply, CW3 stated that Defendant Zollars *admitted* in an employee town hall meeting in February 2009 that YRC had violated its credit agreement with its lenders.

129.   CW9, a Company Vice President of Enterprise Services and Revenue Management between 2007 and 2011, stated that the lending groups were "calling a lot of the shots" at YRC during the purported technical integration. CW9 explained that the banks "had a lot of control over YRC" and applied pressure for YRC to complete the technical integration.

CW9 reported directly to Defendant F. Joseph Whitsel III. CW9 also reported to Chief Information Officer Phil Gaines. Additionally, CW17 confirmed that Defendant Zollars had to keep the "bankers and lenders" happy. CW17 further noted that financial decisions had to be "run by the banks the lenders" for approval because it was "contractually controlled."

130.   The incomplete, materially flawed technical integration of Yellow and Roadway and the consequent negative effects on Company revenue were not a secret among lower and mid-level employees.  In fact, most senior executives, including the Individual Defendants, had actual knowledge of or recklessly disregarded these problems throughout the Class Period, and these problems remained undisclosed to investors. Specifically, CW2 stated that revenue meetings were held with senior executives approximately once a month throughout the Class Period. There were about 150 people in the revenue department at CW2's location and the meetings would occur in two sessions to accommodate the large number of people. One meeting would occur at 10AM and the other would occur at 11AM.  The meetings were held in a satellite office that YRC rented at 2801 College in Overland Park, Kansas. Other people in the Toledo and Akron offices would attend via videoconference. CW2 said that in these meetings in 2008, s/he first heard Defendant Zollars tell everyone that it was a "guarded secret," but that if YRC didn't hit certain numbers the banks would pull the notes. After Defendant Zollars spoke, Defendant Whitsel, who was head of revenue management, recapped what Zollars had said. This same message was repeated in subsequent meetings and the first two times it was repeated the group was instructed *not to share this information with other parts of the Company*, according to CW2.

131.   Similarly, CW3 stated that in November 2008 Defendants Zollars and Wicks organized employee town halls with all members of management and told employees about a

plan that included an across the board 10% reduction in employee salaries and the elimination of the Company's 401(k) program.  According to CW3, in these meetings, yet undisclosed to investors, Zollars *admitted* that the Company "was fighting to survive."

132.   CW1 also stated that Defendant Smid, was aware of the problems with the integration during the Class Period. CW1 said that s/he listened to Defendants Smid and Zollars speak at town hall meetings every three or four months throughout the Class Period in which Smid spoke of the problems with the integration.  S/he said that Smid would "lay it on the line."

133.   Moreover, senior managers, including the Individual Defendants, admitted and/or recklessly disregarded that the banks holding YRC's debt continued to exert enormous control over the Company late into 2009. CW9 said that s/he attended meetings in May or June of 2009 with all of the lending groups. *Defendants Whitsel, and Wicks all attended these meetings, and discussed in very frank terms the "ugly discussions" YRC's management had with the banks during the materially flawed technical integration.* Further, CW9 said that during these meetings with YRC's lending groups, the lending groups were shown financial forecasting models that revealed YRC's financials were going to be "ugly."

134.   After the Company announced the technical integration was "complete" on March 1, 2009, CW12 recalled being "required to make a special report on winning back customers" and that these reports came out of the "War Room." CW12 further stated that s/he was appointed to be one of the project managers tasked with winning back lost customers. CW12 further explained he attended weekly "enterprise solutions group" meetings beginning a few months before October 2009 with Defendant Wicks and other senior executives, including Group VP Craig Tallman, VP of Enterprise Strategy Bruce Kennedy, and CW17, wherein they

{175091.DOC }

addressed a multitude of problems plaguing the Company. During these weekly meeting, they discussed, *inter alia*, lost customers, trouble spots, initiatives to win back lost business, sales opportunities, and results of these campaigns. During the "enterprise solutions group" meetings attended by Defendant Wicks and other senior executives, CW12 noted that he "verbally provided details on the reasons that customers were leaving YRC." CW12 reiterated that all of these reasons were accumulated directly from the actual customers who were leaving YRC. CW17 confirmed his attendance and the foregoing discussions taking place at the "enterprise solutions group" meetings. In fact, CW17 stated, "Losing customers was always a topic of conversation," and Defendant Zollars was personally aware of whether YRC was losing any top customers.

135.   CW17 also noted that senior executives, including vice president of sales, Natalie Putman, the CFO, the vice president of finance, and Defendant Smid would go on calls with customers at customers' request. "These conference calls were ordinary," said CW17. Finally, CW17 explained that "[e]veryone knew that customers were leaving and why they were leaving and what could be done to save them."

136.   Further, the Individual Defendants also received daily updates about the operations and revenue streams of the Company. According to CW11, a daily operations report was sent by email that contained everyone in management. CW11 saw the email distribution list each day and Defendant Zollars was always on this list.  The daily report showed the daily tonnage, the number of bills, the amount of revenue, on a per day, per month and per year basis. There were also parts of the report that showed forecast numbers versus actual numbers.

137.   Similarly, CW9 confirmed that IT produced daily reports and that Zollars name was on the email list along with the names of other executives.  S/he said that the management

team had to know what was being billed, and that operationally, they would meet each day to see which terminals were not performing. Additionally, Defendant Zollars held monthly meetings with all the YRC vice-presidents, which CW9 attended, wherein CW9 explained that by looking at the daily reports, "anyone could run the numbers and see Zollars' [comprehensive] plan was not doable." Moreover, CW17 stated that the "information about the [Company's] downturn was in the daily shipment counts" and that the "[n]umbers were dropping off." CW17 said, "It was straight forward to see what was happening."

138.   Further, Defendants were aware of the proposed exchange offer, which effectively left the Company with no equity value, for at least most of the year prior to the announcement. Commenting on the offer, Defendant Zollars admitted, "This is something we've been talking about for most of the year in terms of the final step in our comprehensive **play**." (Emphasis added). Yet despite this knowledge of the Company's serious financial condition for at least most of the year prior to the announcement, Defendants continued to tout the positive aspects of YRC's financial condition and operations. On November 3, 2009, Jason Seidl, a longtime follower of YRC as an analyst for Dahlman Rose & Co., said the deal's details caught him by surprise. "I had no idea it would be this large," Seidl is quoted by the *Kansas City Sta*r website. "I didn't see the train wreck hitting the school bus full of kids and nuns." Accordingly, this proposed exchange offer was made because the technical integration was incomplete and materially flawed, resulting in lost customers and lost revenues, and the Company was on the precipice of financial ruin, yet this information remained undisclosed to investors during the Class Period.

139.   Defendants were also motivated to issue materially false and misleading statements, as described herein, in order to keep YRC common stock at artificially inflated

70

prices because pursuant to YRC's May 14, 2009 Form 14A, YRC executives could be awarded bonuses in Company stock in an amount of 25% - 200% of their salary if certain performance objectives were achieved.

140.   Additionally, Defendants were motivated to issue materially false and misleading statements, as described herein, in order to keep YRC common stock at artificially inflated prices in part because pursuant to item 5.02 of the Company's Form 8-K that was filed with the SEC on April 3, 2009, portions of Defendants Zollars, Smid, and Wicks' restricted shares of YRC stock would vest only if certain goals were met. For example, 89% of the share would vest if the average share price is greater than or equal to $15.00 per share at any time prior to the third anniversary of the date of grant.

141.   On June 2, 2009, Defendants also announced a shakeup of senior management: YRC "today announced senior leadership appointments across a new functional organization structure." "As a part of the organizational changes, Keith Lovetro, former President, YRC Regional Transportation; Michael Rapken, former Executive Vice President and Chief Information Officer; Jim Ritchie, former President of YRC Logistics; and Christina Wise, former Vice President and Treasurer will be leaving the company." Additionally, on October 5, 2009, Defendants announced more changes to its senior leadership structure. "The modifications are an advancement of the *functional organization* structure introduced in June across YRC Worldwide to streamline decision-making, eliminate duplicate efforts and costs while maintaining focus on critical customer-impacting areas." Per the press release, Defendant Wicks assumed the role of COO, Sheila Taylor assumed a new role as executive vice president and CFO, and Mike Naatz assumed an expanded role leading revenue management.

142.   Defendants were motivated to materially misrepresent to the SEC and investors

71

the true financial condition of YRC and the true facts about YRC's incomplete, materially flawed technical integration because, in touting positive aspects of YRC, Defendants were able to, and did: (a) deceive the investing public regarding the Company's compliance with internal controls and financial reports; (b) deceive the investing public regarding YRC's business, operations, management, future business prospects, and the intrinsic value of YRC's common stock; and (c) cause Plaintiffs and other members of the Class to purchase YRC common stock at artificially inflated prices.

143.   Defendants acted with scienter in that each Defendant knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding YRC, their control over, and/or receipt and/or modification of YRC's allegedly materially misleading misstatements and omissions and/or their associations with the Company which made them privy to confidential proprietary information concerning YRC, participated in the fraudulent scheme alleged herein.

144.   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of YRC's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases, alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

Because of their positions with the Company, and their access to material non-public information available to them, but not to the public, the Individual Defendants knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

145.   Because of the Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about YRC's business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.

146.   As officers and controlling persons of a publicly-held company whose securities are registered with the SEC pursuant to the Exchange Act, publicly traded, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and

accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

147.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions there from, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with YRC, each of the Individual Defendants had access to the adverse undisclosed information about YRC's business prospects and financial condition and performance as particularized herein and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about YRC and its business issued or adopted by the Company materially false and misleading.

148.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

149.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of YRC securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The

{175091.DOC }

scheme: (a) deceived the investing public regarding YRC's business, operations, management, and the intrinsic value of YRC securities; (b) enabled Defendants to artificially inflate the price of YRC shares; (c) caused Plaintiffs and other members of the Class to purchase YRC securities at artificially inflated prices; and (d) harmed investors when the previously undisclosed truth was revealed at the end of the Class Period.

## CAUSATION AND ECONOMIC LOSS

150.   During the Class Period, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated the price of YRC stock and operated as a fraud or deceit on Class Period purchasers of YRC stock by misrepresenting the Company's purported success of the technical integration of Yellow and Roadway; the financial condition of the Company, including its cash flows, liquidity, revenues, compliance with credit agreements, and payment of debt; the success of its customer relationships; and the adequacy of the Company's internal controls. Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed to investors and the market, shares of YRC declined precipitously - - evidence that the prior artificial inflation in the price of YRC stock was eradicated. As a result of their purchases of YRC stock during the Class Period, Plaintiffs and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws, when the true facts were ultimately revealed, removing the artificial inflation from the price of the stock.

151.   Defendants' materially false and misleading statements had the intended effect of causing YRC shares to trade at artificially inflated levels throughout the Class Period-- reaching a Class Period high of over $20.00 per share during August 2008.

152.   While the full scope of the fraud was not revealed until November 2, 2009, a partial disclosure by Defendants occurred on April 23-24, 2009.   On April 23, Defendants published a release announcing purported "results for the first quarter of 2009, the period ended March 31, 2009. This release stated, in part, the following:

> "Our volumes were impacted by multiple factors, most notably the economy and business diversion due to customer anxiety surrounding the integration of Yellow and Roadway," said Zollars. "Some customers have already returned business, which was temporarily diverted, but it is difficult to predict at what levels or how quickly the rest will come back."

153.   The next day, April 24, 2009, YRC held a conference call with analysts and investors to discuss the Company's earnings and operations.   During the conference call, Defendant Zollars, in pertinent part, stated:

> In addition to the economy, we believe we are still experiencing some customer diversion due to concerns surrounding the integration. It's difficult to quantify this volume, but we believe it's about a third of our year-over-year decline at national or about 10%. We believe much of that volume will return, and in fact some of it already has, but we can't predict how quickly or at what levels the rest will come back.

154.   The foregoing statements on April 23 and 24, 2009, constitute a partial disclosure because Defendants partially revealed for the first time that the Company had at least temporarily lost some customers due to integration "concerns."   As the truth was partially revealed on April 23-24, 2009, regarding limited customer "diversion" associated with YRC's technical integration, directly contrary to previous statements made by Defendants regarding the absolute "success" of the integration, investors were harmed.

155.   As a result of the partially corrective disclosures on April 23 and 24, 2009, over 7.64 million shares of YRC traded during these two days, significantly more than the average daily trading volume for the 10 days leading up to April 23, which was 2.384 million shares per day. The share price plummeted over 24%, from a close of $3.91 per share on April 22, 2009,

76

to a close of $2.96 per share on April 27, 2009—only 3 trading days.

156.    The statements on April 23 and 24, 2009 also continued to be materially misleading in that they continued to conceal the full scope of adverse true facts, including that the integration had not been completed by March 1, 2009, and was not a success but rather was riddled with serious problems that had not merely created a temporary "diversion" of some customers but had driven away many customers and resulted lost data and deep across-the-board discounting, material internal control problems, violations of its lending agreements, and a full blown financial crisis for the Company that threatened its very survival such that Defendants were forced to submit to a last ditch play to save the Company – by considering a plan to convert hundreds of millions of dollars of debt into shares of stock. The full scope of the fraud continued to be concealed until November 2, 2009.

157.    On November 2, 2009, investors learned the full truth about the Company and the true dire condition of its business and prospects.  In truth, the Company was performing so far below expectations and was suffering from so many material, concealed problems that a year prior to the end of the Class Period the Company commenced working on a desperate, last-ditch deal to convert hundreds of millions of dollars of debt into shares of stock. This announcement by the Company fully and finally revealed the depths of the Company's pervasive and overwhelming problems -- ranging from the unsuccessful and incomplete integration, to debt and liquidity issues and violations of lending agreements, to the loss of customers, and internal control problems including the loss of massive quantities of crucial customer data that required across-the-board massive discounting to seek to retain those customers who remained -- that made the desperate debt-conversion plan a necessity for the Company's very survival.

{175091.DOC }

158.   On this news, the stock price immediately collapsed as a direct result of the revelation of the truth that had been concealed during the Class Period.  Shares of YRC stock plummeted—falling 64% on a single trading day, over $2.30 per share on huge volume of 54.8 million shares traded, over five times the stock's average daily volume over the past three months, to close trading that day at only $1.32 per share.

159.   The decline in the price of YRC stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of the decline in the price of YRC stock negates any inference that losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' fraudulent conduct.  During the same period in which the price of YRC stock fell over 60% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

160.   The evidence throughout the Class Period confirms that the precipitous drop in YRC's stock was related not to any external macroeconomic conditions or other internal Company dynamics, but rather to Defendants' own fraud.  For example, on December 24, 2008, Defendants issued a materially false and misleading press release announcing, "National Integration to be Complete by Early Spring 2009."  In that release, Defendants misled investors by claiming that "[d]ue to the early success of the integration, the company has reevaluated the timeline and now expects the integration to be mostly complete by early spring 2009." Defendants also falsely stated that, "YRC expects to remain in compliance with its covenants and credit facilities."  As stated above, these statements were false because the integration was anything but successful and it was well known by Defendant Zollars and others that YRC was

in grave danger of not remaining in compliance with its covenants.  In response to these misleading positive statements, YRC's stock climbed nearly 88% over a two-week period following these statements.  This marked stock increase happened despite the fact that YRC's credit rating had been downgraded just one month earlier and the overall economy continued to slide at the end of 2008

161.   In addition, on October 30, 2009, just three days before the full truth was revealed, YRC announced more disappointing results for 2Q 2009 which included significant "further headcount reductions" at the Company.  Despite these results, the Company's stock remained stable, in part due to Defendants' assertion that "execut[ion] on our comprehensive plan" allowed YRC to gain "significant momentum in the third quarter."  However, once the truth of the "comprehensive plan" was revealed on November 2, 2009 – that bondholders would receive a 95% ownership stake in the Company – the Company's stock fell more than 60% in a single day.

162.   The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of YRC stock and the subsequent significant decline in the value of YRC stock when Defendants' prior misstatements and other fraudulent conduct was revealed.

**Applicability of Presumption of Reliance: Fraud-On-The-Market Doctrine**

163.   At all relevant times, the market for YRC common stock was an efficient market for the following reasons, among others:

> (a)   During the Class Period, YRC stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

79

(b)     As a regulated issuer, YRC filed periodic public reports with the SEC and NASDAQ;

(c)     YRC regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     YRC was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

(e)     The share price of YRC securities reacted promptly to unexpected news events.

164.   As a result of the foregoing, the market for YRC securities promptly digested current information regarding YRC from all publicly available sources and reflected such information in YRC stock price.  Under these circumstances, all purchasers of YRC common stock during the Class Period suffered similar injury through their purchase of YRC common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

165.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-

80

looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of YRC who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

166.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased the common stock of YRC between April 24, 2008, and November 2, 2009, inclusive (the "Class") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

167.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, YRC common shares were actively traded on the NASDAQ National Market ("NASDAQ").  As of April 30, 2009, the Company had over 59.44 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the

{175091.DOC }

proposed Class.   Record owners and other members of the Class may be identified from records maintained by YRC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

168.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

169.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

170.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

       (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

       (b)    whether statements and/or omissions by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of YRC ; and

       (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

171.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

172.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

173.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding YRC's business, operations, management and the intrinsic value of YRC common stock; (b) enable Defendants to artificially inflate the price of YRC shares; (c) cause plaintiff and other members of the Class to purchase YRC common stock at artificially inflated prices; and (d) harmed investors when the previously undisclosed truth was revealed at the end of the Class Period.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

174.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for YRC common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

175.   Defendants, individually and in concert, directly and indirectly, by the use, means or

83

instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of YRC as specified herein.

176.   These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of YRC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about YRC and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of YRC common stock during the Class Period.

177.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these Defendants, by virtue of his/her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d)

each of these Defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

178.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessly for the purpose and effect of concealing YRC's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

179.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of YRC common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of YRC's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, plaintiff and the other members of the Class acquired YRC common stock during the Class Period at artificially high prices and were damaged thereby.

180.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for YRC publicly traded securities. At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that YRC was experiencing, which were not disclosed by Defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their YRC common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

181.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

182.   As a direct and proximate result of Defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of**
**the Exchange Act Against the Individual Defendants**
**Zollars, Smid, Wicks, Whitsel and Bruffett**

183.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

184.   The Individual Defendants Zollars, Smid, Wicks, Whitsel and Bruffett acted as controlling persons of YRC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the

86

investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

185.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

186.    As set forth above, YRC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

{175091.DOC }

C.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  October 21, 2011                    Respectfully submitted,


DOLLAR, BURNS & BECKER, L.C.


_/S/   MICHAEL S. KILGORE_____
Michael S. Kilgore (Bar #23025)
1100 Main Street, Suite 2600
Kansas City, MO 64105
Telephone:  (816) 876-2600
Facsimile:  (816) 221-8763

*Co-Local Counsel*

SHAMBERG, JOHNSON & BEGRMAN, CHTD.
Lynn R. Johnson
2600 Grand Blvd., Suite 550
Kansas City, MO 64108
Telephone: (816) 474-0004
Facsimile: (816) 474-0003

*Co-Local Counsel*

KAHN SWICK & FOTI, LLC
Kim Miller
500 Fifth Avenue, Suite 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

88

kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com

*Co-Lead Counsel*

JOHNSON & WEAVER, LLP
Frank J. Johnson
Shawn E. Fields
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
frankj@johnsonandweaver.com
seanf@johnsonandweaver.com

*Co-Lead Counsel*

{175091.DOC }

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

_/S/_     MICHAEL S. KILGORE_____

{175091.DOC }