UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| STAN BETTER & YRC INVESTORS GROUP, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 11-CV-2072 KHV/JPO |
| YRC WORLDWIDE INC., WILLIAM D. ZOLLARS, III, MICHAEL SMID, TIMOTHY A. WICKS, and STEPHEN L. BRUFFETT, | ) ) ) ) | |
| Defendants. | ) ) | |

## **DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

Dated:  December 20, 2011

James D. Griffin, KS # 12545
David M. Buffo, KS # 21399
**HUSCH BLACKWELL LLP**
4801 Main Street, Suite 1000
Kansas City, MO  64112
Telephone:  816.983.8000
james.griffin@huschblackwell.com
david.buffo@huschblackwell.com

Marc J. Sonnenfeld, *pro hac vice*
Karen Pieslak Pohlmann, *pro hac vice*
Jill Baisinger, *pro hac vice*
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market St.
Philadelphia, PA  19103-2921
Telephone:  215.963.5000
Facsimile:  215.963.5001
msonnenfeld@morganlewis.com
kpohlmann@morganlewis.com
jbaisinger@morganlewis.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page(s)**

I.      NATURE OF THE MATTER BEFORE THIS COURT ................................. 1

II.     INTRODUCTION ................................................................... 1

III.    STATEMENT OF FACTS ......................................................... 3

    A.      YRC And The Individual Defendants............................................ 3

    B.      YRC's Performance And Statements During The Putative Class Period............. 4

        1.      In Early 2008, YRC Described Its Plans While Acknowledging The Declining Economic Situation................................................ 4

        2.      By The Fall Of 2008, YRC Explained How The Worsening Economic Situation Affected It And How It Hoped To Respond ............. 5

        3.      In Early 2009, YRC Continued With The Integration But Emphasized The Effects Of The Global Recession................................... 7

        4.      In Spring 2009, YRC Announced The Conclusion Of The Integration Process But Acknowledged "Bumps" In The Road............... 8

    C.      Plaintiffs' Theories Of Liability.............................................. 10

IV.     STATEMENT OF QUESTIONS PRESENTED................................... 11

V.      ARGUMENT .................................................................... 11

    A.      The PSLRA Imposes Uniquely High Pleading Standards.................................. 12

    B.      Numerous Challenged Statements Are Legally Inadequate ............................... 13

        1.      Vague Statements Of Corporate Optimism Are Inactionable.................. 13

        2.      No Claims May Be Based On Unchallenged Factual Statements ........... 15

        3.      Numerous Allegations Merely Set Forth Disagreements With Management Decisions ................................................ 16

    C.      Plaintiffs Do Not Plead That The Remaining Statements Are Materially False Or Misleading As Required By Rule 9(b) And The PSLRA ..................... 18

        1.      Statements Regarding Corporate Performance Are Not False ............... 19

            a.      YRC Informed The Market Of Numerous Difficulties............... 19

            b.      YRC's Expressions Of Hope In The Face Of Difficulties Are Not Actionable ................................................ 22

            c.      The November 2009 Debt Exchange Does Not Render Any Statement False ................................................ 23

        2.      Claims Regarding The Company's Lenders Fail...................................... 24

        3.      Claims Based On Statements Relating To Technical Integration Fail ..................................................................... 25

            a.      Plaintiffs Do Not Properly Plead The Existence Of The Supposed March 1, 2009 Deadline ............................... 26

**TABLE OF CONTENTS**

Page(s)

b.   Claims Relating To The Pre-March 2009 Progress Of
Technical Integration Are Not Properly Pleaded .......................... 27

c.   There Are No Claims From March 1, 2009 To November 2,
2009 Because YRC Promptly Disclosed Integration
Problems .................................................................................. 29

4.   Summary ........................................................................................... 31

D.   Plaintiffs Have Not Pleaded Causation Because No Challenged Statement
Relates To The November 2, 2009 Announcement ............................................. 31

E.   Plaintiffs Fail To Plead Scienter ................................................................... 33

1.   Generic Allegations Of Scienter Are Inadequate .................................... 33

2.   Plaintiffs Do Not Establish Actual Or Reckless Disregard Of The
Likelihood Of Misleading Investors ........................................................ 33

VI.   CONCLUSION ............................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

Adams v. Kinder-Morgan, Inc.,
   340 F.3d 1083 (10th Cir. 2003) ..........................................................................26

Andropolis v. Red Robin Gourmet Burgers, Inc.,
   505 F. Supp. 2d 662 (D. Colo. 2007).............................................18, 22, 33, 35

Ashcroft v. Iqbal,
   129 S. Ct. 1937 (2009) ..........................................................................................3

Basic, Inc. v. Levinson,
   485 U.S. 224 (1988)..............................................................................................20

CALPERS v. Chubb Corp.,
   394 F.3d 126 (3d Cir. 2004)................................................................................26

Caprin v. Simon Transp. Servs., Inc.,
   99 F. App'x 150 (10th Cir. 2004) ..................................................................21, 26

Craftmatic Sec. Litig. v. Kraftsow,
   890 F.2d 628 (3d Cir. 1989)................................................................................17

Cutsforth v. Renschler,
   234 F. Supp. 2d 1216 (M.D. Fla. 2002) ...............................................18, 27, 29, 30

Dean Witter Reynolds, Inc. v. Howsam,
   261 F.3d 956 (10th Cir. 2001), rev'd on other grounds, 537 U.S. 79 (2002) ...........................3

Dronsejko v. Grant Thornton,
   632 F.3d 658 (10th Cir. 2011) .......................................................................12, 13

Dura Pharm., Inc. v. Broudo,
   544 U.S. 336 (2005)..................................................................................12, 31, 32

Grossman v. Novell, Inc.,
   120 F.3d 1112 (10th Cir. 1997) .......................................................14, 20, 21, 23

In re Level 3 Commc'ns, Inc. Sec. Litig.,
   Nos. 09-cv-200, 215, 296, 606, 2010 WL 5129524 (D. Colo. Dec. 10, 2010)............... passim

## TABLE OF AUTHORITIES

Kane v. Madge Networks NV,
    No. C-96-20652, 2000 WL 33208116 (N.D. Cal. May 26, 2000)........................16, 22, 28, 29

Kapur v. USANA Health Scis., Inc.,
    No. 2:07-CV-00177, 2008 WL 2901705 (D. Utah July 23, 2008) .........................................24

Karacand v. Edwards,
    53 F. Supp. 2d 1236 (D. Utah 1999)...............................................................................3

Maher v. Durango Metals, Inc.,
    144 F.3d 1302 (10th Cir. 1998) ....................................................................................12

McNamara v. Pre-Paid Legal Servs., Inc.,
    189 F. App'x 702 (10th Cir. 2006) .................................................................................3

N.J. v. Sprint Corp.,
    314 F. Supp. 2d 1119 (D. Kan. 2004)......................................................................16, 33

Phila. v. Fleming Cos., Inc.,
    264 F.3d 1245 (10th Cir. 2001) .............................................................21, 24, 33, 34, 35

Pirraglia v. Novell, Inc.,
    339 F.3d 1182 (10th Cir. 2003) .............................................................................14, 16, 21

In re The Reserve Fund Sec. and Derivative Litig.,
    673 F. Supp. 2d 182 (S.D.N.Y. 2009).............................................................................4

Santa Fe Indus., Inc. v. Green,
    430 U.S. 462 (1977)...................................................................................................17

Sheldon v. Vermonty,
    31 F. Supp. 2d 1287 (D. Kan. 1998)..............................................................................12

Sikkenga v. Regence Bluecross Blueshield of Utah,
    472 F.3d 702 (10th Cir. 2006) ...............................................................................12, 23

In re Stone & Webster, Inc. Sec. Litig.,
    253 F. Supp. 2d 102 (D. Mass. 2003).............................................................................22

In re Syntex Corp. Sec. Litig.,
    No. 92-20548, 1993 WL 476646 (N.D. Cal. Sept. 1, 1993)...................................................22

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007)..............................................................................3, 12, 13, 33

## TABLE OF AUTHORITIES

In re Thornburg Mortg., Inc. Sec. Litig.,
    695 F. Supp. 2d 1165 (D.N.M. 2010), reconsidered in part,
    2011 WL 2429189 (D.N.M. June 2, 2011) ..............................................................34

Thornburg Mortg., Inc. Sec. Litig., 2011 WL 2429189 (D.N.M. June 2, 2011) ...........................34

TSC Indus., Inc. v. Northway, Inc.,
    426 U.S. 438 (1976)..............................................................................................14

In re United Telecomms. Inc., Sec. Litig.,
    781 F. Supp. 696 (D. Kan. 1991)..........................................................................17

In re Williams Sec. Litig.,
    558 F.3d 1130 (10th Cir. 2009) .......................................................................31, 32

## STATUTES

15 U.S.C. § 78j..................................................................................................................1

15 U.S.C. § 78t..................................................................................................................1

15 U.S.C. § 78u-4 ..............................................................................................12, 13, 33

15 U.S.C. § 78u-5 ......................................................................................................35

## I.     NATURE OF THE MATTER BEFORE THIS COURT

This putative class action alleges claims for securities fraud under Sections 10(b) and

20(a) of the 1934 Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), from April 24, 2008

through November 2, 2009.  Plaintiffs claim to be shareholders of YRC Worldwide Inc. ("YRC"

or the "Company"), ¶ 1,[1] who purchased YRC stock at artificially inflated prices.  ¶ 10.  They

name as defendants YRC and four former officers.[2]  ¶¶ 12-16.  Defendants move to dismiss the

Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private

Securities Litigation Reform Act of 1995 ("PSLRA").

## II.    INTRODUCTION

The Complaint and the documents that it cites demonstrate that YRC, a transportation

company, was forthcoming during the financial crisis that began in 2008 and extended through

2009.  In the very materials that plaintiffs use to plead their Complaint, YRC and its officers

described the pressures the Company faced while still expressing hope that their efforts to

improve the Company's fortunes would be successful.  YRC explained that the ongoing

integration of two subsidiaries, Yellow Transportation, Inc. ("Yellow") and Roadway Express,

Inc. ("Roadway"), was ultimately intended to benefit the Company by eliminating duplicative

routes, overhead costs, facilities, and sales forces.  In the same documents that plaintiffs quote,

YRC also disclosed that integration created many risks, including the need to sell excess

properties, integrate computer systems, and reconsider some customer relationships.  Moreover,

as the overall economic situation worsened throughout 2008 and 2009, the Company discussed

---

[1]     Citations to "¶ ___" refer to paragraphs in the Amended Class Action Complaint ("Complaint").

[2]     The Complaint names only "YRC Worldwide Inc." as a corporate defendant and refers to it as "YRC."  YRC Worldwide is a holding company, but YRC National Transportation, which is more commonly referred to as "YRC," is actually the holding company for the subsidiaries at issue in this litigation.  For purposes of this motion only, defendants refer to YRC Worldwide as "YRC" except in identifying defendants' titles.  Otherwise, they have not drawn distinctions between the two entities.  A separate action raising claims covering approximately the same time period was brought against YRC Worldwide under the Employee Retirement Income Security Act.  In re YRC Worldwide Inc. ERISA Litig., No. 09-2593 (D. Kan) (Lungstrum, J.).

the unprecedented difficulties created by decreased shipping volume combined with predatory pricing by YRC's competitors. Nonetheless, based on a selective reading of the Company's public statements, the Complaint contends that YRC misled investors into believing that all was going smoothly.

There are many fatal flaws with this Complaint, but first is plaintiffs' failure properly to plead a materially false or misleading statement. Many of the challenged statements are inactionable expressions of corporate optimism, others are undisputed factual statements, and still others are mere disagreements with corporate policy that cannot constitute securities fraud. Even as to the statements regarding Company performance, discussions with lenders, and problems with technical integration, there are no properly pleaded false statements. YRC correctly explained the difficulties the Company faced while expressing optimism that management's efforts would be successful. Plaintiffs seem to believe that defendants had a duty to assume failure and to disclose every detail of every discussion regarding the Company's performance and integration. In fact, there are no such obligations.

Second, plaintiffs fail to plead loss causation—i.e., a connection between the supposed false statements and supposed damages. This is because the so-called "disclosure" of the truth on November 2, 2009 was unrelated to any of the reasons the various statements were allegedly false. YRC did not reveal hidden problems on November 2, 2009.

Finally, plaintiffs' failure to plead scienter—i.e., a wrongful state of mind—is an independent basis for dismissal. Plaintiffs fail to set forth particularized allegations establishing a strong inference of recklessness or actual knowledge of misstatements. They also fail to plead that defendants <u>actually</u> knew that predictions of future performance were false.

## III.   STATEMENT OF FACTS

For purposes of this motion to dismiss only, defendants generally accept as true the Complaint's allegations.  This Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009).  Moreover, in addressing motions to dismiss securities fraud claims, the Court should consider documents "incorporated into the complaint by reference." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); see also McNamara v. Pre-Paid Legal Servs., Inc., 189 F. App'x 702, 710 n.14 (10th Cir. 2006) (approving consideration of SEC filings that "were central to Plaintiffs' claims"); Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956, 961 (10th Cir. 2001), rev'd on other grounds, 537 U.S. 79 (2002) ("it is accepted practice" to attach to motions to dismiss documents referred in or central to the complaint); Karacand v. Edwards, 53 F. Supp. 2d 1236, 1245-47 (D. Utah 1999) (denying motion to strike SEC filings and conference call transcripts cited by plaintiffs and/or relevant to assessing PSLRA safe harbor argument). Accordingly, defendants have included as exhibits relevant portions of documents cited in the Complaint.

### A.   YRC And The Individual Defendants

YRC serves "manufacturing, wholesale, retail, and government customers" with its principal place of business in Overland Park, Kansas. ¶ 11.  The two subsidiaries at issue, Yellow and Roadway, operated for many years as two distinct entities with separate customer bases, shipping software, and revenue streams. ¶ 3 n.1.  Much of the Complaint focuses on alleged difficulties in integrating Yellow and Roadway.

The other defendants are former officers.  William Zollars was YRC Worldwide's chairman, chief executive officer, and president; Stephen Bruffett was YRC Worldwide's chief

financial officer ("CFO") and executive vice president[3]; Timothy Wicks was YRC Worldwide's CFO, executive vice president, and chief operating officer; and Michael Smid was YRC Worldwide's chief operations officer and president of YRC National Transportation.   ¶¶ 12-15.

**B.    YRC's Performance And Statements During The Putative Class Period**

All of the events at issue took place from April 2008 through November 2009—a period in which YRC, like virtually every other company in the United States, faced financial challenges that had not been seen since the 1930s.  The very first sentence of the very first statement plaintiffs challenge from April 2008 acknowledged that "[t]he soft economy, severe winter weather and record fuel prices created a very difficult operating environment in the first quarter." ¶ 19 (quoting Apr. 24, 2008 Press Release, Ex. 2).  Moreover, the "soft" economy became extraordinarily dire in September 2008 following the Lehman Brothers bankruptcy:  one Court quoted commentators describing events in this period as "some of the most cataclysmic failures in our economic history," including a former governor of the Federal Reserve who described the "shock after Lehman as worse and more complicated than the one that caused the Great Depression." In re The Reserve Fund Sec. and Derivative Litig., 673 F. Supp. 2d 182, 185 n.3 (S.D.N.Y. 2009) (internal citation omitted).  The Complaint's selective reading of YRC's public statements ignores this context, which the Company consistently emphasized.

**1.    In Early 2008, YRC Described Its Plans While Acknowledging The Declining Economic Situation**

The putative class period begins with YRC's April 2008 report of its first quarter 2008 results.  YRC acknowledged the challenges that it faced from the economic downturn and rising fuel costs but provided investors with guidance for its predicted earnings in the second quarter of 2008. ¶ 19 (citing Apr. 24, 2008 Press Release, Ex. 2).

---

[3]    Bruffett actually left YRC in August 2008. Ex. 1 (Aug. 14, 2008, Form 8-K).  Also, F. Joseph Whitsel III was dismissed by stipulation on December 7, 2011 (Docket Entry 40).

YRC reported its second quarter 2008 results on July 25, 2008, which were near the top range of its predictions; it provided guidance of $0.30-$0.40 per share and earned $0.38 per share. July 25, 2008 Conf. Call Tr. at 2, Ex. 3 (cited in ¶ 26). During the same conference call, YRC informed investors that it had completed the planning to integrate operations, including sales forces, for Yellow and Roadway; YRC reported that customer response was positive. Id. YRC mentioned that Yellow and Roadway would be on the same technology platform, id. at 8, although noting that "moving everybody onto existing technology" would probably not take place until "the end of next year." Id. at 13. YRC explained that integration involved redesigning the "distribution points" and shifting from a "traditional hub-and-spoke" system to a completely new approach. Id. at 5. YRC also explained that the integration involved selling real estate to eliminate duplication in the networks. Id. at 7, 8.

As it did consistently, though, YRC acknowledged challenges, including the loss of some customers. Id. at 9. Only a week later, YRC discussed ongoing decreases in "tonnage"—i.e., amounts shipped—and corresponding decreases in revenue, which it attributed to the "weak economy." Ex. 4 at 34 (Aug. 6, 2008 Form 10-Q) (cited in ¶ 23). Moreover, "[a]s the economy has weakened, capacity has become more readily available and competition for available shipments has increased." Id.

### 2. By The Fall Of 2008, YRC Explained How The Worsening Economic Situation Affected It And How It Hoped To Respond

On September 8, 2008, well before announcing its quarterly results, YRC updated the market on operational integration issues, stating that it was bringing together local sales teams and creating one operating network. ¶ 28 (citing Sept. 8, 2008 Press Release, Ex. 5). YRC connected its decisions to the country's financial situation, explaining that "[t]he economic downturn has created the capacity in our networks needed to effectively integrate our operations,

while improving service reliability and speed." Ex. 5 at 1. YRC also stated that it expected to remain in compliance with its credit agreement. ¶¶ 28, 30, 32 (citing Sept. 8, Oct. 3, and Oct. 7, 2008 Press Releases).

YRC reported its third quarter 2008 results on October 23, 2008. ¶ 34. YRC had provided guidance for this period, ¶ 25 (citing July 24, 2008 Press Release), but ultimately it did not achieve those results because "the economy slowed more than we expected during the quarter." ¶ 34 (citing Oct. 23, 2008 Press Release, Ex. 6). Indeed, YRC stopped providing guidance because of economic uncertainty. Ex. 6 at 1. Zollars emphasized the difficulties facing the Company, explaining that "the economic environment progressively weakened resulting in lower th[a]n expected volumes and more competitive pricing," and that these factors meant that, unlike most periods, no typical end-of-the-quarter spike in business occurred. ¶ 35 (citing Oct. 24, 2008 Conf. Call Tr., Ex. 7). In addition, YRC faced "the ripple effect of the auto industry," "recent hurricanes," increased labor costs, and costs associated with the integration itself. Ex. 7 at 2. The Company announced that it had begun consolidating distribution centers, closing unprofitable locations, and looking into more sale or leaseback transactions to monetize its real estate assets. Id. at 3, 4, 5, 8. YRC reiterated that it expected to lose some business that "will not make sense" in the new national network. Id. at 4; see also id. at 14. It again acknowledged declining tonnage and that ordinary seasonal spikes in transportation had not occurred. Id. at 7, 10. However, the Company still emphasized its belief that its plans for the future would be productive, specifically noting that "Wal-Mart, General Electric, Wolseley Ferguson, and Hallmark" had "expressed support for the benefits of the integration." Id. at 3.

The next few weeks led to additional disclosures by YRC regarding the difficult economic circumstances and its response. For example, in late October YRC announced layoffs of 3,700 dock workers and truck drivers at Yellow and Roadway. ¶ 37. The Company answered

media speculation regarding the Company's finances, ¶¶ 37-38, and stated that it was in compliance with its bank covenants and was paying down debt, that it was working on the integration process, and that it was pleased with customer and employee support. ¶¶ 40, 42, 44 (citing alleged Oct. 29, 2008 Letter from Zollars).  On November 20, 2008, YRC announced that its credit rating had been downgraded and that this required the Company to "collateralize" (i.e., to sell) its "remaining unencumbered assets, which primarily include its real estate and revenue equipment." Nov. 20, 2008 Press Release, Ex. 8 (cited in ¶ 48).  YRC noted the likelihood that it would enter into sale and leaseback transactions and that it would "continue to dispose of excess facilities including the expected 150 properties from the integration of Yellow … and Roadway." Id.; see also ¶ 50 (citing Dec. 24, 2008 Press Release describing cancellation of tender offer and reevaluation of lending agreements with banks).

### 3.   In Early 2009, YRC Continued With The Integration But Emphasized The Effects Of The Global Recession

On January 29, 2009, YRC reported fourth quarter and full year 2008 losses.  ¶ 52 (citing Jan. 29, 2009 Press Release, Ex. 9).  This release also disclosed discussions with banks and the Company's expectations that its credit agreement would be amended by mid-February.  Id.

In a conference call following this release, YRC began the discussion by describing 2008 as a "challenging year" in which the

> operating results reflected the significance of the economic recession that has been longer and deeper than anyone anticipated. … With respect to the fourth quarter, each month continued to progressively weaken as the economy slowed further and the retail holiday peak never showed up.  Lower volumes and declining prices had the most significant impact on our fourth-quarter earnings, along with some accelerated integration investments and pension settlement costs.

Jan. 30, 2009 Conf. Call Tr. at 2 (Ex. 10) (cited in ¶ 54).  YRC reiterated that it was accelerating the integration so that its "business mix and volumes would be . . . a better match with the network capacity we'll have in the new integrated network" and that some customers would be

lost. Id. at 3; see also id. at 4 (stating that integration would accelerate). YRC disclosed that some customers had reacted to adverse information regarding the Company and switched to competitors. Id. at 3. YRC also provided details about the distribution centers that it was closing and its customer support processes. ¶ 54. It emphasized that the integration entailed elimination of "duplicate infrastructure" and some property sales. Ex. 10 at 4.

Also on the January 30, 2009 call, YRC characterized ongoing negotiations with its lenders as productive, id. at 6, 9, but informed investors of the complexity and significance of those conversations. Id. at 12, 13. In a separate release, YRC announced completion of the first phase of a significant sale and leaseback transaction to improve liquidity. ¶ 57. On February 20, 2009, YRC disclosed another sale and leaseback and amendments to a bank agreement. ¶ 59.

      **4.**     **In Spring 2009, YRC Announced The Conclusion Of The Integration Process But Acknowledged "Bumps" In The Road**

On March 2, 2009, YRC announced the March 1, 2009 integration of Yellow and Roadway, emphasizing improvements in its distribution points. ¶ 61 (citing Mar. 2, 2009 Press Release, Ex. 11). Only six weeks later, YRC informed investors that the process had not been trouble-free and that some customers had been lost. ¶ 63 (citing Apr. 23, 2009 Press Release), ¶ 65 (citing Apr. 24, 2009 Conf. Call Tr.). Indeed, Zollars began the April 24, 2009 conference call by stating that "[t]he process wasn't perfect and we had some hurdles in the first couple of weeks." Ex. 12 at 2 (Apr. 24, 2009 Conf. Call Tr.). Zollars elaborated:

> In addition to the economy, we believe we are still experiencing some customer diversion due to concerns surrounding the integration. It's difficult to quantify this volume, but we believe it's about a third of our year-over-year decline at national or about 10%. We believe much of that volume will return, and in fact some of it already has, but we can't predict how quickly or at what levels the rest will come back.

Id.; see also ¶ 65 (same). YRC continued to emphasize the overall poor economy and the Company's "focus on liquidity as we manage through this economic recession." Ex. 12 at 2, 5.

On May 15, 2009, YRC disclosed that, due to the customer diversion, it had amended its credit agreement to remove an earnings covenant for the second quarter of 2009, although operational trends continued to improve and customer loyalty remained strong. ¶ 68. On June 18, 2008, YRC discussed an amendment to its revolving credit facility, explaining that it "reflects the continued support of our lender group as we further implement our strategic actions both operationally and financially." June 18, 2009 Press Release (cited in ¶ 70) (Ex. 13). YRC later updated the market about its efforts to manage the still-challenging economic environment, emphasizing that the March 2009 integration had allowed it to reduce facilities and costs and to enhance service. ¶ 72 (citing July 8, 2009 Press Release); see also ¶ 74 (citing July 14, 2009 Press Release) (describing discussions with lenders, finalization of the amendment to the revolver, and a forthcoming Teamsters vote on contract concessions).

On July 30, 2009, during a conference call discussing second quarter results, Zollars commented that the second quarter began only a month after "the integration ... which was a once in a lifetime event." ¶ 77 (citing July 30, 2009 Conf. Call Tr., Ex. 14). Zollars acknowledged yet again "that [the] process wasn't perfect, and we hit quite a few bumps in the road two weeks following the integration." Id. He explained that even though the Company had made strides in "addressing our cost structure, we have not reflected the full benefits because of the macro economy and its significant impact on our top line." Ex. 14 at 2; see also id. (describing "the global recession that's plagued our industry for the last few years" and an ongoing "financial overhang that continues to perpetuate itself in the marketplace"). Nonetheless, he reported that the integration had been "successfully completed," id. at 6, and described the numerous service centers that closed as part of the process. Id. at 3; see also ¶ 79 (quoting Aug. 10, 2009 Form 10-Q; disclosing that customers had reduced shipments to mitigate integration risks, which led to lower than expected second quarter earnings).

9

On October 30, 2009, YRC reported its third quarter financial results.  Although its shipment trends had stabilized and it continued to execute its plan "to manage . . . this severe economic downturn," the Company experienced losses in almost every measurement category.  ¶ 81.  On that same date, YRC stated that it was in discussions with its noteholders regarding an exchange offer for its notes and contingent convertible notes.  Id.  The putative class period ends on November 2, 2009, when YRC announced the debt exchange.

### C.     Plaintiffs' Theories Of Liability

Plaintiffs' challenges proceed on the theory that YRC faced even more problems than it disclosed and, therefore, that various statements from April 2008 through November 2009 were false and misleading.  Plaintiffs' claims can generally be grouped into three categories.  First, they challenge aspects of the Company's performance, relying heavily on "confidential witnesses" ("CWs")—anonymous former employees—who emphasize layoffs and resignations, the sale of certain facilities, and the effectiveness of the Company's efforts to respond to the economic situation.[4]  Second, they challenge statements regarding YRC's relationship with its lenders, its compliance with credit agreements, and the timing of the debt exchange.[5]  Finally, plaintiffs challenge the narrow issue of computer integration between Yellow and Roadway, including the decision to use Roadway rather than Yellow technology, a supposed lender

---

[4]   See, e.g., ¶¶ 103, 113-15, 130-31 (addressing employment issues); ¶ 110 (addressing sale of facilities); ¶ 137 (addressing the "comprehensive plan").  Here and throughout the brief, defendants have not cited every paragraph that repeats or summarizes the factual allegations at issue.  Defendants have attached as Appendix A a short summary of the key allegations.

[5]   See, e.g., ¶¶ 116-18 (lender relationships); ¶¶ 109, 128 (compliance with credit agreements); ¶ 82 (timing of debt exchange).

requirement that integration occur by March 1, 2009, and lack of resources.[6]  Plaintiffs argue that

some customers were lost as a result of the integration and that others delayed payments.[7]

## IV.   STATEMENT OF QUESTIONS PRESENTED

     1.     Does the Complaint fail to plead a materially false or misleading statement with

particularity as required by Rule 9(b) and the PSLRA?

     2.     Does the Complaint fail to plead loss causation?

     3.     Does the Complaint fail to set forth particularized factual allegations establishing

the requisite strong inference of scienter as to each defendant?

## V.   ARGUMENT

     Plaintiffs' Complaint challenges numerous statements made over an eighteen-month

period.  There are many fatal flaws with this Complaint, beginning with plaintiffs' inclusion of a

single factual allegation but paraphrasing that same allegation as an "independent claim"

numerous times.  For example, only one witness claims that "the trailers were 10% full," ¶ 112,

but this phrase is repeated five times throughout the Complaint.  ¶¶ 3, 21, 24, 36, 39; see also

App. A (summarizing factual allegations and repetitions thereof).  Moreover, the Complaint

quotes long passages of documents without explicitly identifying what is supposedly false.  This

flaw, on its own, is enough to dismiss the Complaint.  In re Level 3 Commc'ns, Inc. Sec. Litig.,

Nos. 09-cv-200, 215, 296, 606, 2010 WL 5129524, at *9 (D. Colo. Dec. 10, 2010).  Nonetheless,

defendants assume that plaintiffs intend to challenge only the statements that are in bold and

italics.  Even as to these highlighted sections, plaintiffs fail to comply with their obligations

under the PSLRA and Rule 9(b) for the reasons set forth below.

---

[6]    See, e.g., ¶¶ 100, 105, 106, 111, 125, 126, 134 (use of Roadway technology); ¶¶ 94, 114, 116-18, 123, 129, 130 (timing of integration); ¶¶ 93, 95, 97-99, 101, 108, 123 (lack of resources).

[7]    See, e.g., ¶¶ 102, 106, 112, 135 (customer losses and declining tonnage); ¶¶ 107, 127 (stalled payment); ¶¶ 105, 125, 134 (efforts to respond to customer losses).

### A.    The PSLRA Imposes Uniquely High Pleading Standards

To state a claim under Section 10(b),  plaintiffs must allege (1) a "material misrepresentation (or omission)"; (2) "scienter, i.e., a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance" (i.e., "transaction causation"); (5) "economic loss"; and (6) "'loss causation', i.e., a causal connection between the material misrepresentation and the loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (citations omitted).  Claims under Section 10(b) are subject both to Rule 9(b)'s requirement to plead fraud with particularity and the PSLRA's more "[e]xacting pleading requirements." Tellabs, 551 U.S. at 313; see also Dronsejko v. Grant Thornton, 632 F.3d 658, 665 (10th Cir. 2011).  A complaint that does not meet these standards must be dismissed.  15 U.S.C. § 78u-4(b)(1).[8]

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see also Sheldon v. Vermonty, 31 F. Supp. 2d 1287, 1290 (D. Kan. 1998).  Accordingly, a plaintiff must allege the "'who, what, when, where, and how'" of the alleged fraud, in other words, "'the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 726-727 (10th Cir. 2006) (citation omitted).  In addition, the PSLRA requires the complaint to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1) (emphasis added).

The PSLRA also requires plaintiffs to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

---

[8]    Defendants have not separately addressed the Section 20(a) control person claims because this count requires establishment of a primary securities violation. Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998).  The failure to plead a Section 10(b) claim necessarily requires dismissal of the Section 20(a) claim.

4(b)(2). A "strong inference" means an inference that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314. The complaint must plead <u>facts</u> supporting this inference. <u>Dronsejko</u>, 632 F.3d at 666.

**B.      Numerous Challenged Statements Are Legally Inadequate**

Plaintiffs' challenges to YRC's statements generally address claims relating to the Company's performance, its relationships with lenders, and technical integration, but certain flaws permeate the Complaint and apply to <u>all</u> of plaintiffs' allegations.

**1.      Vague Statements Of Corporate Optimism Are Inactionable**

Many challenged statements are inactionable because they simply recount vague statements of corporate optimism. These include at least the following:

- "[W]e believe that we have turned the corner"; "Given our solid action plans and the momentum that is underway, we are excited." ¶ 19.

- "[W]e really did feel like the investors deserved to know that we've turned the corner." ¶ 20.

- "We are encouraged by our progress." ¶ 25.

- "The integration will occur in phases to ensure service continuity to customers and provide a seamless transition." ¶ 28.

- "Based on the support from customers and our labor partners … we've gained a level of confidence." ¶ 35.

- "[W]e're staying keenly focused on customer satisfaction." ¶ 42.

- "[W]e are confident about the things we can control and our ability to weather the things we cannot. Most importantly, we remain focused on providing exceptional service to our customers." ¶ 44.

- "Integrating our network enables us to provide unparalleled benefits to customers." ¶ 46.

- "[T]hese disappointing downgrades do not change our strategic plans," and "[d]espite the collateralization of these assets, the company's potential to implement multiple strategic actions is not impacted." ¶ 48.

- "The discussions with the banks are progressing well." ¶ 52.

- "[D]iscussions with our banks … remain very productive." ¶ 57.

- "We are pleased that we finalized another significant component of our liquidity initiatives." ¶ 59.

- "We've designed our network to help customers succeed.  It's that simple."; "Our focus is delivering confidence to our customers." ¶ 61.

- "Our self-help recovery plan is proactive and has the support of our stakeholders.  We are taking the steps needed to manage our plan today and position our company for success as the economy recovers."; describing the integration as "trailblazing." ¶ 72.

- Describing finalization of amendment to revolving credit facility as "significant." ¶ 74.

- "We continue to receive solid support from our lenders."; describing debt exchange as a "milestone." ¶ 81.

These statements are immaterial puffery.  A statement is "material" if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (footnote omitted); Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997) (same).  Vague statements of corporate optimism of the type listed above are "not actionable because reasonable investors do not rely on them in making investment decisions." Grossman, 120 F.3d at 1119; see also id. at 1121-1122 (finding statements regarding "substantial success," a "compelling set of opportunities," and similar statements inactionable); Pirraglia v. Novell, Inc., 339 F.3d 1182, 1189 (10th Cir. 2003) (affirming dismissal of "upbeat" statements such as "broad market acceptance" and claims that sales were fueled by "customer demand").  Claims based on these immaterial statements of optimism should be dismissed.[9]

---

[9] Moreover, the statement in paragraph 59 is simply immaterial, whether it is a statement of optimism or not:  Plaintiffs do not allege how this statement addressing industry practices regarding sale/leasebacks—true or false—could possibly have mattered to any investor.

### 2.     No Claims May Be Based On Unchallenged Factual Statements

Numerous other statements are inactionable because, at best, they describe factual events without claiming that these events did not happen in the way they were disclosed. These statements include at least the following:

- YRC renewed a credit agreement and made "footprint changes at YRC Regional."[10] ¶ 19.

- YRC's actions to "improve … efficiency, get our regional companies back on track and reduce overhead costs have been effective." ¶ 25.

- YRC "is accelerating" integration and, "[s]ince acquiring Roadway, the company has reduced duplicat[ive] back-office functions, shared technology applications, formed common management teams and, most recently, combined corporate sales." ¶ 28.

- YRC "generated solid free cash flow and paid down debt." ¶ 34.

- "We are in compliance with our bank debt covenants." ¶ 40.

- "[M]ore than 60 facilities [are] either consolidated or in the process of consolidation." ¶ 46.

- Describing consequences of downgraded credit rating on credit agreements. ¶ 48.

- "[W]e are on track to finalize an amendment by mid-February." ¶ 52.

- "[W]e generated a significant amount of cash." ¶ 52.

- "These transactions are a key component of the discussions with our banks." ¶ 57.

- "We are pleased that we finalized another significant component of our liquidity initiatives." ¶ 59.

- "It is common practice in our industry to lease facilities from other industry providers, and in fact, we presently lease other facilities from Estes and they lease from us. This is a continuation of that relationship." ¶ 59.

- "YRC offers about 100 more service centers than either Roadway or Yellow did individually." ¶ 61 (also describing service points, locations, the size of the network, and level of employee experience).

- Integration removed "substantial capacity" and "reset the volume needs of our network." ¶ 63.

---

[10]   The "regional" segments did not include Yellow or Roadway. Ex. 4 at 7 (Aug. 6, 2008 Form 10-Q).  Plaintiffs make no claims about regional entities, so it is unclear why they have highlighted these issues.

- Integration created the "most comprehensive LTL network in North America." ¶ 72.

- Identifying headcount reductions, describing nature of debt exchange, describing shipment trends, and stating that "100% of the credit facility and ABS lenders" approved amendments to credit agreements. ¶ 81.[11]

Plaintiffs do not include particularized allegations showing that any of these straightforward factual statements were false when made.  No allegations from any other source plead, for example, that YRC did not reduce its overhead costs and reduce duplicative sites, that it had not entered into particular credit agreements under the terms announced, that the Yellow/Roadway integration did not remove "substantial capacity," that the shipment trends did not improve, or that sale/leaseback transactions were not common.  Plaintiffs have thus failed to plead how these statements were actually false when made.  Pirraglia, 339 F.3d at 1189; Kane v. Madge Networks NV, No. C-96-20652, 2000 WL 33208116, at *7-8 (N.D. Cal. May 26, 2000).

### 3.    Numerous Allegations Merely Set Forth Disagreements With Management Decisions

Many of plaintiffs' claims are based on factual allegations with supposed corporate mismanagement at their core and are therefore inappropriate for Rule 10b-5 litigation. Level 3, 2010 WL 5129524, at *10.  Numerous CW allegations consist of such comments, including at least the following:

- CW3 asserts that a particular sale-leaseback transaction was a poor business decision because the rent paid was too high. ¶ 110.

- CW9 alleges that daily reports showed that management's comprehensive plan was "not doable," ¶ 137, and from this allegation argues that statements relating to efforts to implement the comprehensive plan were false.  See, e.g., ¶¶ 72, 74, 81.

- Numerous statements are supposedly false because CWs disagree with YRC's alleged decision to shift the integration from using Yellow's technology to using Roadway's

---

[11]   Plaintiffs refer to YRC's "purported results," see, e.g., ¶¶ 19, 25, 34, 52, 63, but any claims based on YRC's historical financial information fail. Plaintiffs do not allege that YRC ever revised these results, and "an accurate report of past successes does not contain an implicit representation that the trend is going to continue." N.J. v. Sprint Corp., 314 F. Supp. 2d 1119, 1129 (D. Kan. 2004) (citation omitted).

technology. ¶¶ 93, 95, 123, 124 (stating that Yellow's technology was preferable and that IT's original approach was "careful[]"); 96 (claiming that the decision "made absolutely no sense"), 97 (complaining that not enough people knew the Roadway software and that it was "old").

- Numerous CWs dispute resource allocation decisions, expressing their wish that they had more time and more money. ¶¶ 98-99, 108 (complaining that management did not allot enough IT hours to the project and that IT had to deal with "fire drills").

- Other CWs express disagreements with the terms of YRC's alleged decision to offer large discounts and to write off certain accounts. ¶¶ 105, 107, 125, 127; see also ¶ 106 (describing increase in number of "hard core collection cases").

- Some CWs contend that layoffs "did not make business sense" and that the e-commerce group should not have been let go. ¶ 114; see also id. ¶¶ 113, 115, 131 (describing lay-offs, acceptance of resignations, and benefits and salary cuts).

These are classic examples of disagreements with corporate policy, but they do not set forth a claim of securities fraud. Rule 10b-5 does not "regulate transactions which constitute no more than internal corporate mismanagement." Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 (1977); see also Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 638-39 (3d Cir. 1989) (cautioning against use of "artful legal draftmanship" to "undermine[]" Santa Fe). At most, plaintiffs have pleaded poor business judgments rather than securities claims predicated on "false" statements. In re United Telecomms. Inc., Sec. Litig., 781 F. Supp. 696, 700 (D. Kan. 1991) (dismissing claims that alleged only a "failure to disclose possible mismanagement").

Indeed, the District of Colorado addressed similar allegations relating to integration in Level 3. Like this action, the Level 3 plaintiffs alleged, inter alia, that defendants knew the integration was "behind schedule and over budget," that the company was using "multiple systems causing customer delays," that the company laid off employees who had knowledge regarding the system, and that certain aspects of the integration had been delayed. 2010 WL 5129524, at *2-3. From this, plaintiffs claimed that various statements were false because the company knew that it had "not made significant progress on the integrations," "despite partial

disclosure of provisioning delays, the integration ... was behind schedule," there were customer complaints, and the company "constrained" sales to stabilize the backlog. Id. at *5. The court dismissed the complaint because these allegations did not properly plead a particularized false statement, id. at *9, and, at most, set forth mere mismanagement. Id. at *10; see also Cutsforth v. Renschler, 235 F. Supp. 2d 1216, 1242-43 (M.D. Fla. 2002) (dismissing numerous allegations related to integration—including "inadequate billing of customers or pursuing accounts receivable" and "integrating the Company's computer system" because they set forth only corporate mismanagement).

All of the supposedly false statements are based, at least in part, on allegations describing disagreements with corporate policy.  ¶¶ 21, 27, 29, 31, 33, 36, 39, 41, 43, 45,47, 49, 51, 53, 55, 56, 58, 60, 62, 64, 66, 67, 71, 73, 75, 76, 78, 80, 82.  Accordingly, they should be dismissed. Similarly, plaintiffs' generalized assertion that every 10-Q contained a "false and misleading statement[]" regarding internal controls should be dismissed.  ¶¶ 23-24.  "Plaintiff does not aver that management did not actually evaluate the Company's internal controls and determine them to be effective. ... [such] allegation[s are] of mismanagement, which [are] not actionable." Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d 662, 683 (D. Colo. 2007).

### C.     Plaintiffs Do Not Plead That The Remaining Statements Are Materially False Or Misleading As Required By Rule 9(b) And The PSLRA

Once the Complaint is stripped of the allegations that are immaterial puffery, uncontested statements of historical facts, and claims of corporate mismanagement, there are relatively few allegations left.  Even the remaining claims relating to corporate performance, relationships with lenders, and the technical integration are woefully inadequate.

1.    **Statements Regarding Corporate Performance Are Not False**

Plaintiffs challenge a variety of statements regarding YRC's overall performance.  These

claims fail because, in the same statements from which plaintiffs draw their allegations, YRC

disclosed extensive information about difficulties facing the Company.  General expressions of

optimism that the Company would weather those difficulties do not cast doubt on the disclosures

or create independent claims because the Company was not required to describe its prospects

fatalistically or pejoratively.   Finally, the October/November 2009 announcement of the debt

exchange does not render any statement false because the Complaint lacks particularized facts.

a.    **YRC Informed The Market Of Numerous Difficulties**

Plaintiffs challenge statements made between September 2008 and April 2009, claiming

that somehow YRC's statements "misled" the market into believing that YRC was performing

well when it was not.  This contention fails because the very same statements that plaintiffs

quote also included information about the difficulties YRC was facing.  For example:

- Sept. 8, 2008:  YRC described a softening economy that was harming both its volume levels and pricing.  ¶ 28.

- Oct. 23, 2008:  YRC announced that it would cease providing guidance because of economic uncertainty.  It also identified a "progressively" weakening economic environment.  ¶ 34; Ex. 6.

- Oct. 24, 2008:  YRC announced declining tonnage, pricing volume, and predatory pricing by competitors.  Ex. 7 at 7, 8, 10, 11.  It also acknowledged that it anticipated some customer losses during the integration process.  Id. at 14.

- Oct. 29, 2008:  YRC announced layoffs of 3,700 employees.  ¶ 37.

- Nov. 17, 2008:  YRC announced "unprecedented" economic challenges.  ¶ 46.

- Nov. 20, 2008:  YRC announced that the downgrading of its credit constituted a trigger event requiring sales of facilities and monetization of unencumbered assets.  ¶ 48.

- Dec. 24, 2008:  YRC cancelled a tender offer and announced that it was modifying credit agreements to improve its flexibility.  ¶ 50.

- Jan. 29, 2009:  YRC announced significant losses in all categories, decreased tonnage, and the effects of a "recession that has been longer and deeper than anyone anticipated." Ex. 9 at 1.

- Jan. 30, 2009:  "[E]ach month continued to progressively weaken as the economy slowed further and the retail holiday peak never showed up."  YRC also announced declining prices, lower volumes, and costs associated with "accelerated integration investments and pension settlement costs." Ex. 10 at 2.

Plaintiffs' contention that YRC was somehow leading its investors to believe that all was going well is utterly unfounded.

The various allegations by CWs contending that YRC faced financial difficulties are completely consistent with the information that the Company provided.  See, e.g., ¶¶ 112-15.  To take one example, plaintiffs repeatedly quote a statement attributed to CW9, who said that, at some unspecified time, "trailers were only 10% full and a lot of lanes were not running full." ¶ 112.  YRC, however, disclosed declining tonnage and the fact that it was eliminating routes and facilities because of overcapacity and duplicative facilities.  Supra § III(B)(1)-(2).  Thus, this non-particularized allegation does not make any public statement false.  See, e.g., Grossman, 120 F.3d at 1125 (rejecting claims of falsity when "these alleged omissions concern matters discussed in great detail in the registration statement"; rejecting suggestion that defendant had duty to disclose more than it did).  Similarly, even assuming that information regarding the lenders' supposed "control" of YRC was material, ¶¶ 116-17, YRC disclosed ongoing communications with lenders, amendment of credit agreements, and the consequences thereof.  It is unclear what additional information investors could possibly have required on this topic. Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988) (discussing risks of setting materiality threshold so low that investors would be "bur[ied] … in an avalanche of trivial information").

Given YRC's extensive disclosures, plaintiffs' focus on two internal statements supposedly made in October and November 2008 does not advance their cause.  In particular,

CW2 alleges that Zollars told employees in October 2008 that it was a "guarded secret" that YRC was "in danger" of missing revenue targets and that banks would "pull their notes," ¶ 31, and CW3 alleges that, in a November 2008 town hall meeting, Zollars stated that YRC was "fighting to survive." ¶ 49. Neither statement contradicts YRC's public announcements.

As to the revenue target statement, plaintiffs plead no facts explaining what particular statement was contradicted by the <u>risk</u>—not the certainty—that YRC might miss certain targets. The Tenth Circuit has held that a mere possibility of an event is not enough to plead a Section 10(b) claim. <u>Phila. v. Fleming Cos., Inc.</u>, 264 F.3d 1245, 1265-66 (10th Cir. 2001) (construing issue in terms of materiality and scienter). Plaintiffs also fail to draw a connection between the possibility that unspecified banks would "pull their notes" and the specific credit agreement described in the October 3, 2008 announcement, ¶¶ 30-31, which the Complaint contends was rendered false by Zollars' statement. Plaintiffs cannot simply assume that the two are the same. <u>Grossman</u>, 120 F.3d at 1124 ("Mere conclusory allegations of falsity are insufficient.").

As to the "fighting to survive" comment, this statement is not pleaded with particularity because plaintiffs provide no information beyond this three word snippet: there is no context or any other factual description that might provide insight into Zollars' representation; there is also no explanation as to whether he was discussing the Company overall, a component of the Company, labor issues, integration issues, or something else entirely. <u>Pirraglia</u>, 339 F.3d at 1189; <u>Grossman</u>, 120 F.3d at 1124; <u>Caprin v. Simon Transp. Servs., Inc.</u>, 99 F. App'x 150, 162 (10th Cir. 2004). Even if one assumes that the statement was made and did refer to the Company overall, this generalized statement does not somehow render any other statement false. By the time Zollars made this statement at some unidentified point in late 2008, the Company had announced that because of the economic uncertainty it would no longer provide guidance, that it was laying off thousands of employees, that it was facing declining tonnage and predatory

21

pricing pressures, and that the recession was affecting every aspect of the Company. Supra §

III(B)(1)-(2).  Moreover, this statement was made, at most, only a few weeks after the Lehman

bankruptcy and other "cataclysmic" financial events.  Supra § III.  In short, this out-of-context

three-word phrase does not make any other statement "false."

> **b.**  **YRC's Expressions Of Hope In The Face Of Difficulties Are Not Actionable**

YRC did, of course, express its hopes that matters would improve.  Accordingly, in

almost every statement that plaintiffs challenge, YRC explained how it was trying to improve its

position, improve flexibility, and move forward.

Plaintiffs quote extensively from Zollars's October 30, 2008 letter, ¶¶ 40-45, but they do

not identify a single statement made there—or at any other time—that contradicted YRC's

public statements or that could have led any investor to believe that YRC was not facing

difficulties.  Likewise, the expressions of optimism—most of which are inactionable puffery, see

supra § V(B)(1)—that YRC made throughout the class period also cannot be termed "false."

This is because there is no requirement that a company characterize itself pejoratively to

the market.  The securities laws only "rarely require companies to disparage their own product

lines or the skills of their managers. ... Nor are companies required to predict that their future

operations will fail." Kane, 2000 WL 33208116, at *8; see also In re Stone & Webster, Inc. Sec.

Litig., 253 F. Supp. 2d 102, 126 (D. Mass. 2003) (same; noting that there is no obligation to

"characterize" even poor results "in pejorative fashion"); In re Syntex Corp. Sec. Litig., No. 92-

20548, 1993 WL 476646, at *7 (N.D. Cal. Sept. 1, 1993) ("A company has no duty to disparage

its own competitive position in the market."); Andropolis, 505 F. Supp. 2d at 683 (stating that

claims cannot be based on supposed failure to disclose "mismanagement").

"The complaint tells a story of executives who, while recognizing some difficulties with integration, were optimistic about their ability to address those inefficiencies promptly and reap the benefits of integrating the acquired companies. These aspirational statements were not material misstatements." Level 3, 2010 WL 5129524, at *10.

**c.    The November 2009 Debt Exchange Does Not Render Any Statement False**

Plaintiffs allege that numerous statements in 2009 were rendered false because YRC was "already considering a plan to convert" debt into stocks at the "expense" of the shareholders. ¶¶ 3, 53, 58, 60, 64, 69, 71, 73, 76, 82, 85. There are at least two flaws with this theory.

First, the supposed basis for plaintiffs' claim is a single comment by Zollars in which he allegedly stated that "this is something we've been talking about for most of the year in terms of the final step in our comprehensive plan." ¶ 85. Plaintiffs do not allege where this statement was published or provide any context for the alleged statement. There is no such statement in any Company announcement plaintiffs cite, including the October 30 and November 2, 2009 announcements. Exs. 15, 16.[12] Nor are any facts pleaded about who engaged in these supposed discussions, when they occurred, or what was discussed. Without such allegations, plaintiffs have completely failed to allege with particularity that any statement was "false" by reason of this purported comment. Grossman, 120 F.3d at 1124; Sikkenga, 472 F.3d at 727. Plaintiffs' claims are further weakened by the lack of allegations casting doubt on representations that YRC's advisor "began" discussions regarding a debt exchange only in July 2009, Ex. 17 (cited in ¶ 72), or that the ultimate transaction was effectuated in a "short" period of time. Ex. 16 (Nov. 2, 2009 Announcement). In short, the Complaint provides no basis to believe that Zollars' comment—"this is something we've been talking about"—referred to anything but the

---

[12]    Plaintiffs claim that an "August 3" statement was rendered false by this comment, ¶ 82, but the Complaint identifies no statement made on that date.

Company's overall "comprehensive plan," which was simply an effort to "realize efficiencies … restore financial strength, and position its operating companies for future success." Ex. 17 (July 8, 2009 Press Release); Ex. 18 (July 30, 2009 Press Release) (cited in ¶ 77).

Second, even taking plaintiffs' interpretation as accurate, it does not make every statement throughout the course of 2008-2009 "false" because YRC did not specifically discuss a debt exchange plan in every such statement. Plaintiffs cannot plead falsity by arguing that YRC should have raised a completely separate issue that was not related to the matters discussed. Kapur v. USANA Health Scis., Inc., No. 2:07-CV-00177, 2008 WL 2901705, at *15 (D. Utah July 23, 2008) ("Lead Plaintiff has not sufficiently shown that these statements were misleading where, as here, the reasons Lead Plaintiff proffers as to why they were misleading do not contradict the accuracy or completeness of the statements themselves."). Framed slightly differently, even if one assumes that a debt exchange plan was being discussed at some point in time, plaintiffs have not shown how any statement was made false by this "omission."

## 2.    Claims Regarding The Company's Lenders Fail

The Court should also reject plaintiffs' claims based on statements relating to YRC's lenders. Many of the allegations contain statements of historical fact or puffery, and the reasons why these are inactionable have already been addressed. See supra § V(B).

Plaintiffs claim that other statements about YRC's lenders were false because YRC was "in danger" in Fall 2008 of missing its revenue targets, which could lead to detrimental actions by its lenders. ¶¶ 31, 33, 36, 41 (referring to statements of October 3, October 7, and October 29, 2008). A "danger" of missing revenue targets, however, does not render any of the identified statements materially false or misleading. Fleming, 264 F.3d at 1265-66 (addressing similar issues in context of materiality and scienter); see also supra § V(C)(1)(a). Moreover, by October 2008, the supposed time period of the alleged statement about the revenue target, ¶ 31, YRC was

telling the market that it would remain in full compliance with its debt covenants but that it had been affected by the softening economy.  ¶¶ 28, 30, 32; see also supra § III(B)(2) (describing disclosures).  An alleged internal concern does not make these statements false, especially when there is no allegation that YRC missed the revenue target.

Similarly, plaintiffs challenge as false numerous statements regarding "productive" or "positive" lender discussions based on CW allegations that the discussions were "ugly."  ¶¶ 53, 58, 71.  The underlying statements are not, as described previously, material.  Supra § V(B)(1).  Even if they were, there is nothing inconsistent in stating that lenders were "supportive" while describing the actual negotiations as "ugly" or difficult or contentious.  Plaintiffs do not explain how any investor could possibly have been misled about any material issue given that the Complaint fails to allege that the lenders did not amend the EBITDA targets or otherwise effectuate the changes YRC announced.[13]  Moreover, plaintiffs provide no detail regarding what they mean by "ugly," ¶ 117, nor, on a related point, do they give information describing "ugly" financial models or how this could have affected any statement made by YRC.  ¶ 133.  These generalized statements lack particularity even if they were material.

### 3.    Claims Based On Statements Relating To Technical Integration Fail

Plaintiffs raise no challenges to the "operational" integration but instead limit their claims to the technical integration of Yellow and Roadway IT systems.  These claims, however, are not properly pleaded.  The Complaint does not adequately allege that there was a "March 1" deadline for the technical integration, and, even if it did, plaintiffs fail to plead that any statement regarding the technical integration was false.

---

[13]    Zollars supposedly stated in a February 2009 town hall meeting that YRC had violated its credit agreement, ¶¶ 109, 128, but plaintiffs do not identify what specific statements were rendered false by this purported comment, as to which there is no detail or context.  To the extent this representation supposedly rendered statements about lender "support" false, these statements are merely puffery.  Supra § V(B)(1).  Even if YRC had violated its credit agreement, the very statements plaintiffs cite establish that the lenders did, in fact, modify numerous credit agreements throughout 2009.  See supra § III(B)(2)-(4) (describing modifications).

### a.     Plaintiffs Do Not Properly Plead The Existence Of The Supposed March 1, 2009 Deadline

Plaintiffs contend that statements regarding YRC's integration process were false because YRC did not disclose that its lenders supposedly required a March 1, 2009 integration date. ¶¶ 3, 21, 27, 29, 33, 36, 41, 45, 47, 51, 55.  Plaintiffs, however, do not properly plead that there was any such deadline as a "stipulation of the loan" to YRC.  ¶¶ 94, 123.

Although this claim is repeated throughout the Complaint, CW8 is the only source.  CW8, an "account manager/e-business field manager" during the class period, ¶ 2(h), provides no explanation as to how he "learned" this supposed information.  There are no allegations describing who provided this information to him, when he received it, or the context in which he received it.  Caprin, 99 F. App'x at 158 (stating that Rule 9(b) requires not only the "time, place, and content" of each fraudulent allegation, but also "the consequences thereof").  Plaintiffs also provide no details explaining how an individual in CW8's position would have received this supposedly secret information.  CALPERS v. Chubb Corp., 394 F.3d 126, 147, 148, 150-51 (3d Cir. 2004) (considering reliability of anonymous sources and likelihood that they would have identified information); Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1102-03 (10th Cir. 2003) (adopting a fact-specific approach to addressing strength of sources; focusing on "detail, number, and coherence and plausibility" of the allegations; noting that allegations of "secret meetings" may require particularly detailed pleading).  Perhaps most significantly, CW8 does not identify when this supposed condition was imposed.  In short, the premise of plaintiffs' argument, i.e., that there was a deadline, is not sufficiently alleged.

### b.     Claims Relating To The Pre-March 2009 Progress Of Technical Integration Are Not Properly Pleaded

There can also be no claims based on any pre-March 2009 statement regarding technical integration—the only aspect of the process that plaintiffs address.  These include statements regarding the integration's timing, motivation, and customer reaction.

First, plaintiffs challenge various statements regarding the motivation for integration, arguing that YRC did not accelerate the integration because it was the "right time" but because lenders required this timing.  See, e.g., ¶¶ 3, 21, 27, 29, 31, 33, 36, 51, 55.  Even assuming that there was a lender-imposed deadline, no allegations cast doubt on the reasons that YRC did announce that it was moving forward with integration:  namely, the need to eliminate duplicative facilities, sales forces, and routes during a time of increasing economic problems.  See supra § III(B)(1)-(3).  Moreover, again assuming that there was a lender-imposed deadline, plaintiffs do not identify any obligation to disclose this fact—there is no explanation as to how this requirement could have been material in light of the other, undisputed reasons why integration was accelerated.  Cutsforth, 235 F. Supp. 2d at 1230 ("it is not enough … for a defendant simply to omit information potentially of interest to investors, but rather the omission must render statements actually made misleading"; citing numerous cases).

Second, plaintiffs argue that YRC misstated the overall positive customer response to integration.  See, e.g., ¶¶ 27, 29, 36, 43, 45, 55.  The Complaint, however, does not include a single allegation regarding customer dissatisfaction with technical integration before March 1, 2009.  The sole allegation on this issue comes from CW9, who claims that customers left YRC "well before" the integration was completed because they "didn't want to be part of the nonsense" of the process and that YRC "parlayed" these customer losses into "financial problems."  ¶ 102.  This does not come close to meeting plaintiffs' particularity burden:  CW9

provides no detail regarding the size or identities of any customers or when or why they left, nor does he give detail regarding the nature or extent of the "financial problems" following these supposed losses. Indeed, the Complaint does not even allege that the technical integration had occurred when the customers allegedly left or that they were concerned about this issue. Such lack of detail is impermissible. See, e.g., Kane, 2000 WL 33208116, at *8 (rejecting allegations regarding customer loss when the complaint offered "generalities" that were "repeated . . . with little variation" and without "hazard[ing] a guess at the numbers involved").

Finally, plaintiffs challenge various statements regarding YRC's efforts and ability to accelerate integration. See, e.g., ¶¶ 28, 34, 44, 46, 49, 50. It is in this area that plaintiffs' repeated confusion of the "technical" integration with other aspects of integration is most pronounced. To take one example, plaintiffs challenge YRC's November 17, 2008 representation that "[i]ntegrating our network enables us to provide unparalleled benefits to customers," ¶ 46, based on supposed problems with technical integration. The statement that plaintiffs quote, however, makes clear that it comments on physical integration, as it describes "shipment densities," "service offerings," "reliability" and "more direct points." To the extent the other statements discuss any particular aspect of integration, they likewise describe operational components and not technical integration. ¶¶ 28 (discussing future plans to "increase … network density"), 34 (describing "additional facility sales"), 44 (describing "combining the operational networks and the local sales teams"), 46 (describing consolidation of "more than 60 facilities" and "enhanced local pick-up and delivery services"). In other words, the CW allegations do not even address the actual statements made by YRC.

In fact, only one CW allegation specifically relates to technical integration issues before March 1, 2009. CW8, who was not a member of the IT group, ¶ 2(h), claimed that, in February 2008, "IT explained to senior management that it would take more than a year to successfully

complete the integration." ¶ 93.  This allegation, though, relates to a time period two months

before the putative class period and before the supposed switch to Roadway technology

occurred.  It thus has no relevance to events that actually did transpire.  Moreover, this allegation

and the related claims that various IT employees had to shift course and change from Yellow to

Roadway technology are, at bottom, nothing more than disagreements with management's

business decisions.  There is no obligation to disclose internal disputes.  Kane, 2000 WL

33208116, at *9.  There was certainly no obligation by management to speculate or to provide

additional information.  Even if defendants were aware of the "different computer systems," "at

that early stage …they reasonably could have thought that the problem could be resolved, or

minimized." Cutsforth, 235 F. Supp. 2d at 1246.

> **c.      There Are No Claims From March 1, 2009 To November 2,**
> **2009 Because YRC Promptly Disclosed Integration Problems**

On March 2, 2009, YRC announced that it had successfully completed the

Yellow/Roadway integration and described improved service centers, increased direct service

points, and other infrastructure issues.  ¶ 61.  YRC made no statements about technical

integration on March 1, 2009.  Plaintiffs, though, allege that the March 1 statement was false

because integration was "materially flawed," YRC could not load accurate pricing on the system,

customer data was lost, and parts of the system were not fully integrated; plaintiffs further claim

that, because of these problems, customers left and YRC's finances were harmed.  ¶¶ 62, 105-

12.  These claims also fail.

YRC disclosed only six weeks later that there were problems and that some customers

had been lost in the immediate days after the integration was complete.  In particular, on April 23

and 24, 2009, YRC specifically identified "customer anxiety" and ongoing customer diversion.

¶¶ 63, 65 (quoting Apr. 23, 2009 statement and Apr. 24, 2009 Conf. Call Tr. respectively); see

also ¶¶ 68 (May 15, 2009 statement that customers had been diverted), 79 (Aug. 10, 2009 statement that some customers had left to "mitigate" risks and not yet returned).   Although they characterize these as "partial disclosures," ¶ 67, plaintiffs do not identify what more YRC should have done: it disclosed problems and their consequences.   Plaintiffs cannot base a claim on YRC's decision not to itemize the specific reasons customers may have left.   Even assuming data was lost and other problems occurred, see, e.g., ¶ 105, there was no obligation to provide more detail.   Thus, plaintiffs' various allegations about customer losses and related matters are irrelevant because YRC did not conceal these issues.

Second, plaintiffs' allegations of customer losses, financial problems, and the like are not pleaded with particularity.   ¶¶ 105-12.  Plaintiffs do not identify specific customers that left, the significance of those customers, the extent of write-offs, or any other information.   Given that the Company did disclose problems, as noted above, the Complaint's failure to include specific information further undercuts the suggestion that its disclosures were somehow misleading.

Finally, plaintiffs' suggestion that the integration was not "complete" because of these issues is also unfounded.   At most, they have simply described specific aspects of the very problems that the Company acknowledged.   Cutsforth, 235 F. Supp. 2d at 1252 (rejecting claims regarding completion of integration when Company acknowledged problems); see also id. at 1242 (rejecting suggestion that "completion" necessarily meant that "all of the operational details arising from the merger were finished").   Plaintiffs state repeatedly that only the "billing and shipping system" was integrated.  ¶ 62.  There is no explanation, however, as to what other aspect of the technical system mattered for purposes of integration.   Moreover, the fact that there may have been difficulties does not mean that integration had not occurred; no source disputes that, as of March 1, 2009, Yellow and Roadway were operating as one company.

### 4.  Summary

Plaintiffs do not properly plead that defendants made materially false statements at any point during the putative class period.  The claims from April through September 2008 fail because they are puffery or address undisputed factual representations; from September 2008 through April 24, 2009, YRC accurately identified information regarding problems, including customer losses associated with integration; and, from April 24, 2009 until the end of the class, there were no additional "false" statements addressing issues that had not been disclosed.

### D.  Plaintiffs Have Not Pleaded Causation Because No Challenged Statement Relates To The November 2, 2009 Announcement

A further independent ground to grant defendants' motion to dismiss is plaintiffs' failure to allege causation.  Even if plaintiffs had adequately pleaded falsity, they have not shown how the supposed truth that was "revealed, for the first time," on November 2, 2009, ¶ 83, had any connection to any false statement.

Loss causation is an essential element of a Section 10(b) fraud claim and has been described by the Supreme Court as "a causal connection between the material misrepresentation and the loss." Dura, 544 U.S. at 341.  Dura held that the Ninth Circuit improperly reversed a grant of a motion to dismiss, explaining, "Alleging that price has been inflated as a result of a misrepresentation is not enough—even if the plaintiff has suffered a loss—unless the plaintiff can identify a 'causal connection' between the loss and the misrepresentation." In re Williams Sec. Litig., 558 F.3d 1130, 1136-37 (10th Cir. 2009) (citing Dura).  Without such a link, plaintiffs with groundless claims could force settlements, thus transforming "a private securities action into a partial downside insurance policy." Dura, 544 U.S. at 347-48 (citations omitted).

Plaintiffs here contend that YRC's November 2, 2009 announcement relating to its exchange offer was the corrective disclosure that "revealed" the "truth." ¶¶ 83, 157.  However,

as the Tenth Circuit has explained, to constitute a corrective disclosure, the announcement "must at least relate back to the misrepresentation and not to some other negative information about the company." Williams, 558 F.3d at 1140. In Williams, the Tenth Circuit found that "[t]he causal connection between false statements about a company's prospects and that same company's eventual bankruptcy years later is too remote to constitute a corrective disclosure." Id. at 1142. Accordingly, it affirmed the grant of summary judgment in favor of defendants because plaintiffs "failed to present evidence suggesting that the declines in price were the result of the revelation of the truth and not some other factor." Id. at 1143.

The claims in this case similarly fail. Despite plaintiffs' conclusory assertions that the November 2, 2009 disclosure revealed problems with technical integration, debt and liquidity, customer losses, and internal controls, ¶ 157, the November 2, 2009 press release says nothing about these issues. Instead, it repeats that the exchange offer was part of YRC's comprehensive plan. Ex. 16 (Nov. 2, 2009 Press Release). There is no link between the exchange offer and any of the prior challenged statements other than the October 30, 2009 statement, which actually disclosed the exchange offer four days earlier. Ex. 15. Likewise, the "post-class period developments," ¶¶ 88-92, do not reveal "fraud"; if anything, they confirm the accuracy of class period statements. In the end, plaintiffs have seized on a statement preceding a stock price decline and claimed that it disclosed the "truth" about some prior fraud. Just as in Dura and Williams, though, these efforts should be rejected. "To satisfy the requirements of Dura, ... any theory ... will have to show some mechanism for how the truth was revealed." Williams, 558 F.3d at 1138. Because the November 2, 2009 announcement did not reveal the "truth" of the supposed "fraud," plaintiffs' claims should be dismissed.[14]

---

[14]   Plaintiffs characterize YRC's April 23-24, 2009 statements about problems with the integration as "a partial disclosure." ¶¶ 67, 152, 154. If plaintiffs try to use April rather than November as the relevant date, their

E.      **Plaintiffs Fail To Plead Scienter**

Plaintiffs also fail to plead a strong inference of scienter as mandated by the PSLRA. 15

U.S.C. § 78u-4(b)(2); Tellabs, 551 U.S. at 313.

1.      **Generic Allegations Of Scienter Are Inadequate**

Numerous generic allegations of scienter are legally inadequate. These include the

claims that defendants' positions support an inference of scienter and that they generally had

access to information. ¶¶ 143-49. The Tenth Circuit has rejected such allegations. Fleming, 264

F.3d at 1264. Although plaintiffs plead that defendants had a "motiv[e]" to increase the stock

price, ¶ 142, the Tenth Circuit also rejects efforts to plead scienter based on "motive and

opportunity." Fleming, 264 F.2d at 1262; Sprint, 314 F. Supp. 2d at 1140. To the extent

plaintiffs try to use "motive" to enhance their scienter claims, the Complaint does not contend

that defendants sold any stock or profited personally from the supposed fraud. This omission

weakens plaintiffs' efforts to rely on bonuses or other supposed motives. Andropolis, 505 F.

Supp. 2d at 678. In any event, plaintiffs' efforts to plead motive based on bonuses fail. ¶¶ 120,

139-40. Executive compensation based on stock performance is common to all corporations and

executives, and, as such, has been found legally insufficient to plead scienter. Fleming, 264 F.3d

at 1269; see also Andropolis, 505 F. Supp. 2d at 678 (rejecting alleged motive to project

appearance of successful company as common to all executives; citing cases).

2.      **Plaintiffs Do Not Establish Actual Or Reckless Disregard Of The
        Likelihood Of Misleading Investors**

Plaintiffs' efforts to plead scienter by alleging knowledge or reckless disregard of

supposedly true facts also fail. ¶¶ 122-35. Plaintiffs rely on the CWs to meet this burden, id.,

---

claims would be limited to positive statements relating to the integration issues made from March 2, 2009-April
23, 2009, as March 2, 2009 was the first statement by YRC that the integration had been "successful." Ex. 11.
Even such a limited class period, though, would fail for all the reasons set forth herein.

but the allegations fall short. At most, as summarized in paragraph 121, they have pleaded that, at some point, certain defendants were aware of problems with technical integration; that customers left, forcing YRC to offer discounts; that YRC faced pressure from lenders and was in danger of violating its bank covenants; and that it eventually failed to comply with a credit agreement.

Knowledge of risks, however, is not equivalent to scienter. The Tenth Circuit has clearly and explicitly held that plaintiffs must plead more than mere knowledge of the underlying facts to plead scienter. "[T]he important issue in this case is not whether Defendants knew the underlying facts, but whether [they] knew that not disclosing [them] posed substantial likelihood of misleading a reasonable investor." Fleming, 264 F.3d at 1264. Without exception, plaintiffs have failed to plead this "next step" in the chain necessary for this case to proceed.

Plaintiffs do not even attempt to make such a showing as to Wicks, Bruffett, or Smid. Nothing explains how they made any statement with actual knowledge or reckless disregard of the risk that it might mislead investors; there are certainly no allegations as to how each individual acted with scienter or how each took actions evincing a wrongful state of mind. In re Thornburg Mortg., Inc. Sec. Litig., 695 F. Supp. 2d 1165, 1199-1200 (D.N.M. 2010) (extensively analyzing case law on this issue), see also Thornburg Mortg., Inc. Sec. Litig., 2011 WL 2429189, at *54-55 (D.N.M. June 2, 2011) (reconsidering earlier ruling in part on other grounds; rejecting again efforts to plead scienter generally as to officers).

As to Zollars, plaintiffs merely reiterate CW allegations that he knew of "risks" that the Company would not meet its targets or that it was "fighting to survive." Supra § III(C)(1)(a). "Assuming for the sake of argument, however, that Defendants actually [knew of the risks], we cannot say at this juncture that the 'likelihood of [the] potential event' … was so significant that Defendants were reckless in not disclosing [it]." Fleming, 264 F.3d at 1265-66; see also id. at

1267-68 (discussing failure to disclose pending litigation; noting that defendants were not required to assume worst case scenario).   At best, plaintiffs have attempted to plead scienter by hindsight, an approach that this Circuit has rejected. Id. at 1264-65 (emphasizing that complaints must plead contemporaneous knowledge).

Finally, many statements relate to future events. See, e.g., ¶¶ 28, 30, 32, 44, 50, 52, 54. As to these statements, plaintiffs must plead particularized facts establishing that the speaker had actual knowledge of the statements' falsity at the time each were made.   15 U.S.C. § 78u-5(c); see also Andropolis, 505 F. Supp. 2d at 677.   As described above, plaintiffs fail to plead even recklessness; they certainly do not plead the higher standard of actual knowledge at to each of these statements.

## VI.   CONCLUSION

For all the foregoing reasons, defendants respectfully request that this Court grant their motion to dismiss the Complaint.

Dated:   December 20, 2011

| | |
|---|---|
| s/ Marc J. Sonnenfeld | s/ David M. Buffo |
| Marc J. Sonnenfeld, *pro hac vice* | James D. Griffin, KS # 12545 |
| Karen Pieslak Pohlmann, *pro hac vice* | David M. Buffo, KS # 21399 |
| Jill Baisinger, *pro hac vice* | **HUSCH BLACKWELL LLP** |
| **MORGAN, LEWIS & BOCKIUS LLP** | 4801 Main Street, Suite 1000 |
| 1701 Market St. | Kansas City, MO  64112 |
| Philadelphia, PA 19103-2921 | Telephone:  816.983.8000 |
| Telephone:  215.963.5000 | james.griffin@huschblackwell.com |
| Facsimile:  215.963.5001 | david.buffo@huschblackwell.com |
| msonnenfeld@morganlewis.com | |
| kpohlmann@morganlewis.com | *Attorneys for Defendants* |
| jbaisinger@morganlewis.com | |
| | |
| *Attorneys for Defendants* | |