IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| STAN BETTER and YRC INVESTORS GROUP, Individually and On Behalf of All Other Similarly Situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 11-CV-2072 KHV/JPO |
| YRC WORLDWIDE INC., WILLIAM D. ZOLLARS, MICHAEL SMID, TIMOTHY A. WICKS, and STEPHEN L. BRUFFETT, | ) ) ) ) | |
| Defendants. | ) ) | |

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT.................................................................1

II.   STATEMENT OF THE FACTS.............................................................3

III.  ARGUMENT......................................................................................7

      A.    Applicable Legal Standards......................................................7

      B.    Defendants' Fact-Based Arguments Are Premature and Cannot Succeed............7

              1.    Plaintiffs have Adequately Pleaded Materially False And Misleading Statements and Omissions....................................9

              2.    Defendants' Statements and Omissions Do Not Constitute Inactionable Puffery........................................12

              3.    Defendants' Purported "Disclosure" Arguments Fail...............14

      C.    Defendants Had a Duty to Disclose Which They Violated...............16

      D.    Plaintiffs Have Stated a Claim for Violations of the Securities Laws, Not Mere Mismanagement.....................................................20

      E.    Plaintiffs' Well-Placed Confidential Witnesses Support Falsity And Scienter.......................................................................21

      F.    Plaintiffs Have Adequately Pleaded Scienter............................24

      G.    Plaintiffs Have Adequately Pleaded Causation..........................30

      H.    Defendants Concede the Section 20(a) Claim is Valid if Section 10(b) Is Upheld......................................................................34

IV.  CONCLUSION...............................................................................35

i

## TABLE OF AUTHORITIES

<u>CASES</u>

*In re Accelr8 Tech. Corp. Sec. Litig.*,
147 F.Supp.2d 1049 (D. Colo. 2001)…………………..……………………….32

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003)………………………………………….…passim

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009)……………………………………………………….2, 7

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F.Supp.2d 474 (S.D.N.Y. 2004)………………………………………….29

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)……………………………………………………………8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)……………………………………………………………2

*Brumbaugh v. Wave Sys. Corp.*,
416 F.Supp. 2d 239 (D. Mass. 2006)………………………………………….12

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999)………………………………………..…….25

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002)…………………………………………………16

*Campbell v. Castle Stone Homes, Inc.*,
No. 2:09-cv-250 TS, 2011 WL 902637 (D. Utah Mar. 15, 2011)…………………;……32

*Caprin v. Simon Transportation Svs., Inc.*,
99 F. App'x 150 (10th Cir. 2004)…………………………………...……………22

*In re Comverse Tech., Inc. Sec. Litig.*,
543 F.Supp.2d 134 (E.D.N.Y. 2008)…………………………………………15

*In re Donald J. Trump Casino Sec. Litig.*,
7 F.3d 357 (3d Cir. 1993)……………………………………………...………16

*In re Donna Karan Int'l, Inc. Sec. Litig.*,
No. 97 Civ. 2011, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998)……………...………20

*Dura Pharm., Inc. v. Brodo,*
544 U.S. 336 (2005)............................................................................3, 31

*Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.,*
343 F.3d 189 (2d Cir.2003).....................................................................32

*In re Faro Techs. Sec. Litig.,*
534 F.Supp. 1248 (M.D. Fla. 2007)...........................................................20

*Florida State Bd. of Admin. v. Green Tree Financial Corp.,*
 270 F.3d 645 (8th Cir. 2001)....................................................................26

*Freudenberg v. E*Trade Financial Corp.,*
712 F.Supp.2d 171 (S.D.N.Y. 2010)...........................................................33

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000).....................................................................15

*In re Gilead Sciences Sec. Litig.,*
536 F.3d 1049 (9th Cir. 2008)..................................................................32

*Grossman v. Novell, Inc.,*
120 F.3d 1112 (10th Cir. 1997)......................................................7, 13, 14, 15

*Hall v. Children's Place Retail Stores, Inc.,*
580 F.Supp.2d 212 (S.D.N.Y. 2008).......................................................16, 18

*In re ICG Commc'ns, Inc., Sec. Litig.,*
No. 00-cv-01864-REB-BNB, 2006 WL 416622 (D. Colo. Feb. 7, 2006).......3, 20, 34

*Kramer v. Time Warner, Inc.,*
937 F.2d 767 (2d Cir. 1991).................................................................25

*Lane v. Page,*
581 F.Supp.2d 1094 (D.N.M. 2008)...........................................................20

*Lentell v. Merrill Lynch & Co., Inc.,*
396 F.3d 161 (2d Cir. 2005)....................................................................35

*Litwin v. Blackstone Group, L.P.,*
634 F.3d 706 (2d Cir. 2011)......................................................................9

*In re Level 3 Commc'ns, Inc. Sec. Litig.,*
Nos. 09-cv-200, 215, 296, 606, 2010 WL 5129524 (D. Colo. Dec. 10, 2010)............20

*Malin v. XL Capital Ltd.,*

499 F.Supp.2d 117 (D. Conn. 2007)................................................30

*In re MannKind Sec. Actions,*
No. CV-00929, 2011 WL 6327089 (C.D. Cal. Dec. 16, 2011)............................30

*Matrixx Initiatives, Inc. v. Siracusano,*
131 S.Ct. 1309 (2011)...........................................................1, 7, 8

*McCabe v. Ernst & Young, LLP,*
494 F.3d 418 (3rd Cir.2007).....................................................32

*McDonald v. Kinder-Morgan, Inc.,*
287 F.3d 992, 997 (10th Cir. 2002)...............................................7

*Mishkin v. Zynex Inc.,*
09-CV-00780-REB-KLM, 2011 WL 1158715 (D. Colo. Mar. 30, 2011)..................30

*In re Nature's Sunshine Product's, Inc. Secs. Litig.,*
251 F.R.D. 656 (D. Utah 2008)...................................................33

*New Jersey v. Sprint Corp.,*
314 F.Supp.2d 1119 (D. Kan. 2004)...............................................19

*In re Parmalat Sec. Litig.,*
375 F.Supp.2d 278 (S.D.N.Y. 2005)...............................................34

*In re Qwest Communications Int'l, Inc. Sec. Litig.,*
387 F.Supp.2d 1130 (D. Colo. 2005)..............................................32

*Rosen v. Textron,*
321 F.Supp.2d 308 (D.R.I. 2004).................................................12

*In re SemGroup Energy Partners, L.P.,*
729 F.Supp.2d 1276 (N.D. Okla. 2010)...........................................passim

*In re Sprint Corp. Secs. Litig.,*
232 F.Supp.2d 1193 (D. Kan. 2002)..........................................8, 14, 31, 32

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
250 F.3d 87 (2d Cir. 2001)......................................................34

*Tellabs v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007).............................................................passim

*In re Time Warner Inc. Sec. Litig.,*
9 F.3d 259 (2d Cir. 1993).......................................................19

*In re Vivendi Universal, S.A., Sec. Litig.,*
381 F.Supp.2d 158 (S.D.N.Y. 2003)..............................................................30

*In re Williams Sec. Litig.,*
339 F.Supp.2d 1242 (N.D. Okla. 2003)..........................................................29

*In re Williams Sec. Litig. – WCG Subclass,*
558 F.3d 1130 (10th Cir. 2009)......................................................................34

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.,*
655 F.3d 1039 (9th Cir. 2011)........................................................................30

<u>STATUTES & RULES</u>

17 CFR § 229.303...........................................................................................18

17 CFR § 240.10b–5(b)....................................................................................17

Fed. R. Civ. Pro. 8...........................................................................................31

Fed. R. Civ. Pro. 12(b)(6)..................................................................................7

## I.    PRELIMINARY STATEMENT

Faced with the Amended Class Action Complaint's ("Complaint") detailed allegations of securities fraud, Defendants improperly reach well beyond the four corners of the pleading to blame this case on the recession, in an attempt to portray themselves as mere victims of circumstance and to deflect focus from Defendants' specifically alleged knowing or reckless misrepresentations and omissions of material fact regarding YRC ("YRC" or the "Company"), its financial condition, operations, results, and business from April 24, 2008, through November 2, 2009. Def. Br. at 4-8. This factual defense has no place on a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

Indeed, the bulk of Defendants' motion ignores controlling legal authority and instead concentrates on premature fact-based quibbling that cannot support dismissal at this early stage. For example, Defendants argue that Plaintiffs' allegations do not meet the materiality standard because they do not allege the "extent of the [undisclosed] 'financial problems'" of the Company, despite the fact that the Complaint is replete with details concerning YRC's stagnant cash flows, liquidity, revenues, non-compliance with credit agreements, and debt repayment issues.   Def. Br. at 28. The Supreme Court denied these types of arguments in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309 (2011), holding that a plaintiff adequately alleged materiality where the information concealed may not rise to the level of "statistically significant" and was merely "anecdotal." *Id.* at 1319. Ignoring the Supreme Court's dictates to take all well-pleaded allegations as true, Defendants seek to raise factual arguments regarding the very existence of the March 1, 2009, integration deadline, while acknowledging a well-placed confidential witness confirms this deadline in the Complaint. Def. Br. at 26. *See Twombly*, 550 U.S. at 572 ("[A] judge ruling on a defendant's motion to dismiss a complaint 'must accept as true all of the factual allegations contained in the complaint'") (citations omitted); *Ashcroft v.*

*Iqbal,* 129 S.Ct. 1937, 1949 (2009). For example, with regard to the Complaint's alleged fact that Defendants concealed material information concerning the debt conversion plan that effectively gave bondholders 95% of the Company's equity, Defendants argue the true meaning of Defendant Zollars' admission, "This is something we've been talking about for most of the year in terms of the final step in our comprehensive play," has a meaning that defies common sense.[1] Similarly, Defendants raise improper factual arguments challenging the very existence of the March 1, 2009 integration deadline, even though they acknowledge that the Complaint includes a well-placed confidential witness in support of that deadline. Def. Br. at 26.

With regard to scienter, in a three-page argument that cannot be viewed as a serious challenge to Plaintiffs' detailed and devastating scienter allegations, Defendants *admit* to their own awareness of YRC's problems at the time misstatements and omissions were made; ignore the deluge of particularized facts from no fewer than 17 well-placed confidential witnesses;[2] side step allegations internal company correspondence and mandatory execution of employee confidentiality agreements; and resort to arguing that Plaintiffs are required to allege a particular motive in the form of stock sales to plead scienter, despite the fact that *Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007), established that motive allegations are not even required, and despite Plaintiffs' detailed motive allegations tying Defendants compensation to a stock based bonus plan that could be up to 200% their salaries. Def. Br. 33-34.

Defendants also wrongly argue that the Complaint fails to adequately plead loss causation in accordance with Rule 8 notice pleading standards. The Complaint alleges that the revelations of the true, adverse facts are closely linked to Plaintiffs' allegations of concealed problems concerning the integration effort, customer loss, resulting financial difficulties, and internal

---

[1] *E.g.,* Defendants posit Zollars meant the entire comprehensive play despite the plain language "final step." Def. Br. at 23.

[2] Defendants concede the adequacy of the allegations based on 15 of the 17 CWs, which strongly support both falsity and scienter. Defendants only challenge two CWs at all, basing these attacks on misapplication of caselaw.

controls. ¶3. Indeed, YRC's stock plummeted a staggering 64% upon the revelation of the true, previously-concealed facts facts. *See In re ICG Communications, Inc. Sec. Litig.*, No. 1:00-cv-01864, 2006 WL 416622 at \*10 (D. Colo. 2006) ("ICG's stock price dropped precipitously [53.95% of its value in one day] after these truths were revealed. These allegations are sufficient to plead loss causation under the applicable standard."); *see also In re SemGroup Energy Partners, L.P.*, 729 F.Supp.2d 1276, 1301 (N.D. Okla. 2010) (requiring only that allegations "provide defendants with 'fair notice of what plaintiff's claim is and the grounds upon which it rests.'" (quoting *Dura Pharm., Inc. v. Brodo,* 544 U.S. 336, 346 (2005)).

Stripped of premature distractions, and in light of the applicable standards for determination of a motion to dismiss under the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Defendants' motion offers no cognizable basis for dismissal. Defendants' motion should be denied.

## II.     STATEMENT OF THE FACTS

In December 2003 Yellow Corp. ("Yellow") acquired Roadway Corp. ("Roadway") for approximately $1.1 billion. The resulting entity, Yellow Roadway Corporation ("YRC"), offers a range of services for the transportation of industrial, commercial, and retail goods, serving manufacturing, wholesale, retail and government customers. YRC operated for five years as two separate and distinct entities, Yellow and Roadway, with separate customer bases, shipping software, and revenue streams.

Prior to the start of the Class Period, YRC was experiencing financial troubles, and in February 2008, the Company made the decision to renew its credit agreement with its lenders and attempt a technical integration of the Yellow and Roadway technology platforms. ¶21 at n. 1. Undisclosed to investors, these two endeavors were intertwined. *Id.* Defendants failed to disclose to the public that YRC's renewed credit agreement contained an express provision mandating

that the technical integration be completed by March 2009. *Id.* In this regard, the decision to accelerate the integration process was not a product of YRC's desire for "improved efficiencies and enhanced service" or "based on the support from customers" as Defendants claimed, but rather it was a decision driven entirely by YRC's lenders. ¶36.

YRC could not meet the March 2009 deadline and Defendants knew or recklessly disregarded this material fact. According to CW7, a former IT supervisor at YRC, at the time of Defendants' February 2008 announcement that YRC would integrate the Yellow and Roadway technology platforms, an integration team had been ordered to integrate the two systems onto Yellow's more sophisticated, technologically advanced platform. ¶93. Given the size of the two systems and customer bases, CW8 reported that the IT department at YRC had informed Defendants that integration could not be successfully completed until December 2009. ¶31.

As a result of pressure from lenders, Defendants abandoned the initial integration plan and resorted to a new undisclosed integration plan, with a goal of scrambling to integrate onto the inferior Roadway platform to save time. ¶95. During this time, however, Defendants made public statements boasting that the reason the integration completion timetable shifted up to early spring 2009 was "[d]ue to the early success of the integration." ¶50. CW11 and CW1 explained that the Company abandoned all the effort that the integration team had invested in the Yellow integration plan, and forced the IT department to conduct an ill-advised about-face. *Id.* Not only was the antiquated Roadway system difficult to use, but YRC did not free up the resources for the integration that, according to CW5, the Company had promised to ensure a successful transition. ¶¶97, 98. The shoddy integration effort has disastrous effects on YRC's business.

While Defendants touted "positive customer response," "support from customers," "solid free cash flow," and "confiden[ce] in our ability to deliver a run rate of at least $200 million of operating income improvement by the end of 2009 from the integration, CW8 explained that

because of the forced speed of the integration, YRC lost customer data, customers lost functionality, and in turn, YRC lost business. ¶¶ 28, 34, 108. Customers began abandoning their YRC contracts and commitments because, as CW9 noted, they "didn't want to be part of the nonsense" of the integration. ¶27. Within YRC, "[e]veryone knew that customers were leaving and why they were leaving," but, as Defendant Zollars admitted to CW2 and other employees, YRC publicly concealed the "guarded secret" that the Company was in danger of missing revenue targets, at which point the banks would pull their notes. ¶¶135, 31. According to CW3, Defendant Zollars also admitted in an employee town hall meeting in February 2009 that YRC had violated its credit agreement with its lenders. ¶109.

Despite the cacophony of customer complaints and other concealed problems associated with the failed integration, on March 2, 2009, Defendants announced that YRC had completed the "Successful Integration of National Networks." ¶34. YRC, however, continued to lose business and money. The loss of customer data and user profiles from the integration resulted in huge inadvertent price increases, which began to materialize after the purported integration completion date. ¶111. The raised prices infuriated long-time customers—some of whom had received the same base rate for nearly 25 years—and prompted many of them to sever their relationships with YRC. *Id.* In a desperate effort to assuage these concerns and keep business, executive Whitsel sent an email after the integration to CW11 and others directing them to give ALL customers an across the board 60% discount off their base rate. ¶105. Customers who owed YRC money stalled payments because they believed YRC was headed toward bankruptcy. ¶107. No effort was made to collect these owed payments; YRC simply wrote them off. *Id.*

YRC did not just lose customers in 2009; it lost employees and Company property as well. CW1 noted that there were massive layoffs—including a particularly large one in April, 2009—reduced hours and reduced benefits for all employees during the Class Period. ¶115.

5

Management did not dissuade employees from interviewing for new jobs on their lunch breaks, and forced employees to take three unpaid days every month. *Id.* YRC put its main buildings and shipping terminals up for sale during this time and leased them back at astronomical rates. ¶110. According to CW3, YRC sold its shipping terminals to and leased them back from Estes, a direct competitor, and "the lease back agreement was so bad that within six years the rent paid would equal the amount paid for the terminals." ¶110.

In an April 23, 2009, press release, Defendants partially revealed for the first time some of the difficulties that YRC had been facing:

> Our volumes were impacted by multiple factors, most notably the economy and business diversion due to customer anxiety surrounding the integration of Yellow and Roadway," said Zollars. "Some customers have already returned business, which was temporarily diverted, but it is difficult to predict at what levels or how quickly the rest will come back. ¶152.

The partial disclosure continued to materially mislead investors because Defendants failed to disclose the integration problems such as data loss that led to such customer diversion, the massive debt and liquidity issues the Company faced, and the Company's impending debt conversion effort which would render YRC's stock virtually worthless. ¶155. The day after the partial disclosure, in a conference call with analysts and investors, Defendant Zollars mentioned that the Company was experiencing some customer "diversion," but "believe[d] much of that volume would return." ¶153. The share price of YRC stock fell from $3.91 on April 22, 2009 to $2.96 on April 27, 2009.

The Complaint alleges that YRC was in the midst of a full-blown financial crisis, and with little hope of rebounding, Defendants were forced to effectuate the last ditch play that Defendant Zollars admitted they had been contemplating for "most of the year." ¶138. On November 2, 2009, Defendants revealed that YRC was working on a deal to convert millions of dollars of debt into shares of stock, and would effectively place 95% of the Company's equity in

6

the hands of its debtors.  ¶¶156-57. Jason Seidl, a longtime follower of YRC as an analyst for Dahlman Rose & Co., was flabbergasted at the extent of YRC's financial ruin, exclaiming, "I had no idea it would be this large….I didn't see the train wreck hitting the school bus full of kids and nuns." ¶86.

It was not until November 2, 2009 that investors learned the full truth about the devastating pervasive problems that had been plaguing YRC over the past 18 months, including: the unsuccessful and incomplete integration; the debt and liquidity issues and violations of lending agreements; the loss of customers; and the internal control problems causing the loss of massive quantities of crucial customer data that required across-the-board massive discounting to save business.  ¶157. The news shocked investors, who traded frenetically as the value of YRC shares plummeted a whopping 64% on a single trading day from over $2.30 per share to $1.32 per share on trading volume over five times the stock's average daily volume. ¶5.

## III.    ARGUMENT

### A.    Applicable Legal Standards

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the complaint must be construed in the light most favorable to plaintiff and its allegations must be taken as true. *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 997 (10th Cir. 2002).   Moreover, all "reasonable inferences" must be drawn in the plaintiff's favor.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "A Rule 12(b)(6) dismissal will be upheld 'only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief."  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1117 (10th Cir. 1997).

### B.    Defendants' Fact-Based Arguments Are Premature and Cannot Succeed

Tellingly, Defendants have elected to simply ignore *Matrixx*, 131 S.Ct. 1309, the Supreme Court's recent, controlling precedent on the materiality inquiry. *Matrixx* dramatically

changed the landscape regarding materiality and forcefully supports the adequacy of Plaintiffs'

claims. In *Matrixx*, a fraud case under Section 10(b), the court held that the plaintiffs' claims

satisfied the materiality inquiry -- despite their lack of statistical significance -- given that the

source, content, and context of adverse event reports led to a plausible link between use of the

defendant company's drug product and loss of smell. *Id.* at 1321-22. Similarly here, the source

of the numerous reports of the adverse true facts comes from the people in the best position to

detail the problems, YRC's own former employees—including senior management-level

personnel high-level personnel who had direct contact with the Individual Defendants.   The

content of those reports reveals that while the Company was publicly touting "support from

customers," "ample liquidity," "positive cash flow," and "compl[iance] with our debt

covenants," in truth, and in sharp contrast to those statements, the Company was actually

experiencing substantial failures in the technical integration of Yellow and Roadway; a

deteriorating financial condition, including hampered cash flows, liquidity, revenues,

noncompliance with credit agreements, and debt repayment problems; lost customer

relationships; and inadequate internal controls. ¶¶ 3, 35, 40.

"In the context of a Rule 12(b)(6) motion, the court is reminded that materiality is a

mixed question of law and fact and ordinarily should be reserved for the trier of fact." *In re*

*Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1215 (D. Kan. 2002). In order to meet "the

materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted

fact would have been viewed by the reasonable investor as having significantly altered the 'total

mix' of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)

(internal quotation omitted). Additionally, "a complaint may not properly be dismissed . . . on the

ground that the alleged misstatements or omissions are not material unless they are so obviously

unimportant to a reasonable investor that reasonable minds could not differ on the question of

their importance.'" *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (citation omitted). Here, materiality has been adequately alleged. *See id.*, at 718 ("Where the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim is even lower.").

     1)     **Plaintiffs have Adequately Pleaded Materially False and Misleading Statements and Omissions**

The Complaint alleges that, throughout the Class Period, Defendants repeatedly misled investors regarding the Company's technical integration, financial condition, relationship with its lenders, the financial state of the Company and its internal controls. ¶3; *see also generally* Declaration of Frank J. Johnson in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Johnson Decl."), Ex. 1.

Defendants argue that Plaintiffs have not adequately pleaded materially false and misleading statements regarding YRC's flawed technical integration. Def. Br. at 25-31. This is wrong. The Complaint alleges that Defendants repeatedly touted that the Company was accelerating the technical integration due to, *inter alia*, the "early success of the integration," "the increasingly dynamic operating environment," a "positive customer response" and the "positive momentum" it generated. ¶¶28, 35, 44, 46, 50, 54, 61 ("Due to the early success of the integration, the company has reevaluated the timeline and now expects the integration to be mostly complete by early spring 2009."). Defendants also made statements that "[w]e don't know of one single customer that has left us as a result of [the integration]" and that the Company had purportedly completed the "successful integration" of the Yellow and Roadway networks. ¶¶56, 61, 63. Among other reasons, these statements were materially false and misleading because the terms of the Company's credit agreements themselves—*not* the purported "early success of the integration," "the increasingly dynamic operating environment," the "positive customer response" or the "positive momentum"— required completion of the

technical integration by March 2009. ¶29. Specifically, CW8 revealed that the IT department originally told senior management the technical integration could not be completed until December 2009; however, "the bank wanted the integration completed by March 2009," which was a "stipulation of the loan."  ¶36. Further, Defendants' statement that "[w]e don't know of one single customer that has left us as a result of [the integration]" was also materially false and misleading when made because in truth, according to CW9, YRC customers began abandoning their contracts even **prior to** the purported "completion" of the integration on March 1, 2009.[3] ¶56. Finally, although YRC publicly proclaimed the "successful integration" of the networks was complete, in truth, the forced technical integration was incomplete and materially flawed at the time of this announcement. ¶62.

Throughout the Class Period, Defendants also repeatedly misled investors about the Company's financial and operational performance, particularly with respect to the integration's effect on YRC's long-term prospects. *See, e.g.,* ¶¶19-20, 28, 32, 38, 40, 42, 44, 46, 50. These statements were materially false and misleading when made because they failed to disclose, *inter alia*, that YRC's financial troubles began prior to the start of the technical integration of Yellow and Roadway. ¶21; *see also* Johnson Decl. Ex. 1. In fact, CW9 revealed that many of YRC's "trailers were only 10% full and a lot of lanes were not running full." ¶21. Thus, YRC had not "turned the corner" and still faced tumultuous times ahead, which was confirmed by a string of poor financial results continuing long after April 25, 2008. ¶21. These statements were also materially false and misleading when made because Defendant Zollars stated as early as October 2008 that it was a "guarded secret" that YRC was "in danger" of missing its revenue targets and

---

[3] Amazingly, Defendants argue that Plaintiffs do not include a "**single allegation**" that customers were dissatisfied with the technical integration prior to the March 1, 2009 deadline. Br. at 27 (emphasis added). The very next sentence in their brief contradicts this argument: "The **sole allegation on this issue** comes from CW9, who claims that customers left YRC 'well before' the integration was completed because they 'didn't want to be a part of the nonsense'" of the technical integration. Def. Br. at 27 (emphasis added).

that banks would "pull their notes" because the integration would not meaningfully improve earnings as promised. ¶¶31, 135.

Plaintiffs also plead with particularity numerous materially false and misleading statements made by Defendants about the Company's relationship with its lenders during the Class Period. *See, e.g.*, ¶¶28, 32, 40, 52, 57, 59, 68, 70, 72. These statements were materially false and misleading when made because they failed to disclose the Company's imminent risk of violating its lending agreements, the control exerted by YRC's lenders, the dire consequences of such a breach, and Defendants' year-long plan to enter a debt exchange, which would effectively leave YRC with almost no equity value. *See, e.g.*, ¶¶28, 32, 40; *see also* Johnson Decl. Ex. 1. For example, YRC assured investors on several occasions that "YRC Worldwide expects to remain in full compliance with all terms of its credit agreement," despite Defendant Zollars admitting to as many as 150 YRC managers in October 2008 the "guarded secret" about the near certain "danger" that the Company would miss its revenue targets and breach its credit agreement, causing the lenders to "pull the notes." ¶¶28, 31-32, 40. More importantly, Defendants' statements about amendment negotiations with YRC's lenders were false and misleading when made because they failed to disclose the critical fact that, throughout this period, Defendants were planning to finalize these amendments by entering into a debt exchange with YRC's lenders "to convert over half a billion dollars of debt into shares of Company stock, therefore effectively giving bondholders as much as 95% of the equity of the Company" and virtually eliminating public shareholders' stake in YRC. ¶83. As Defendant Zollars himself admitted in response to an inquiry on the debt exchange offer on November 2, 2009, "[t]his is something we've been talking about for most of the year in terms of the final step in our comprehensive

play."[4]  ¶85. Tellingly, Jason Seidl, a longtime follower of YRC as an analyst for Dahlman Rose & Co., said the next day that the deal's details caught him by surprise. "I had no idea it would be this large," Seidl is quoted by the *Kansas City Star* website, "I didn't see the train wreck hitting the school bus full of kids and nuns." ¶85.

### 2) Defendants' Statements and Omissions Do Not Constitute Inactionable Puffery

In an attempt to re-characterize a number of their false and misleading statements as inactionable "puffery," Defendants selectively cherry-pick words to present without context. *See Def. Br.* at 13-14. *See Rosen v. Textron*, 321 F.Supp.2d 308, 320 (D.R.I. 2004) ("whether a particular statement is mere puffery or actionable misstatement must be determined by looking not only to the challenged language itself, but also the context in which the statement was made."); *See also* Johnson Decl. Exhibit A. Indeed, courts now view statements of corporate optimism with disfavor. *See Brumbaugh v. Wave Sys. Corp.*, 416 F.Supp. 2d 239, 250 fn. 11 (D. Mass. 2006) (citing authority and noting that the puffing concept has "gone the way of the dodo"). Perhaps acknowledging the futility of their attack, Defendants do not offer a scintilla of analysis as to why any particular statement qualifies as inactionable corporate optimism, but instead simply list sixteen bulleted purportedly offending "statements." *Def. Br.* at 14. When evaluated individually and placed in their proper context, the challenged statements clearly misled investors.

For example, Defendants cull the five words, "We are encouraged by our progress," from a longer statement contained within the Company's July 24, 2008, press release (¶ 25), and argue

---

[4] Defendants bizarrely protest that Zollars' statement "this is something we've been talking about for most of the year in terms of the final step in our comprehensive plan," referred to "the Company's overall comprehensive plan." Def. Br. at 23-24. This is nonsense. Defendant Zollars explicitly referred to "this" as the **final step** in our comprehensive plan. It cannot logically follow that "this" final step of the comprehensive plan would be the overall comprehensive plan itself. Moreover, as Plaintiffs allege, Defendant Zollars made this statement specifically in discussing the debt exchange. ¶85. Defendants' logically implausible argument only further highlights the well-pleaded allegation that Defendant Zollars was referring to the stockholder-diluting debt exchange as "something we've been talking about for most of the year." *Id.*

that the statement is mere puffery.  Def. Br. at 13.  Defendants, however, exclude the false factual statement about this purported "progress" that immediately follows: "The company expects to offset these cost increases with operational efficiencies by year end 2008." ¶ 25.  As alleged with particularity in the Complaint, this statement was false and misleading when made because Defendants knew or recklessly disregarded that problems with the integration would prevent any operational efficiencies to be realized by year end 2008.  ¶¶ 3, 106.  Defendants had no reasonable basis to be encouraged, and in fact based this optimism on a fact Defendants knew or recklessly disregarded was not true.  *See Grossman*, 120 F.3d at 1120 n.6 ("[A] statement as to beliefs or opinions . . . may be actionable if the opinion is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact.").  The statement also reflects an opinion based on a present/past fact, as the statement suggests that YRC had already made progress by which the Defendants were encouraged. *In re Sprint Corp. Secs. Litig.*, 232 F.Supp.2d 1193, 1217 (D. Kan. 2002) ("As a general rule, optimistic opinions or beliefs regarding actual past or present facts are more likely material than statements couched as optimistic predictions.").

Similarly, Defendants selectively challenge as corporate optimism Defendant Zollars's false and misleading statement "we believe we have turned the corner." Def. Br. at 13. Again, Defendants ignore the remainder of the sentence: "and expect meaningful earnings improvement starting with the current quarter," which provides the statement's context. ¶19; Johnson Decl. Ex. 1. This statement is actionable because Defendants had no reasonable basis to expect any earnings improvement in the third quarter of 2008.  Defendants knew or recklessly disregarded that the Company's financial condition was worsening significantly in the second half of 2008 due in large part to the failures of the accelerated technical integration and loss of customers. ¶¶100,103, 105, 107. Therefore, this statement concerning meaningful earnings improvement in

13

Q3 2008 "cannot be dismissed as mere corporate optimism, because each of these statements could have, and should have had, some basis in objective and verifiable fact." *Grossman*, 120 F.3d at 1123.

Defendants may not parse and stitch their statements for protection.  At the motion to dismiss stage, "the court must be convinced that the market could 'easily' determine the statements at issue to be nothing more than immaterial puffery." *In re Sprint Corp. Secs. Litig.*, 232 F.Supp.2d at 1219 (citation omitted).  When viewed in their entirety and in context, Defendants' statements materially misled investors as to status of the Company.  *Id.*  (If defendants are aware of undisclosed adverse information, "defendants' optimistic statements reassuring the market bear a stronger degree of materiality.").

### 3)   Defendants' Purported "Disclosure" Arguments Fail

Defendants suggest that YRC's various difficulties were "completely consistent with the information the Company provided" to the market. Def. Br. at 19-20.  In support, Defendants list a number of instances where YRC purportedly "announced" various problems that the Company had been experiencing during the Class Period; unfortunately for Defendants, the cited statements in truth downplay the significance of the problems and even deny their existence.

While never formally raised, Defendants seem to hint that a truth on the market defense may apply.  By not acknowledging the legal defense they dance around, Defendants avoid conceding that its rigorous standards are not met here and that the defense is premature, as well as inapplicable. Truth on the market is very difficult to establish because "the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Further, courts require a particularly credible and detailed disclosure when the misstatement or omission involves a

company executive. *In re Comverse Tech., Inc. Sec. Litig.*, 543 F.Supp.2d 134, 151 (E.D.N.Y. 2008). Therefore, the "[t]ruth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis of dismiss[al]." *Ganino*, 228 F.3d at 167.

Defendants' bulleted examples of YRC's purported "disclosures" to the market not only fail to demonstrate the "degree of intensity and credibility" required to assert a truth-on-the-market defense, they fail to assert the facts that Defendants argue they disclose. Def. Br. at 19-20. For example, Defendants cite an October 24, 2008 earnings call, in which they argue Defendant Zollars acknowledged that YRC anticipated customer loss. Def. Br. at 19.   The statement responds to a question regarding YRC's expected level of "customer attrition," and instead of disclosing to investors the customer decline that Defendants claim, the statement instead illustrates that Defendants *did not* expect to lose customers:

> I think we've modeled in a loss that *we really don't believe*, but we're trying to be conservative here and make sure that we still feel really solid about the costs coming out and the impact on income that will have.  So we've modeled a little – we have modeled in an appropriate level, but again as I said, we feel very good about being able to retain the customers we want. Def. Ex. 7 at 14.

Zollars' "disclosure" to the market hardly alerts investors to impending customer losses, but rather informs them—to the contrary -- that defendants "don't really believe" customer attrition to exist. Thus, Zollars' statement simply furthered the fraud. *Ganino*, 228 F.3d at 167.

To the extent Defendants argue that any of their statements to the public represented cautionary risk disclosures, this argument fails as well.   Merely citing statements that acknowledge a "softening economy," a "progressively weakening economic environment" or even "customer anxiety and ongoing customer diversion," does not provide meaningful risk disclosure because of the statements' vagueness. Def. Br. at 19, 29. *See Grossman*, 120 F.3d at 1120 ("[T]he cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions … which the plaintiffs challenge.") (quoting *In re Donald J.*

*Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993)). Further, to operate as a meaningful cautionary risk disclosure, the statement must be forward-looking, and all these statements relate to current conditions or facts. *Id.* at 1122 (bespeaks caution' doctrine only applies to forward-looking statements and denying application where statements referred to "historical facts").

### C.    Defendants Had a Duty to Disclose Which They Violated

"Once defendants choose to speak about their company, they undertake a duty 'to speak truthfully and to make such additional disclosures as ... necessary to avoid rendering the statements misleading.'" *Hall v. Children's Place Retail Stores, Inc.*, 580 F.Supp.2d 212, 226 (S.D.N.Y. 2008); *see also Caiola v. Citibank, N.A.,* 295 F.3d 312, 331 (2d Cir. 2002) (holding that upon choosing to speak, a company has a "duty to be both accurate and complete"). Here, Defendants chose to speak, and they did so in a misleading manner when they concealed adverse information and made positive statements regarding the technical integration of Yellow and Roadway; YRC's financial condition; YRC's compliance with credit agreements and debt repayment problems; YRC's customer relationships; and the adequacy of internal controls. ¶3.

Defendants argue that "assuming there was an [undisclosed] lender-imposed deadline, Plaintiffs do no identify any obligation to disclose this fact." Br. at 27. This is just not true. The Complaint alleges that Defendants affirmatively chose to speak about acceleration of the integration process – and once they did so, they triggered the duty to speak accurately and completely regarding the reasons for the acceleration. *See Caiola,* 295 F.3d at 331; *see also Matrixx,* 131 S.Ct. at 1322 ("[C]ompanies can control what they have to disclose under these provisions by controlling what they say to the market."); 17 CFR § 240.10b–5(b). ¶¶ 28, 35, 36, 44-47, 50, 54, 55.

Specifically, the Complaint pleads that on October 24, 2008, Defendant Zollars stated: "Based on the support from customers and our labor partners in addition to our experience so far

we've gained a level of confidence necessary to accelerate the [integration] process further." ¶35. Defendant Zollars' statement is materially false and misleading because it fails to disclose the materially omitted fact that YRC was abandoning a carefully developed integration plan and accelerating the integration process to comply with lender demands. ¶¶36, 93-95. Moreover, Defendants' statement regarding "customer support" was materially false and misleading when made because, as CW9 explained, customers began abandoning their YRC contracts and commitments "well before" the integration was purportedly completed on March 1, 2009, as they "didn't want to be part of the nonsense" of the integration. ¶36.

As a result of the undisclosed lender-imposed deadline (¶¶3, 21, 94 123), Defendants were forced to abandon the initial integration plan from integrating onto the Yellow platform. ¶¶29, 93-95. Defendants argue that they were under no obligation to disclose the nature of internal discussions regarding the Company's performance and integration, and that expressing optimism on such subjects was not misleading. Def. Br. at 2, 29. Defendants misconstrue their disclosure obligations, because when a Company chooses to speak, it must do so truthfully. *Hall*, 580 F.Supp.2d at 226. According to CW11 and CW1, YRC abandoned the initial integration plan in July 2008 (¶95), and adopted an accelerated integration plan that the Complaint alleges was a reaction to conditions from merger-related bank loans. ¶¶94, 95. However, on September 8, 2008, when Defendants announced their plans to accelerate their integration strategy and several months after the Company abandoned its initial plan, Defendant Zollars attributed the acceleration to "positive customer response" and the "increasingly dynamic operating environment." ¶28. Although Defendants seem to suggest that the decision to completely change their blueprint for integration was merely the result of some meaningless internal squabble, in reality, this decision to abandon IT's initial careful plan to integrate all YRC systems and to force the IT department to immediately reverse course—without the benefit of a plan in order to

comply with lender-imposed deadline—would have disastrous consequences for the integration and for the Company as a whole. ¶¶95-96. Therefore, because Defendants chose to publicly explaining the reasons for its accelerated integration plan when, in fact, the cause for acceleration was entirely different, they violated their "duty to speak truthfully and to make such additional disclosures as ... necessary to avoid rendering" Zollars' statement regarding the cause of the acceleration of the integration process misleading. *Hall*, 580 F.Supp.2d at 226.

### Defendants Violated Item 303(a) of Regulation S-K

Item 303 requires that every SEC Form 10-K and 10-Q "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R 229.303. The "[i]nstructions to paragraph 303(a)" explain that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." *Id.*[5]

During the Class Period, Defendants filed with the SEC the Company's 1Q:08 Form 10-Q, 2Q:08 Form 10-Q, 3Q:08 Form 10-Q, 2008 Form 10-K, 1Q:09 Form 10-Q, and 2Q:09 Form 10-Q signed and certified by Defendants Zollars, Bruffett, and/or Wicks. ¶22. In each of these reports, Defendants were required to comply with the disclosure requirements under Item 303, and thus had a duty to disclose any trends or uncertainties, known to management, that were reasonably likely to materially affect YRC's liquidity, sales, revenues or income. In spite of Item 303, YRC's 10-K and 10-Qs throughout the Class Period failed to disclose management's

---

[5] *See also* 17 C.F.R. 229.303(a) (requiring disclosure of "such other information" as necessary to provide an understanding of corporate conditions); Commission Statement About MD&A of Financial Condition and Results of Operations 67 FR 3746-02, 2002 WL 90781, at *3747 (Jan. 25, 2002) (observing that Item 303(a) "identifies a basic and overriding requirement of MD&A" in requiring the disclosure of "such other information," while noting the importance of providing investors with "an accurate understanding" of a company).

knowledge, at the time these reports were filed, that Defendants were considering a proposed exchange offer with bondholders that would effectively leave the Company with no equity value. ¶¶82-87. In fact, commenting on the offer after its announcement, Defendant Zollars conceded that the Company had been discussing the debt conversion but failed to disclose it, "[t]his is something we've talked about for most of the year in terms of the final step in our comprehensive play." ¶86. Despite Defendants' inappropriate factual defense that Defendant Zollars' statement had some different meaning from what his words unambiguously convey, the statement clearly indicates that Defendants knew of a known trend that would have a material impact on the company, yet failed to disclose it. This is a clear violation of Item 303, as unbeknownst to investors, Defendants were planning a deal that would render the value of YRC stock worthless. Morgan Keegan Co. analyst Arthur Hatfield commented: "When you consider as part of the merger they are issuing... about 4 billion in incremental shares... there really is no equity value in the company." ¶91. *See New Jersey v. Sprint Corp.*, 314 F.Supp.2d 1119, 1132 (D. Kan. 2004) (recognizing a duty to disclose uncertain or contingent plans that would render public statements materially misleading) (citing and discussing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 262 (2d Cir. 1993) (finding an obligation to disclose consideration of new stock offering that substantially diluted rights of existing shareholders)).

Accordingly, Defendants were required by Item 303 to disclose in their 10-K and 10-Qs facts concerning a known uncertainty and their repeated failures to do so constitute material omissions actionable under Section 10(b).

### D. Plaintiffs Have Stated a Claim for Violations of the Securities Laws, Not Mere Mismanagement

Defendants' argument that Plaintiffs' securities fraud claims constitute "mere" mismanagement is a red herring. Plaintiffs have adequately alleged that Defendants made materially false and misleading statements and omissions with scienter during the Class Period

which harmed the Class when the true facts were revealed.  This conduct is actionable under Section 10(b) of the Exchange Act.  *In re SemGroup Energy Partners, L.P.*, 729 F.Supp.2d at 1292; *see also In re Faro Techs. Sec. Litig.*, 534 F.Supp. 2d 1248, 1263 (M.D. Fla. 2007) ("The Individual Defendants are not alleged to be simply poor managers—they are alleged to be dishonest ones").  Indeed, "even if defendants' conduct can be deemed mismanagement, this 'will not preclude a claim under the federal securities laws if the[y] … failed to disclose a specific material fact resulting from that mismanagement.'" *Id.* (citing *In re Donna Karan Int'l, Inc. Sec. Litig.*, No. 97 Civ. 2011, 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14, 1998); *Lane v. Page*, 581 F.Supp.2d 1094, 1113 (D.N.M. 2008)).

Defendants rely upon, but mischaracterize the conclusion of the court in *In re Level 3 Commc'ns, Inc. Sec. Litig.*, Nos. 09-cv-200, 215, 296, 606, 2010 WL 5129524 (D. Colo. Dec. 10, 2010). In *Level 3*, while defendants had argued that the complaint, which contained allegations concerning a company integration, should be dismissed as mere mismanagement, the case was not dismissed on mismanagement arguments but rather on scienter grounds. *Id.* at *11-12. In fact, the court distinguished the allegations in *Level 3* from those in *In re ICG Commc'ns, Inc., Sec. Litig.*, No. 00-cv-01864-REB-BNB, 2006 WL 416622 (D. Colo. Feb. 7, 2006)—a 10(b) case in which the complaint survived a Rule 12(b)(6) motion—reasoning that the complaint in *ICG* contained allegations that the defendants "were engaged in artificially inflating reported numbers or instructing employees to mask the truth of what was truly happening." *Id.* at *11-12. Here, like *ICG*, the Complaint abounds with particularized allegations of scienter including specific allegations that Defendants instructed employees not to communicate details of the integration with others and that YRC was keeping a "guarded secret" that if the Company did not hit certain financial targets, the banks would pull their notes. ¶¶103, 129.

E.   **Plaintiffs' Well-Placed Confidential Witnesses Support Falsity and Scienter**

Plaintiffs' particularized allegations are supported by extensive, detailed reports from seventeen well-placed CWs who were at the Company during the relevant time period. *See, e.g.,* ¶¶2, 21, 27, 29, 31, 36, 41, 43, 49, 53, 56.  It therefore comes as no surprise that Defendants do not even attempt to challenge fifteen of the seventeen CWs whose statements provide strong and corroborative support for the Complaint's falsity and scienter allegations.  Indeed, many of the CWs had direct contact with the Individual Defendants and were a part of the Company's former management.  In fact, the CWs include the former director of liability claims, the former vice president of enterprise services and revenue management, two former senior project managers, and the former director of business strategy. Many of the CWs worked within the same departments or on the same projects and readily support each other's reports and the other facts alleged in the Complaint. ¶2. The majority of the CWs also worked for YRC prior to and throughout the Class Period, thus providing a thorough and uninterrupted perspective of the Company during the relevant time period. *Id.* The CWs provide a cogent inside view into Defendants' actions and operations during the Class Period and provide detailed and particularized support the falsity of Defendants' statements and omissions and Defendants' scienter. *See Adams v. Kinder-Morgan, Inc.,* 340 F.3d 1083, 1103 (10th Cir. 2003).

The Tenth Circuit has held that "depending on the generality of the allegation, it may or may not be necessary to plead the source of the information in order to satisfy the particularity requirement of [the PSLRA] in an information and belief complaint." *Adams,* 340 F.3d at 1101-02 ("[R]equiring plaintiffs to identify the source of the facts they allege is to require, in effect, that plaintiffs plead their evidence in their complaint"). Nevertheless, the Tenth Circuit held that "by disclosing such sources plaintiffs can significantly strengthen their pleading." *Id.* at 1102. Thus, Plaintiffs have significantly strengthened their pleading here by particularly identifying its sources, *i.e.,* its seventeen CWs, by including, the bases of the CW's knowledge, the positions

each CW held at YRC, the time period of employment at YRC, and their exposure to the relevant conduct.[6] *See, e.g.,* ¶¶2, 93-115. The facts alleged in the Complaint and supported by the seventeen CWs are particularly detailed, numerous, and plausible, and thus "support a reasonable belief" that Defendants' statements were false and misleading. *See Adams*, 340 F.3d at 1103.

Tellingly, Defendants challenge the allegations of only two of the seventeen CWs, conceding the adequacy of fifteen others. Def. Br. at 26. Defendants contend that CW8's statement regarding YRC's failure to disclose the lender imposed deadline date, included as a stipulation to the loan, for the integration to be completed is insufficient. Def. Br. at 26. In support of their argument, Defendants misconstrue *Caprin v. Simon Transportation Svs., Inc.*, 99 F. App'x 150, 158 (10th Cir. 2004) as requiring Plaintiffs to plead the "time, place, and content" of each of CW8's "fraudulent allegation[s]" and the "consequence thereof." Def. Br. at 26. Instead, *Caprin* holds that Plaintiffs "must identify the time, place, and content of each allegedly **fraudulent representation or omission**, identify the person responsible for it, and identify the consequences thereof." *Caprin*, 99 F. App'x at 158 (emphasis added). The "time, place, and content" referenced by the *Caprin* court does not pertain to statements made by CWs, as Defendants claim, but rather to the fraudulent representations made by Defendants. *Id.*

Defendants further challenge CW8 and CW9 – not on the grounds that these witnesses are not credible, or were not in a position to know the facts they report, or were not at the Company during the relevant time period – but simply on the grounds that their statements are not detailed enough.  Defendants claim CW8's statement concerning the lender imposed deadline on the integration fails because it does not identify the date on which this condition was

---

[6] "In this case, the allegations based on the statements of the CWs are entitled to significant weight because the complaint describes the bases of the CWs' knowledge, the positions they held, their exposure to the relevant conduct, and the relevant time frame." *Mishkin v. Zynex Inc.*, 09-CV-00780-REB-KLM, 2011 WL 1158715 (D. Colo. Mar. 30, 2011).

imposed or the manner in which CW8 learned this information. Def. Br. at 26.   Similarly, Defendants contend that CW9's statements regarding customers leaving YRC "well before" the completion of the integration because they "didn't want to be a part of the nonsense" of the technical integration fails because it provides "no detail regarding the size or identities of any customers or when or why they left." Def. Br. at 28. Unfortunately for Defendants, the PSLRA does not "purport to move up the trial to the pleadings stage." *Adams*, 340 F.3d at 1101. In deciding whether a plaintiff's sources support a reasonable belief that defendants' statements were false and misleading, courts in the Tenth Circuit "should evaluate the facts alleged as a whole, evaluating the level of detail, number, and coherence and plausibility of the allegations." *Id.* at 1102-1103.

Here, based on information provided by CW8, Plaintiffs alleged that CW8 "learned that YRC's senior management had agreed to terms with the banks holding the notes on YRC's merger-related debt that mandated a complete integration by March 2009" and that the "March 2009 integration completion date was included as a 'stipulation of the loan' to YRC." ¶94.   In fact, CW9 stated that the lending groups "had a lot of control over YRC" and were "calling a lot of the shots" at YRC during the technical integration. ¶116. Plaintiffs corroborated CW8's statements by pleading that as a result of the pressure of the bank imposed deadline, Defendants abruptly "made the undisclosed decision to completely change the initial integration plan from integrating onto the Yellow platform to integrating onto the Roadway platform instead." ¶95. These specific allegations were confirmed by CW1 and CW11. ¶¶94-95 ("CW11 explained that in July 2008, the Company abandoned the initial integration plan."). Additionally, CW9's statements about customers abandoning YRC "well before" the integration are reinforced by CW12 who confirmed that many customers were "severely, adversely affected and frustrated" by the integration. ¶106 ("Many simply walked away from their obligations.").

The Complaint provides a compelling, specific and coherent inside view, through the eyes of seventeen insiders (15 of whom are unchallenged), into the operations and conduct of YRC during the Class Period that support a strong inference of scienter and a reasonable belief that Defendants' statements and omissions were materially false and/or misleading when made.

### F.    Plaintiffs Have Adequately Pleaded Scienter

After spending the majority of their motion on premature fact-based materiality arguments unsuitable for resolution at this stage, Defendants, with respect to the critical element of scienter, can only muster three pages of pot shots which ignore the avalanche of well-pleaded scienter allegations that exceed the *Tellabs* standard.

A complaint adequately pleads scienter if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 308. The inference "need not be irrefutable . . . or 'even the most plausible of competing inferences.'" *Id.* Rather, it need only be "at least as compelling" (*i.e.*, in "equipoise") as any opposing inference of scienter. *Id.* Accepting Plaintiffs' allegations as true and construing them in the light most favorable to Plaintiffs, the Court must consider the Complaint in its entirety to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* Therefore, the Court should "assess all the allegations holistically," and even "vague or ambiguous" allegations must be considered. *Id.* In the Tenth Circuit, to adequately plead scienter plaintiffs need only allege "recklessness." *Adams,* 340 F.3d at 1105 (citations omitted).

The Complaint's myriad particularized allegations of scienter include but are not limited to: Zollars' public admission that YRC had been talking about the exchange offer plan for "most

of the year" prior to its disclosure; Defendant Zollars, Smid, and Wicks' admissions of the failed integration and poor financial state of the Company at internal company meetings; no fewer than seventeen high-level, corroborative witnesses whose statements strongly support Defendants' knowledge and/or reckless disregard of the true facts concealed throughout the Class Period; reports of internal documentation and emails reflecting the Company's true concealed problems being provided directly to Defendants on a regular if not constant basis throughout the Class Period; Defendants' insistence on employees signing confidentiality agreements to keep secret the true, adverse condition of the Company and the problems and ultimate failure of the integration; the resignation of Defendant CFO Bruffett in the thick of the undisclosed disaster during the Class Period but prior to the revelations of the truth that resulted in the stock's collapse. ¶¶13, 82, 85, 93-138.  These allegations of knowledge and/or recklessness are further enhanced by allegations of financial motivations for the Individual Defendants who received stock bonuses of up to 200% of their salaries if certain Company performance objectives were achieved.[7]  ¶¶139-140.

Despite such particularized factual allegations, Defendants make two half-hearted scienter arguments.  First, Defendants assert that the Complaint is largely based on "generic allegations of scienter" because it includes allegations of knowledge due to Defendants' positions and fails to include stock sales.  Def. Br. at 33.  This argument ignores both the Complaint and the law. In complaining that the Complaint should be dismissed for failure to include a particular type of motive allegation (insider sales), Defendants make no mention of the allegations of stock-based compensation for the Individual Defendants *of up to 200% of their salaries* based on the meeting of Company performance objectives.  They also disregard the

---

[7] Court may take judicial notice of public information filed with the SEC. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). *See* YRC Proxy Statement attached to declaration as Exhibit B.

controlling mandates of *Tellabs* to take all scienter allegations together, and noting that motive allegations are not even required. *Tellabs*, 551 U.S. at 310.

Second, Defendants argue Plaintiffs fail to demonstrate "actual or reckless disregard of the likelihood of misleading investors,"[8] but in the process *concede* that "certain defendants were aware of problems with technical integration; that customers left, forcing YRC to offer discounts; that YRC faced pressure from lenders and was in danger of violating its bank covenants; and that it eventually failed to comply with a credit agreement." Def. Br. at 33-34. Oddly, Defendants suggest that their knowledge of these undisclosed material facts is irrelevant to the scienter inquiry. In truth, their knowledge of such facts *establishes* scienter. *Adams*, 340 F.3d at 1105. ("We therefore understand a 'strong inference' of scienter to be a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading."); *SemGroup*, 729 F.Supp.2d at 1297 (citing *Florida State Bd. of Admin. v. Green Tree Financial Corp.*, 270 F.3d 645, 664 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting their public statements were materially inaccurate.").

The Complaint's allegations make crystal clear the reasons Defendants knew or recklessly disregarded the truth during the Class Period while making materially misleading statements and omissions. For instance, CW8 explained directly to senior management that because of the sheer size of the systems and customer bases, it would take more than a year to successfully complete the integration and provided a target date of December 2009. ¶123. As a result, throughout the Class Period Defendants instructed YRC's employees not to disclose the

---

[8] Defendants misstate the 10th Circuit's scienter pleading standard and appear to confuse the materiality inquiry with scienter. Def. Br. at 33. *See Adams*, 340 F.3d at 1105 ("In a securities fraud case, the appropriate level of scienter is 'a mental state embracing intent to deceive, manipulate, or defraud,' or recklessness.") (citation omitted).

problems of the flawed technical integration, and sought to silence public discussions on the matter by having employees sign confidentiality agreements. ¶103. CW8 explained that senior management required him/her and everyone in the IT department to sign confidentiality agreements pertaining to the integration because management did not know how YRC's customers or the shipping industry would react to news of the flawed integration effort. ¶104. CW1 and CW2 also acknowledged being required to sign confidentiality agreements preventing them from discussing any aspects of the integration, including the manner in which the technical integration was conducted. *Id.*

Defendants also concealed from investors that the technical integration deadline was a condition of their loans, and that ultimately, the integration was a failure. Defendant Zollars personally told CW2—a long time YRC employee in the Revenue Management Department— and others during town hall meetings starting in 2008 that YRC was keeping a "guarded secret" that if the Company did not hit certain financial numbers, the banks would pull their notes. ¶129. CW3 also noted that in an employee town hall meeting that he/she attended in February 2009, Defendant Zollars himself admitted, despite public statements to the contrary, that YRC had violated its credit agreement with its lenders. ¶109.

Moreover, the Complaint's allegations demonstrate Defendants' first-hand, detailed knowledge or reckless disregard of the crumbling financial state of the Company. According to CW11 and CW9, all management, including Defendants, received daily reports via email concerning operations and revenue streams. ¶136. CW11 confirmed that Zollars was always on the distribution list on the daily emails showing daily tonnage, bills, and revenues. *Id.* Similarly, CW9 confirmed that Zollars also appeared on the email distribution list for daily reports issued by the IT department, and had to know billing amounts and which terminals were not performing. ¶137. As a result of the poor financial state of YRC, CW3 reported that Defendants

Zollars and Wicks organized town halls in November 2008 where they informed employees of the elimination of certain benefits, and at such meetings Defendant Zollars himself admitted that YRC "was fighting to survive." ¶131. At that same time in November 2008, Zollars painted a very different picture of YRC to the public by issuing misleading statements such as, "With the support from our customers...our national integration is going even better than we originally anticipated," the integration is "progressing ahead of schedule," "disappointing downgrades do not change out strategic plans" and "the company's potential to implement multiple strategic actions is not impacted." ¶¶46-49.

The Tenth Circuit has upheld scienter allegations in cases involving significantly less compelling and detailed allegations than those in the case at bar. In *Adams*, the complaint alleged that the treasurer of the company told the defendant CFO that a single one of the company's multiple plants would be unprofitable, and that the CFO often complained to the treasurer that the plant was losing money. *Adams*, 340 F.3d at 1105. Because the CFO signed financial statements that declared that the plant positively impacted earnings, the court found those facts, without more, established a strong inference of scienter.[9] *Id.* The Court also found that by association to the CFO and by reason that he was the most senior executive at the company, the complaint also sufficiently alleged scienter as to the CEO.[10] *Id.* at 1106.

The allegations here are stronger than those in *Adams*. Here, CWs place undisclosed, adverse material information in the hands of the Individual Defendants Zollars, Smid, and Wicks, pin the Defendants at Company meetings admitting knowledge of the adverse

---

[9] Individual Defendants Zollars, Bruffett and Wick signed YRC's SEC filings during the Class Period, which is further indicative of scienter. *SemGroup*, 729 F.Supp.2d at 1298 (N.D. Okla. 2010) (Fact that "Defendants personally signed and caused [company] to file materially false and misleading reports with the SEC...which contradicted facts that were then available to them regarding [the company]'s impaired financial condition and resulting credit risks...is indicia of scienter."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 489 (S.D.N.Y. 2004) (imputing knowledge of false financial statements to key officers of the company).
[10] By attributing scienter to the CEO by reason of his senior executive position, *Adams* illustrates that the Tenth Circuit *does* endorse the idea that defendants' positions may support an inference of scienter, contrary to Defendants' argument otherwise. Def. Br. at 33.

information and requiring YRC employees to sign confidentiality agreements to prevent any information leaking to the public regarding the incomplete and flawed integration, all while publicly touting its success and the support of customers. ¶¶46, 103, 104, 117, 122, 125, 128, 130, 131, 133, 134, 136, 137. Not only did Defendants admit to keeping a "guarded secret" from the public, but they also actively prevented other YRC employees from disclosing any adverse information regarding the Company. ¶¶103-04. These allegations demonstrate Defendants' recklessness, at minimum, as "the recklessness standard is met [when] Defendants, its senior management, and directors, were in a position to know this information, understand its materiality, and realize that failure to provide complete and accurate information with regard to these subjects would likely mislead investors." *In re Williams Sec. itig.*, 339 F.Supp.2d 1242, 1259 (N.D. Okla. 2003).

Even more absurd is Defendants quibbling that the Complaint should be dismissed because it does not contain motive allegations based on stock sales during the Class Period. Def. Br. at 33. Motive allegations are not required to demonstrate scienter. *Tellabs*, 551 U.S. at 310. Further, Defendants know this is a case based on overwhelmingly compelling allegations of knowledge and/or recklessness. Nevertheless, the Complaint alleges a compelling financial motivation for each Individual Defendant: Pursuant to YRC's 2009 Form 14A Proxy Statement, YRC would award its executives, including Defendants Zollars, Smid and Wicks, Company stock bonuses in an amount of 25-200% of their salary if certain performance objectives were achieved. ¶139. *Id.*; *Mishkin v. Zynex, Inc.* at *5. (When viewing the complaint as a whole, an allegation concerning a defendant's financial motivations to commit securities fraud may be considered in determining the presence of scienter). The Complaint also alleges that concealing the true adverse regarding the state of YRC allowed Defendants to maintain investor support and cash flowing to the Company. *See In re MannKind Sec. Actions*, No. CV-00929, 2011 WL

6327089 at *14 (C.D. Cal. Dec. 16, 2011) ("An allegation that 'defendants were motivated to inflate artificially [their company's] stock price *in the short term ... and obtain much-needed operating capital* does allege facts of a palpable motive for fraud' as it goes beyond 'the generic desire to raise capital which can be attributed to every company.'") (emphasis in original) (citing cases); *see also WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052 (9th Cir. 2011) ("continued infusion of investment capital" during time when company has depressed operating income another consideration when determining intent to defraud). Additionally, by reason of their financial compensation packages, Defendants were financially motivated to issue materially false and misleading statements in order to keep YRC common stock at artificially inflated prices. *Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 158 (D. Conn. 2007) ("[I]ncentive bonuses provide a 'concrete and personal' benefit sufficient to raise an inference of scienter.")(citation omitted); *In re Vivendi Universal, S.A., Sec. Litig.*, 381 F.Supp.2d 158, 185 (S.D.N.Y. 2003) (Bonus of more than two and a half times the defendant's salary provided "an even greater motive for inflating the appearance of [the company]'s financial performance," and therefore supported an inference of scienter.)  Here, Defendants' motivation to garner additional financial for both YRC and themselves supports Plaintiffs' allegations of scienter.

Defendant CFO Bruffett left YRC during the Class Period in September of 2008 to be CFO for Con-Way, another national transportation company. Given the similarities in compensation[11] between YRC and Con-way, his sudden departure from YRC during the Class Period to a competing company in the same capacity strongly supports a finding that Defendant Bruffett knew or recklessly disregarded YRC's deteriorating condition and left prior to the imminent downward spiral.

---

[11] *See* Con-way, Inc.  2009 proxy statement attached to declaration as Exhibit C. (Con-way compensation includes similar performance based stock compensation. See page 25 of proxy statement).

Plaintiffs' highly-detailed allegations of scienter readily surpass the *Tellabs* standard, which simply requires the Court to find that the scienter allegations are at least as likely as any countervailing inference of non-culpable behavior.   *Tellabs,* 551 U.S. at 308.   Indeed, Defendants have posited no alternative, reasonable explanation for the fraud, and have failed to challenge in any way the vast majority of of Plaintiffs' Confidential Witnesses.

### G.      Plaintiffs Have Adequately Pleaded Causation

To allege loss causation, Plaintiffs need only allege a "causal connection between the material misrepresentation and the loss." *Dura,* 544 U.S. at 342. Rule 8 pleading standards apply, as "[l]oss causation requires only a 'short and plain statement [that] must provide the defendants with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *SemGroup,* 729 F.Supp.2d at 1301 (quoting *Dura,* 544 U.S. at 346). To that end, courts in the Tenth Circuit have required that plaintiffs only plead how the misrepresentation "touches upon the reasons for the investment's decline in value" (*In re Sprint Corp. Sec. Litig.*, 232 F.Supp.2d at 1228), and have denied dismissal when plaintiffs have alleged merely "some indication of the loss and causal connection." *Campbell v. Castle Stone Homes, Inc.*, No. 2:09-cv-250 TS, 2011 WL 902637 at *6 (D. Utah Mar. 15, 2011).[12]

The Complaint meets the requirements for pleading causation by alleging that the price of YRC's stock was inflated during the Class Period due to Defendants' nondisclosure of YRC's failures in the technical integration of Yellow and Roadway; the deteriorating financial condition of the Company, including its hampered cash flows, liquidity, revenues, noncompliance with

---

[12] Loss causation is a matter of proof at trial and normally inappropriate grounds for dismissal on motion to dismiss. *See In re Gilead Sciences Sec. Litig.*, 536 F.3d at 1057; *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir.2003); *McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 427 n. 4 (3rd Cir.2007). *See also In re Sprint Corp. Sec. Litig.*, 232 F.Supp.2d at 1228 ("it is not plaintiffs' burden to prove loss causation in their pleadings... [r]ather, 'it is sufficient at this stage of the proceedings that Plaintiffs have alleged they have suffered damage and this damage was caused by the misleading statements'") (quoting *In re Accelr8 Tech. Corp. Sec. Litig.*, 147 F.Supp.2d 1049, 1057 (D. Colo. 2001).

credit agreements, and debt repayment problems; lost customer relationships; and the inadequacy of the Company's internal controls. ¶3. The Complaint further alleges that, when the previously undisclosed information about the Company's dire financial condition was revealed to the public in the November 2, 2009, press release announcing a debt conversion plan placing 95% of the Company's equity in the hands of its debtors, "shares of YRC's stock plummeted" and investors were harmed as a result. ¶5.   These allegations readily satisfy the causation pleading requirement. *See In re Qwest Comms. Int'l, Inc. Sec. Litig.*, 387 F.Supp.2d 1130, 1148 (D. Colo. 2005) (Plaintiff adequately pled loss causation by alleging that defendants made material misrepresentations in financial statements that were revealed following disclosure of company's accounting manipulations.); *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (not "facially implausible" that misrepresentations regarding reasons for product demand caused drop in value following publication of poor financial results).

In addition, the 64% drop in stock value after the November 2 announcement on trading over five times its daily average strongly supports the adequacy of plaintiffs' allegations of causation. ¶5. A number of courts have found that allegations of a significant stock coupled with a disclosure was sufficient to plead loss causation. *See Freudenberg v. E\*Trade Financial Corp.*, 712 F.Supp.2d 171, 203 (S.D.N.Y. 2010) (citing cases); *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d at 498 (holding that allegations that loss was a consequence of company's false statements coupled with 30% decline of share value on heightened trade volume satisfies loss causation on a 12(b)(6) motion to dismiss).

Despite the calamitous 64% stock price drop after Defendants revealed the true, previously concealed adverse facts, Defendants nevertheless argue Plaintiffs cannot plead loss causation because the information revealed on November 2, 2009, does not have "any

connection to any false statement." Def. Br. at 31.[13]  This argument is wrong.  The Complaint alleges a clear connection between Defendants' November 2, 2009, debt conversion announcement and Defendants' actionable misrepresentations and omissions over the previous 18 months regarding the Company's Roadway integration, debt and liquidity, customer losses, and internal controls.   YRC converted hundreds of millions of dollars of debt into Company stock to give bondholders 95% of the equity of the Company because YRC had been hemorrhaging customers and money, in large part as a result of its failure to successfully integrate Yellow and Roadway. ¶¶83, 105, 107, 111, 117. The November 2, 2009, disclosure revealed the full extent to which, unbeknownst to investors, the Company's operations and finances spiraled out of control in the preceding year and a half.  The failed integration and resulting loss of customers crippled the Company financially, and ultimately led to the debt conversion conveyed to investors in the November 2, 2009, 8-K. ¶3, 5. *See In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 306 (S.D.N.Y. 2005) (finding loss causation was adequately pleaded where plaintiffs alleged that, among other things, massive undisclosed debt led to financial collapse and resulted in decline in stock value); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 98 (2d Cir. 2001) (holding that an allegation of loss causation was sufficient where plaintiffs alleged that the concealed lack of skill of the company's principal led to company's eventual liquidity problems). Plaintiffs need not plead that the corrective disclosure mirrored the earlier misrepresentation, as "[t]he law does not require the plaintiffs to allege that

---

[13] Defendants also seem to argue that the April 23-24, 2009, partial disclosure somehow revealed the full fraud and requires the Class Period to end.  Def. Br. at fn 14.  Defendants once again ignore the well-pleaded allegations of the Complaint; the Complaint alleges that the statements on April 23-24, 2009, continued to conceal true, adverse facts and that the full scope of the fraud was not revealed until the end of the Class Period.  ¶¶67, 156 (April 23-24, 2009 statements still misleading because Defendants did not reveal: 1) that integration had not been completed by March 1, 2009 and was riddled with problems such as lost data that had not merely created a temporary "diversion" of customers but drove away many customers; 2) violations of lending agreements; 3) YRC's financial crisis; 4) internal control problems; and 5) that Company was planning to convert hundreds of millions of dollars of debt into shares of stock. *In re Nature's Sunshine Product's, Inc. Secs. Litig.*, 251 F.R.D. 656 (D. Utah 2008) (To shorten a proposed class period in a 10(b) securities case, "the court must be able to rule, as a matter of law, that a curative disclosure had been made so as to render it unreasonable for an investor, or the market, to continue to be mislead [sic] by the defendants' alleged misrepresentations.").

[the company] disclosed every fine detail of the [earlier misrepresentation] to establish that those manipulations caused the plaintiffs' losses." *In re ICG Commn's, Inc. Sec. Litig.*, No. 1:00CV 01864, 2006 WL 416622 at *10 (D. Colo Feb. 7, 2006). *See also In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("disclosure need not precisely mirror earlier misrepresentation").

Defendants cite *In re Williams Sec. Litig. – WCG Subclass* to support the proposition that the Complaint does not sufficiently allege loss causation.  Defendants' selection of *Williams* is odd. *Williams* is a summary judgment decision rendered after expert testimony on causation; in other words, the causation allegations survived the motion to dismiss in that case.  Nevertheless, Defendants claim this summary judgment decision somehow supports dismissal at the pleading stage on the grounds that the November 2, 2009 8-K did not expressly state in mirror-image terms the issues Plaintiffs allege were concealed during the Class Period. Def. Br. at 32.  The court in *Williams*, however, plainly instructed that "to be corrective, the disclosure need not precisely mirror the earlier misrepresentation." 558 F.3d at 1140.

Alternatively, a plaintiff may plead loss causation by alleging that the truth was revealed "by the actual materialization of the concealed risk rather than by a public disclosure that the risk exists." *Id.* at 1138 (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005)).  Like the tort-law concept of proximate cause, "the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission." *Lentell*, 396 F.3d at 172-173. As such, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Id.* at 173 (emphasis in original).  Here, Plaintiffs' investment losses were within the zone of risk concealed by Defendants' misrepresentations and omissions concerning, *inter alia*, technical integration problems, the financial downturn of the

34

Company, noncompliance with credit agreements, debt repayment problems, lost customers, and the inadequacy of the Company's internal controls.  Defendants created a "zone of risk" by not disclosing the aforementioned problems within YRC and concurrently touting the Company's integration successes, "cash flow," "customer support," "compliance with bank debt covenants," etc.  ¶¶32, 35, 40, 46. These risks materialized when the financial condition of YRC deteriorated such that the Company needed to convert its debt to shares of YRC stock, which led to Plaintiffs' investment losses. ¶83.

### H.   Defendants Concede the Section 20(a) Claim is Valid if Section 10(b) Is Upheld

Defendants do not separately address the Section 20(a) control person claim other than to note that a Section 20(a) claim requires establishment of a primary securities violation. Def. Br. at 12. A *prima facie* case merely requires the plaintiff to successfully plead primary violations of the securities laws and to raise a reasonable inference that the individual defendants were control persons. *Adams*, 340 F.3d at 1108. Plaintiffs need not allege that defendant actually or culpably participated in the primary violation. *Id.* at 1109.  Here, Plaintiffs have pleaded their § 10(b) claims with legal sufficiency and established that the Individual Defendants were control persons; thus, secondary liability under § 20(a) is adequately pleaded.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in full.[14]

**Dated:** February 17, 2012              Respectfully submitted,

                                          /s/ Kim E. Miller
                                          Kim E. Miller *(pro hac vice)*
                                          **Kahn Swick & Foti, LLC**

---

[14] In the event that all or any portion of the Complaint is dismissed, Plaintiff respectfully seeks leave to amend under Fed. R. Civ. P. Rule 15.  *In re Qwest Comm'ns Intern., Inc.*, 396 F.Supp.2d 1178, 1209 (D. Colo. 2004) (Allowing plaintiffs leave for a fifth amended complaint as "leave to amend should be 'freely given when justice so requires.'") (quoting Fed. R. Civ. P. 15 (a)).

35

500 5th Avenue Ste. 1810
New York, New York 10110
Phone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

Lewis S. Kahn *(pro hac vice)*
**Kahn Swick & Foti, LLC**
206 Covington Street
Madisonville, Louisiana 70447
Phone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
*Co-Lead Counsel for Lead Plaintiffs and the Class*

Frank J. Johnson
Shawn E. Fields
**Johnson & Weaver, LLP**
110 West "A" Street, Suite 750
San Diego, California 92101
Phone: (619)230-0063
Facsimile (619) 255-1856
*Co-Lead Counsel for Lead Plaintiffs and the Class*

Michael S. Kilgore
**Dollar, Burns & Beckler, L.C.**
1100 Main Street Ste 2600
Kansas City, Missouri 64105
Phone: (816) 876-2600
Facsimile: (816) 221-8763

-and-

Lynn R. Johnson
**Shamberg, Johnson & Bergman, Chtd.**
2600 Grand Blvd. – Suite 550
Kansas City, MO 64108
Telephone: (816) 474-0004
Facsimile: (816) 474-0003
Email: ljohnson@sjblaw.com